UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,                    :

                        Plaintiff,                    :        1:17 Civ. 1302 (NG) (JO)

               -vs-                    :

PROMPT NURSING EMPLOYMENT AGENCY     :
LLC d/b/a SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING         :
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a :
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH :
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,       :

               Defendants.                    :
-----------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF HER MOTION FOR CLASS CERTIFICATION


THE HOWLEY LAW FIRM P.C.
John Howley, Esq.
Leandro B. Lachica, Esq.
350 Fifth Avenue, 59th Floor
New York, New York  10118
(212) 601-2728

*Attorneys for Plaintiff*

**Table of Contents**

Preliminary Statement……………………………………………………………………..1

Statement of Facts……………………………………………………………………..…..3

    A.  Defendants' Standard Employment Contracts and Verbal Assignments……………..4

    B.  Defendants' Policy and Practice of Not Paying the Prevailing Wage
        as of the Commencement Date…………………………………………………………..6

    C.  Defendants' Pattern and Practice of Threatening Serious Harm
        to Prevent Filipino Nurses from Leaving Their Employ……………………………..…7

Argument…………………………………………………………………………………..10

    A.  Plaintiff Satisfies the Requirements of Rule 23(a)…………………………………..11

        1.  The Class Exceeds 200 Filipino Nurses and Joinder is Impracticable…..……11

        2.  Common Questions of Law and Fact Abound……………………….…....…12

            a.  Plaintiff's TVPA Claims Raise Issues Common to the Class………..….…12

               i.  Liability Under 18 U.S.C. § 1589(a)………………....……..…..…12

               ii.  Liability Under 18 U.S.C. § 1589(b)………………………………14

               iii. Liability Under 18 U.S.C. § 1590(a)………………………..……15

               iv. Liability Under 18 U.S.C. § 1594………………………………..…15

            b.  Plaintiff's Breach of Contract Claims Raise
               Issues Common to the Class……………………………………………..16

        3.  Plaintiff's Claims Are Typical of the Claims of Absent Class Members..…..17

        4.  Plaintiff Will Adequately Protect the Interests of the Class…………..…..18

    B.  Plaintiff Satisfies the Requirements of Rule 23(b)(3)……………………………19

        1.  Common Issues Predominate…………………………………………..20

i

2.   A Class Action is Superior to Other Methods of Adjudication…………..…..22

C.  In the Alternative, Plaintiff Satisfies the Requirements of Rule 23(b)(2)…….…..23

Conclusion…………………………………………………………………………...…..24

## Table of Authorities

*Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105 (S.D.N.Y. 2013)……………………….…..…22

*Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995)……………………..11

*Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353 (E.D.N.Y. 2009)………………………………...10-11

*Iglesias–Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363 (S.D.N.Y. 2007)…………………..….18

*Javier v. Beck*, No. 13 Civ. 2926 (WHP), 2014 WL 3058456 (S.D.N.Y. July 3, 2014)……..13, 16, 18

*Madanat v. First Data Corp.*, 282 F.R.D. 304 (E.D.N.Y. 2012)…………………………………11

*Menocal v. The Geo Group, Inc.*, 320 F.R.D. 258 (D. Colo. 2017)…………………………...….19

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002)………………………………….…..20

*Nunag-Tanedo v. East Baton Rouge Parish School Board*,
No. LA CV 10-01172, 2011 WL 7095434 (C.D. Cal. Dec. 12. 2011)……………..3, 11, 13-18, 20-23

*Paguirigan v. Prompt Nursing Employment Agency LLC*,
17 Civ. 1302 (NG), slip op. (E.D.N.Y. Dec. 22, 2017)…………………………………………...13

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993)…………………………………………....…17

*SentosaCare LLC v. Anilao*, Index No. 6079/2006
(Sup. Ct., Nassau Cnty, May 20, 2010)…………………………………………………………..8

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
293 F.R.D. 287 (E.D.N.Y. 2013)………………………………………....…..3, 10-12, 17-18, 20, 22

*Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320 (E.D.N.Y. 2014)…………...…..15-16

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (1989)……………………….…..…16

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011)………………………………….…...…..13

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003)…………………………………….…..15

*Vinluan v. Doyle*, 60 A.D.3d 237 (2d Dep't 2009)…………………………………….…...…..10

*Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)……………………………………...10, 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,                        :

                            Plaintiff,           :        1:17 Civ. 1302 (NG) (JO)

                    -vs-                   :

PROMPT NURSING EMPLOYMENT AGENCY :
LLC d/b/a SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING      :
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a :
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH :
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,    :

                       Defendants.      :
---------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF HER MOTION FOR CLASS CERTIFICATION

Plaintiff Rose Ann Paguirigan submits this memorandum of law in support of her motion for an Order:  (a) certifying this action as a class action pursuant to Rule 23(b)(3) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure; (b) appointing plaintiff's attorneys to represent the class; and (c) granting such other relief as this Court deems just.

### Preliminary Statement

This is an action for damages and injunctive relief for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*, for a declaratory judgment, and for breach of contract under New York law.  Defendants are foreign labor recruiters and nursing home owners who have recruited more than 200 nurses in the Philippines to work for the defendants in this District under contracts of indentured servitude.  The contracts require that the

1

nurses continue working for the defendants until they pay off a $25,000 indenture that is disproportionate to the defendants' actual costs and the nurse's annual compensation.  Indeed, most of the defendants' costs were to obtain visas for the nurses, which federal law prohibits the defendants from passing on to the nurses.

Once the Filipino nurses arrive in the United States, the defendants refuse to pay the prevailing wages required by their employment contracts and use the $25,000 indentures to keep the Filipino nurses from leaving.  The defendants have also commenced and threatened to commence baseless civil litigation, professional disciplinary proceedings, and criminal charges against some Filipino nurses as part of a plan and scheme to cause all the Filipino nurses working in their nursing homes to believe that they will suffer serious harm if they stop working for the defendants.

On behalf of herself and all other Filipino nurses employed by the defendants since December 23, 2008, plaintiff seeks compensatory and punitive damages for violations of the TVPA; compensatory damages for breach of contract; an injunction prohibiting the defendants from threatening or attempting to enforce the indenture; a declaration that the indenture is unenforceable under the 13th Amendment to the U.S. Constitution, 42 U.S.C. § 1994, and New York common law; an award of reasonable attorneys' fees and costs; and such other relief as the Court deems just and proper.

The dispositive issues raised by plaintiff's claims are susceptible of class-wide proof.  The common issues of law and fact include:  (a) whether the defendants' standard employment contract requires them to pay Filipino nurses the prevailing wage "[a]s of the commencement date" or as of the date the contract was signed; (b) whether a New York State Supreme Court decision holding the indenture unenforceable collaterally estops the defendants from arguing that

the indenture is enforceable as liquidated damages; (c) whether the indenture is otherwise unenforceable as a matter of law; (d) whether the defendants have used the indenture and abusive legal proceedings against some Filipino nurses in order to coerce all Filipino nurses to continue working in their nursing homes; (e) whether each of the defendants joined and/or benefitted from a venture that violated the TVPA; and (f) whether the corporate veil should be pierced to impose liability for breach of contract on the individual defendants. *See, e.g., Nunag-Tanedo v. East Baton Rouge Parish School Board*, No. LA CV 10-01172, 2011 WL 7095434, at *6 (C.D. Cal. Dec. 12. 2011) (certifying a class of Filipino teachers to pursue TVPA and employment contract claims).

Once liability is determined, the compensatory damages of individual class members will be determined by a formula based on a comparison of the appropriate prevailing wage (which can be ascertained from publicly-available government records) with the wages each nurse was actually paid (which can be determined from defendants' payroll records). Accordingly, issues common to the class predominate over any individual issues. *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *8-10; *accord Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 304 (E.D.N.Y. 2013).

As demonstrated below, these factors and all of the remaining factors under Rule 23 warrant certification of the proposed class.

## Statement of Facts

Beginning in 2006, defendants Francis Luyun, Bent Philipson, and Sentosa Agency recruited plaintiff in the Philippines to work for a nursing home owned and operated by the defendants in New York. Paguirigan Dep. at 100-105 (Howley Declr., Exh. A).[1] Although the

---

[1] The deposition transcripts and exhibits cited in this memorandum of law are annexed to the accompanying Declaration of John Howley.

defendants now purport to be separate entities, Luyun and Philipson identified themselves to plaintiff and other Filipino nurses as representing "Sentosa." *Id.* They emphasized that "Sentosa" was not merely an employment agency, but that it actually owned the nursing homes where the nurses would work. *Id.* at 101. This intentional representation of a single, integrated entity continued after the nurses arrived in the United States. While defendants claim that the nursing homes entered into "verbal agreements" assigning the Filipino nurses' employment contracts to defendant Prompt Nursing Employment Agency LLC – a company owned by defendant Berish Rubinstein – plaintiff and the other Filipino nurses received paychecks listing "Sentosa Services" as their employer. *Id.* at 104.

### A. Defendants' Standard Employment Contracts and Verbal Assignments

On April 22, 2015, plaintiff signed an employment contract to work for defendant Golden Gate Rehabilitation & Health Care Center, a nursing home owned and operated by the defendants in Staten Island. Paguirigan Dep. 432-38 & Exhibit 3. The contract was signed by defendant Benjamin Landa, the owner of the nursing home. *Id.*

The contract provides for a base salary in accordance with the prevailing wage determined by the U.S. Department of Labor as of the date plaintiff commenced working at the nursing home. Thus, Section IV(1) of the contract provides:

> "As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor."

Exhibit 3, § IV(1). The contract provides that any assignee is required "to pay the Employee the prevailing wage for the geographic area where the Employee is assigned." *Id.* § VIII(8).

4

The contract plaintiff signed is a standard contract that the defendants use with all Filipino nurses who are recruited in the Philippines to work at the defendants' nursing homes. Rubinstein Dep. at 27-83 (Howley Declr., Exh. C) and Exhibits 47-62.  The standard contract provides that the employer will pay a base salary in accordance with the prevailing wage determined by the U.S. Department of Labor as of the date the nurse starts working for the defendants.  *See id.*  The prevailing wage language is identical in all the contracts the defendants have produced in this action.  *See id.*

Plaintiff was instructed by the Sentosa staff in Manila to sign each and every page of her contract, which she did.  Paguirigan Dep. at 432 & Exhibit 3.  Signing every page of the employment contract appears to have been standard practice.  All of the contracts produced by the defendants in this action contain the Filipino nurse's signature on each and every page of the contract.  *See* Rubinstein Dep. at 27-83 and Exhibits 47-62.

The Sentosa staff in Manila attached to plaintiff's contract a letter addressed to the U.S. Embassy.  Exhibit 3.  The letter is on Golden Gate stationary and is signed by defendant Benjamin Landa.  *Id.*  The letter states that Golden Gate offered plaintiff a position as a Registered Nurse for $29.00 per hour.  *Id.*  Defendant Luyun told plaintiff that $29.00 per hour was the prevailing wage at the time she signed the contract.  Paguirigan Dep. at 438-39.

Plaintiff was *not* asked to sign the cover letter, and her signature does *not* appear on it. *Id.* at 437-38 & Exhibit 3.  This also appears to be the defendants' standard practice.  All of the contracts produced by the defendants in this action have corresponding letters addressed to the U.S. Embassy purporting to offer employment at an hourly wage that is consistent with the hourly wage for a Registered Nurse as of the date of the letter.  *See* Rubinstein Dep. at 27-83 and

Exhibits 48-62.  The letters are signed only by a representative of the defendants' nursing homes. *Id*.  None of the letters is signed by a Filipino nurse.  *Id*.

Plaintiff's contract provides that it may be assigned to another nursing home or staffing agency.  Paguirigan Contract, Exhibit 3, § VIII(8).  Defendant Berish Rubinstein claims that he, as owner of defendant Prompt Nursing, and defendant Bent Philipson, as an owner of defendant Golden Gate, entered into a "verbal agreement" to assign plaintiff's contract from the nursing home to defendant Prompt Nursing.  Rubinstein Dep. at 29-30.  No documentation exists of the purported "verbal agreement" to assign the contract.  *Id*.  While Rubinstein claims that Prompt Nursing assumed all rights and obligations under the contract, Golden Gate received nothing in return for the assignment of the contract to Prompt Nursing.  *Id*. at 31.

The "verbal assignment" of employment contracts from the nursing homes to Prompt Nursing for no consideration appears to be a standard practice with all contracts between Filipino nurses and the defendants' nursing homes.  Rubinstein Dep. at 48-62.  The defendants have not produced any documents concerning the assignments of contracts to Prompt Nursing, nor have they produced any evidence of any consideration paid for the "verbal assignments."  When asked multiple times what, if anything, the nursing homes received in return for the assignments of various employment contracts to Prompt Nursing, defendant Rubinstein consistently replied, "Nothing."  Rubinstein Dep. at 48-62.

### B.  Defendants' Policy and Practice of Not Paying the Prevailing Wage as of the Commencement Date

On June 22, 2016, plaintiff began working for the defendants at defendant Spring Creek, a nursing home owned by the defendants in Brooklyn.  Paguirigan Dep. at 351-52 and Exhibit 27.  The defendants employed plaintiff for 35 hours per week at the rate of $29.00 per hour.  *Id*. at 16.  The annual base compensation plaintiff received was less than the annual prevailing wage

6

as of the date she started working for defendants. *Id.* ¶ 27. The hourly wage plaintiff received was less than the hourly prevailing wage as of the date she started working for defendants. *Id*. ¶ 28.

The defendants have a policy and practice of paying Filipino nurses the prevailing wage as of the date they signed their contracts, not as of the commencement date of their employment. Defendant Rubinstein testified that Prompt Nursing did not calculate the prevailing wage for any of the Filipino nurses it employed under the contracts. Rubinstein Dep. at 48-62. Instead, it relied on the letters that the nursing homes submitted to the U.S. Embassy at the time the contracts were signed. *Id.*

The defendants have produced contracts and/or payroll records for 230 nurses who were recruited in the Philippines to work for the defendants' nursing homes in this District during the relevant time period. Each of these nurses signed the defendants' standard contract that provided for full-time employment at the prevailing wage as of the date they started working for the defendants. *See* Rubinstein Dep. at 27-83 and Exhibits 48-62. Each of the nurses, however, was paid the prevailing wage as of the date they signed the contract. *See id.*

C. **Defendants' Pattern and Practice of Threatening Serious Harm to Prevent Filipino Nurses from Leaving Their Employ**

The defendants' standard employment contract contains an indenture requiring them to pay up to $25,000 if they leave the defendants' employ before the end of their contract term. Complaint ¶ 46. This indenture is secured by a confession of judgment for $25,000, which each nurse must sign before leaving the Philippines. Complaint ¶ 47.

Plaintiff and the other Filipino nurses were required to sign acknowledgements, prepared by the defendants, of the amounts actually paid by the defendants on their behalf. These acknowledgements demonstrate that the $25,000 indenture and confessions of judgment are

7

disproportionate to the actual costs incurred by the defendants.  Complaint ¶ 49.  For example,
plaintiff's acknowledgement states that defendant Sentosa Care LLC had paid only $3,685.50 for
attorneys' fees, filing fees, visa fees, ICHP visa screen fees, airfare, and "miscellaneous"
expenses on her behalf.  Exhibit 64.

The $25,000 penalty is also disproportionate to the compensation paid to the foreign
nurses.  Complaint ¶ 50.  It represents 50% of plaintiff's gross (pre-tax) annual compensation.

On May 20, 2010, the New York State Supreme Court, Nassau County, held in
*SentosaCare LLC v. Anilao*, Index No. 6079/2006, that the $25,000 indenture in defendants'
standard employment contract is unenforceable because the parties had unequal bargaining
power and the defendants' actual damages, if any, can be calculated.  Defendants SentosaCare,
Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate, and 10 other
nursing homes owned and operated by the defendants were parties in the *Anilao* case.  *Id*.

Since the *Anilao* decision in May 2010, the defendants have continued to include the
unenforceable $25,000 indenture in their employment contracts with Filipino nurses, and they
have continued to require execution of a $25,000 confession of judgment before the nurses come
to the United States.  *See, e.g.*, Exhibits 47-62.  The defendants have continued to threaten
foreign nurses with enforcement of the unenforceable indenture and confessions of judgment if
they stop working for the defendants.  Complaint ¶ 57.

In 2016, the defendants caused defendant Prompt Nursing to commence lawsuits against
plaintiff and two other Filipino nurses, Jericson Valdez and April Sullivan Francisco, to enforce
the $25,000 indenture.  The lawsuits also sought $250,000 in damages for alleged tortious
interference with contract and tortious interference with prospective business relations.
Complaint ¶¶ 59-61.

The defendants did not have a good faith basis to believe that the $25,000 indenture was enforceable in any of the lawsuits they threatened to commence or caused defendant Prompt Nursing to commence against plaintiff and other Filipino nurses.  Complaint ¶ 63.  The defendants did not have any evidence to support their allegations that plaintiff or other foreign nurses tortiously interfered with the defendants' contracts or prospective business relationships. Complaint ¶ 64.  Indeed, when asked to state the basis for Prompt Nursing's claim that plaintiff tortiously interfered with the contracts of other nurses, defendant Rubinstein testified only that he believed that plaintiff and other nurses had talked about quitting together.  Rubinstein Dep. at 95-97.  He was not able to identify any improper inducement or coercion by plaintiff of any other nurse.  *Id.*

The defendants' baseless and abusive lawsuits against plaintiff and other foreign nurses in 2016 are part of a longstanding pattern and practice designed to induce fear and prevent foreign nurses from seeking other employment.  Complaint ¶ 71.  Since 2006, the defendants or their agents have commenced lawsuits against at least 30 foreign nurses to collect the unenforceable $25,000 indenture.  The defendants have not prevailed in any of those lawsuits. Complaint ¶ 72.

Since 2006, the defendants or their agents have filed professional misconduct complaints with the New York State Education Department against at least 27 foreign nurses because they stopped working for the defendants.  In every case, the New York State Department of Education determined that the foreign nurses had not committed professional misconduct.  Complaint ¶ 73.

The defendants commenced a lawsuit against a lawyer for tortious interference with contract and prospective business relations because he advised foreign nurses who stopped working for the defendants.  Defendants did not prevail in that lawsuit.  Complaint ¶ 74.

9

The defendants met with a District Attorney to seek a criminal indictment of at least 10 foreign nurses because they stopped working for the defendants.  The defendants also urged the District Attorney to seek a criminal indictment against the lawyer whom the foreign nurses retained to advise and defend them against breach of contract and professional discipline complaints.  Complaint ¶ 75.  After the District Attorney obtained indictments against the foreign nurses and their lawyer, the New York State Appellate Division, Second Department, granted an extraordinary writ of prohibition against the prosecution of the foreign nurses and their lawyer on the grounds that it would violate the nurses' Thirteenth Amendment right to be free of involuntary servitude and their lawyer's rights under the First Amendment.  *Matter of Vinluan v. Doyle*, 60 A.D.3d 237 (2d Dep't 2009).

The defendants' actual and threatened legal actions were pursued for the purpose of coercing plaintiff and other foreign nurses to continue working for the defendants.  Complaint ¶ 76.  The defendants pursued these actions with the intent to cause plaintiff and other foreign nurses to believe that they would suffer serious psychological, financial or reputational harm if they did not continue working for defendants.  Complaint ¶ 77.

## **Argument**

For a class to be certified, plaintiff must satisfy the requirements of Rule 23(a) and at least one of the three criteria for certification under Rule 23(b).  *See, e.g., Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 298 (E.D.N.Y. 2013) (citing *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2551 (2011)).  This requires that plaintiff raise questions that the Court concludes, after a "rigorous analysis," are susceptible to common resolution.  *Id.*  Notwithstanding the requirements of a rigorous analysis, however, "the preference in this Circuit is to give Rule 23 a 'liberal rather than restrictive construction' and to

'grant[] rather than deny[] class certification.'" *Id.* (citing *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009)).

Plaintiff seeks to certify a class comprised of all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008. As demonstrated below, this proposed class satisfies the requirements of Rule 23.

**A. Plaintiff Satisfies the Requirements of Rule 23(a)**

***1. The Class Exceeds 200 Filipino Nurses and Joinder is Impracticable***

"Rule 23(a)(1) requires the class to be 'so numerous that joinder of all members is impracticable.'" *Shady Grove*, 293 F.R.D. at 299-300 (quoting Fed. R. Civ. P. 23(a)(1)). This prerequisite is usually satisfied by a class consisting of at least 40 members. *Id.* at 300 (citing *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Madanat v. First Data Corp.*, 282 F.R.D. 304, 309 (E.D.N.Y. 2012)).

In response to requests for the employment contracts and payroll records of potential class members, the defendants have produced employment contracts and payroll records for more than 200 nurses they recruited in the Philippines and who were employed by the defendants in this District during the relevant time period. The defendants' documents establish that the proposed class is sufficiently large that joinder is impracticable. *Shady Grove*, 293 F.R.D. at 300 (evidence of 73 prospective class members satisfied the numerosity requirement).

Joinder is also impracticable because class members – especially those who continue to work for the defendants – have reason to fear retaliation from defendants who have repeatedly commenced baseless civil lawsuits, professional disciplinary complaints, and criminal charges against dozens of Filipino nurses. *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *6, 10

("joinder of the many Plaintiffs in the proposed class is impracticable both because the potential

class members are numerous and because many class members may fear retaliation").

### 2.  *Common Questions of Law and Fact Abound*

"Rule 23(a)(2) requires there to be 'questions of law or fact common to the class.'"

*Shady Grove*, 293 F.R.D. at 300 (quoting Fed. R. Civ. P. 23(a)(2)).  "[T]he claims of the putative

class 'must depend upon a common contention' that is 'of such a nature that it is capable of

classwide resolution—which means that the determination of its truth or falsity will resolve an

issue that is central to the validity of each one of the claims in one stroke.'"  *Shady Grove*, 293

F.R.D. at 300 (quoting *Wal–Mart*, 131 S. Ct. at 2551).  "Put another way, the key inquiry under

*Wal–Mart* is 'whether the disputed issue could be resolved through common *proof*.'"  *Shady

Grove*, 293 F.R.D. at 300 (citation omitted) (emphasis in original).

In this case, the dispositive issues will be resolved by class-wide proof.

### a.  **Plaintiff's TVPA Claims Raise Issues Common to the Class**

### i.      **Liability Under 18 U.S.C. § 1589(a)**

Under Section 1589(a) of the TVPA, it is unlawful to "knowingly provide[] or obtain[]

the labor or services of a person" using (1) "force, threats of force, physical restraint, or threats

of physical restraint" (none of which are at issue in this case); (2) "serious harm or threats of

serious harm"; (3) "the abuse or threatened abuse of law or legal process"; or (4) "any scheme,

pan, or pattern intended to cause the person to believe that, if that person did not perform such

labor or services, that person would suffer serious harm or physical restraint."  18 U.S.C. §

1589(a).

The TVPA defines "serious harm" by reference to an objective, "reasonable person" test.

Thus, "serious harm" is defined as "any harm, whether physical or non-physical, including

psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a *reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2) (emphasis added).

As this Court has already found, a "threat of financial harm constitutes serious harm within the meaning of the TVPA."  *Paguirigan v. Prompt Nursing Employment Agency LLC,* 17 Civ. 1302 (NG), slip op. at 8 (E.D.N.Y. Dec. 22, 2017) (citing *United States v. Dann*, 652 F.3d 1160, 1170-71 (9th Cir. 2011) (threatened enforcement of an $8,000 debt was threat of serious harm)); *Javier v. Beck*, No. 13 Civ. 2926 (WHP), 2014 WL 3058456 at *6 (S.D.N.Y. July 3, 2014) (threatened enforcement of $15,000 confession of judgment was threat of serious harm); *Nunag-Tandedo*, 790 F. Supp. 2d at 1146 (threatened enforcement of $10,000 debt was threat of serious harm).

When deciding whether the $25,000 indenture in this case constitutes a threat of serious harm, the factfinder will determine whether a "reasonable person" from the same background as the named plaintiff – *i.e.*, a recent immigrant from the Philippines earning approximately $50,000 per year before taxes – would consider the threat of repaying a $25,000 indenture to be a threat of serious harm sufficient to compel them to continue working for the defendants.  The answer to that question is common to all class members, because they are all recent immigrants from the Philippines earning approximately $50,000 per year before taxes.  *Nunag-Tanedo*, 2011 WL 7095434, at *6 ("whether Defendants utilized threats of serious financial harm to compel Plaintiffs to work" was a common question sufficient to support class certification of TVPA claims).

Similarly, plaintiff's claim that the defendants violated Section 1589(a) by engaging in the "[a]buse or threatened abuse of law or legal process" raises an issue common to all class members.  "Abuse or threatened abuse of law or legal process" is defined as the "use or threatened use of law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).  Plaintiff alleges that the defendants pursued abusive legal claims against some Filipino nurses to intimidate all Filipino nurses.  The answer to whether defendants engaged in an abuse of law or legal process in order to exert pressure on Filipino nurses is common to all class members.  *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *6 ("whether Defendants' conduct violated the TVPA" is a common question of law sufficient to support class certification).

The issue of the defendants' intent is also common to all class members.  As this Court noted in its decision denying the defendants' motion to dismiss, plaintiff "alleges that the purpose of these lawsuits was to send a message to 'all foreign nurses' that they will incur liability and 'substantial attorneys' fees' if they stop working for the defendants."  *Paguirigan*, slip op. at 10.  If the factfinder determines that the defendants pursued abusive legal actions against some Filipino nurses in order to deter all Filipino nurses from leaving their employ, that will resolve the issue of scienter with respect to the claims of all class members.

### ii.    Liability Under 18 U.S.C. § 1589(b)

The TVPA extends liability to those who "knowingly benefit[], financially or by receiving anything of value" from participation in a venture that involves providing or obtaining labor by the means described in 18 U.S.C. § 1589(a)."  18 U.S.C. § 1589(b).  Proof that each of

the defendants participated in and knowingly benefitted from a venture that violated the TVPA will be identical for both plaintiff's individual claims and the claims of every other class member.  *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at \*6 ("whether the Recruiter Defendants and Attorney Defendants engaged in a common enterprise" were common questions of fact sufficient to support class certification of TVPA claims).

### iii.    Liability Under 18 U.S.C. § 1590(a)

The TVPA extends liability to "any person who knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a).  Proof that each defendant knowingly engaged in conduct prohibited by Section 1590(a) will be identical for both the plaintiff's individual claims and the claims of every other class member.  *See Nunag-Tanedo*, 2011 WL 7095434, at \*6.

### iv.    Liability Under 18 U.S.C. § 1594

The TVPA extends liability to whoever attempts or conspires with another to violate, *inter alia*, Sections 1589 and 1590.  18 U.S.C. § 1594(a)-(b).  Proof that the defendants used the $25,000 indenture and baseless legal actions against plaintiff and other Filipino nurses in an attempt to procure their services by means of threats of serious harm will prove not only plaintiff's individual attempt claim under Section 1594(a), but also the attempt claims of every other Filipino nurse.

Plaintiff's conspiracy claim under Section 1594(b) also raises common issues with the claims of the class.  In order to prevail on her conspiracy claim, plaintiff must prove an agreement to violate one or more prohibitions in the TVPA.  *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014) (citing *United States v. Svoboda*, 347 F.3d 471, 476-77 (2d Cir. 2003)).  Plaintiff need not prove the existence of an explicit agreement, but

15

only that the defendants "entered into a joint enterprise with consciousness of its general nature and extent." *Id.* (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (1989)).  Plaintiff's proof that the defendants entered into such an enterprise with knowledge of its nature and extent will resolve the issue of conspiracy on both an individual and class-wide basis.

### b.   Plaintiff's Breach of Contract Claims Raise Issues Common to the Class

The central issues raised by plaintiff's breach of contract claim are: (a) whether the defendants were required to pay the prevailing wage "[a]s of the commencement date" or as of the date the contract was signed; (b) whether the $25,000 indenture is an enforceable liquidated damages provision or an unenforceable penalty; and (c) whether the defendants are collaterally estopped from arguing for the enforceability of the indenture as a result of the contrary decision by the New York State Supreme Court in the *Anilao* case.  All of these issues are capable of class-wide resolution.  *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *6 ("whether the class members' contracts are void for undue influence or illegality" raises common questions of law sufficient to support class certification).

Similarly, plaintiff's claim to pierce the corporate veil is capable of class-wide resolution. The piercing claim will depend on proof that the defendants held themselves out to the Filipino nurses as a single, integrated entity under the name "Sentosa," ignored corporate formalities, assigned contracts between entities informally by "verbal agreement" without any documentation or consideration, and abused the corporate form to commit fraud against the Filipino nurses.  *See, e.g., Javier*, 2014 WL 3058456 at *9.  Proof of these facts will be class-wide and will not be affected by any individual nurse's claims.

16

### 3.  *Plaintiff's Claims Are Typical of the Claims of Absent Class Members*

"Fed. R. Civ. P. 23(a)(3) requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'"  *Shady Grove*, 293 F.R.D. at 301.  "The 'typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar arguments to prove the defendant's liability.'"  *Shady Grove*, 293 F.R.D. at 301 (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

Here, the claims of the proposed class members arise from the same conduct and are based on the same legal theories as the claims of the named plaintiff.  Plaintiff and the other class members were all recruited in the Philippines, signed the same contracts of indentured servitude and confessions of judgment, and worked for the same group of nursing homes owned and operated by the defendants in this District.  In all respects, this case is indistinguishable from *Nunag-Tanedo*, where the court found that the named plaintiffs' claims were typical of the class claims because "[t]he claims of the class and subclass members arise from the same conduct and are based on the same legal theories as the claims of the named Plaintiffs.  The class members were recruited in the same manner, paid the same fees, signed the same contracts, worked in the same state, and were subject to the same working conditions."  *Nunag-Tanedo*, 2011 WL 7095434, at *6; *accord Shady Grove*, 293 F.R.D. at 301 ("Where the same conduct is alleged to have been 'directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.'") (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (additional citations omitted)).

### 4.   *Plaintiff Will Adequately Protect the Interests of the Class*

"Rule 23(a)(4) requires plaintiffs to 'demonstrate that the proposed action will fairly and adequately protect the interests of the class.  To satisfy this requirement, plaintiffs must show 1) that there is an absence of conflict and antagonistic interests between them and the class members, and 2) that plaintiffs' counsel is qualified, experienced and capable.'"  *Shady Grove*, 293 F.R.D. at 302 (quoting *Iglesias–Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 371–72 (S.D.N.Y. 2007)).

There is no evidence of any conflicting or antagonistic interests between the named plaintiff and the class members.  To the contrary, plaintiff's interests are completely aligned with the interests of proposed class members.  They were all recruited in the Philippines, signed contracts with identical compensation provisions and indentures, and suffered the same types of injuries.  Under these circumstances, plaintiff is an adequate class representative.  *Nunag-Tanedo*, 2011 WL 7095434, at *7 ("There is no evidence of any conflict of interest between class members, and the shared experience of the class members with the named Plaintiffs indicates that the Plaintiffs will prosecute the action vigorously.")

Plaintiff's attorneys have extensive experience with employment-related class actions in general and TVPA cases in particular.  Lead plaintiff's attorney John Howley has more than 27 years of experience in complex labor and employment litigation, including almost two decades as a litigator with Kaye Scholer LLP.  He has represented plaintiffs in multiple TVPA cases, including in *Javier v. Beck*, No. 13 Civ. 2926 (WHP), 2014 WL 3058456 (S.D.N.Y. July 3, 2014), one of the leading TVPA cases in this Circuit.  His significant labor and employment litigation experience includes serving as plaintiffs' attorney in *McReynolds v. Sodexho*, a race discrimination class action that settled for $80 million; as defendants' attorney in *Roberts v.*

*Texaco*, a race discrimination class action that settled for $115 million; and as trial counsel for the Patrolmen's Benevolent Association of the City of New York, Inc. (PBA) in labor disputes with the City of New York.  *See* Howley Decl. ¶¶ 5-7.

Plaintiff's attorneys are fluent in the languages spoken by class members and familiar with their culture.  Plaintiff's co-counsel Leandro B. Lachica is a native Tagalog (Pilipino) speaker, having been born and raised in the Philippines.  He is also a former Consul and Legal Officer with the Philippine Consulate in New York City, where he was responsible for assisting hundreds of Philippine nationals with U.S. employment and immigration issues.  Lachica Decl. ¶¶ 2-6.  Mr. Howley is fluent in Tagalog and also speaks Cebuano, the dialect spoken in the central and southern Philippines.  He has lived, studied, and worked in the Philippines for extended periods of time since 1975.  Howley Decl. ¶ 8.  These additional factors also weigh in favor of appointing plaintiff's attorneys to represent the proposed class.  *See Menocal v. The Geo Group, Inc.*, 320 F.R.D. 258, 270 (D. Colo. 2017) (noting that proposed class counsel "have uniquely relevant experience with the client base . . . [and] are also Spanish speakers, making it easier for them to communicate with some members of the classes").

## B.  Plaintiff Satisfies the Requirements of Rule 23(b)(3)

"Under Fed. R. Civ. P. 23(b)(3), a class action may be maintained if 'the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'"  *Shady Grove,* 293 F.R.D. at 303.  These requirements are easily satisfied here.

### 1. *Common Issues Predominate*

"'Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Shady Grove*, 293 F.3d at 303 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)).

The common issues described above predominate over individual issues in both number and importance for purposes of Rule 23(b)(3).  The central issues involve not just the named plaintiff, but rather all members of the proposed class who were victimized by the defendants' uniform $25,000 indentures and confessions of judgment, threats and attempts to enforce that unenforceable penalty, other baseless legal actions directed at Filipino nurses, and defendants' failure to pay the prevailing wage "[a]s of the commencement" of each nurse's employment. The evidence relevant to these core issues will be common to the entire class.  Moreover, because all of Plaintiffs' claims arise out of the same nucleus of operative facts, the TVPA and contract claims are subject to common proof.  *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *7 (the issue of "contract invalidity" predominated over any individualized issues).

Dispositive issues of liability under the TVPA will also be decided on a class-wide basis. For example, "[s]erious harm is defined as 'any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a *reasonable person* of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.'"  The application of a "reasonable person" test to a class that shares many common attributes ensures that the dispositive common question – how would a reasonable

person react? – will predominate over individual issues.  *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *8 ("because the class members share a large number of common attributes—they are teachers, they are from the Philippines, they are new to the United States, they are educated, they work in Louisiana, they left their homes to work in a new country-they share the 'same background' and 'same circumstances,' allowing the fact-finder to use a common 'reasonable person' standard for all class members").

Similarly, the issue of the defendants' intent will be resolved on a class-wide basis.  This is especially true in this case where plaintiff alleges that actual and threatened legal actions taken by the defendants against some Filipino nurses were intended to convey a threat of serious harm to all Filipino nurses.  As the court held in *Nunag-Tanedo*:  "Because the analysis of claimed TVPA injury will focus on the Defendants' intent with respect to any threats made against Plaintiffs, and on a reasonable person's perception of those threats, the TVPA inquiry will not turn on, or require, individualized determinations.  Thus, the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work.  Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions."  *Nunag-Tanedo*, 2011 WL 7095434, at *8.

By contrast to the dispositive common issues in the case, there are few individual issues to be determined.  While damages will need to be ascertained separately for each class member, the method for calculating damages will be common.  The damages claims of each individual class member will be resolved by reference to mechanical calculations common to the class as a whole with reference to basic documentary evidence:  the date the nurse started working, public records from the U.S. Department of Labor showing the prevailing wage on that date, and the

wage actually paid to the nurse.  Under these circumstances, the numerous common questions predominate over any individual damages issues.  *See, e.g., Shady Grove*, 293 F.R.D. at 304; *Nunag-Tanedo*, 2011 WL 7095434, at *10.

### 2.   *A Class Action is Superior to Other Methods of Adjudication*

When deciding whether a class action is a superior method of adjudication, "courts balance, 'in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication.'"  *Shady Grove*, 293 F.R.D. at 306 (quoting *Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105, 114 (S.D.N.Y. 2013)).  Rule 23(b)(3) provides a list of factors to be considered in making this assessment:  (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).  Each of these factors weighs in favor of class certification.

A class action is far superior to any alternative manner of litigating the claims in this case.  First, it is extremely unlikely that the individual class members have an interest in instituting or controlling their own individual actions: they are foreign nationals who are not familiar with the U.S. legal system; they reasonably fear retaliation from defendants who have engaged in a pattern of abusive legal actions; and while the amount of damages each individual may recover is not insubstantial, it is relatively small compared to the costs of prosecuting an individual lawsuit.

Second, there is no pending litigation concerning the class claims.

Third, this is the most appropriate forum to resolve the claims of all class members.  All of the defendants engage in business, and most have their principal place of business, in this District.  All of the class members worked for the defendants in this District.  No other forum would be adequate to resolve the legal and factual claims at issue.

Fourth, a class action does not present any insurmountable difficulties in case management.  Although the precise amount of damages due to each class member may be determined individually, the method for calculating the damages will be based on a formula using data from readily available government reports and the defendants' payroll records.  By contrast, requiring each of the more than 200 class members to sue individually would result in far greater manageability problems, including duplicative discovery, repeated adjudication of identical facts and legal issues, the risk of inconsistent judgments, and excessive costs for both the litigants and the Court.  For all these reasons, the Court should certify this case as a class action under Rule 23(b)(3).  *See, e.g., Nunag-Tanedo*, 2011 WL 7095434, at *10.

**C.  In the Alternative, Plaintiff Satisfies the Requirements of Rule 23(b)(2)**

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  As explained above, the defendants have acted on grounds that apply generally to the class here.  With respect to all Filipino nurses, the defendants have:  (1) procured their labor and services through threats of serious financial harm and abuse of legal process, in violation of the TVPA; and (2) threatened and attempted to enforce $25,000 indentures that are disproportionate to the defendants' actual costs and the result of undue influence and unequal bargaining power.  Plaintiff, therefore, seeks final relief declaring that the $25,000 indentures are unenforceable and

enjoining the defendants from threatening or attempting to enforce the indentures against any member of the proposed class.  As all members of the proposed class were compelled to sign defendants' standard form contracts containing an identical $25,000 indenture, all proposed class members share a common interest in obtaining this relief.  Because all proposed class members were victims of the defendants' conduct, all of them will likewise benefit from such injunctive relief.  Accordingly, the Rule 23(b)(2) requirements are met.

## Conclusion

For the reasons set forth in this memorandum and the accompanying declarations and exhibits, plaintiff Rose Ann Paguirigan requests entry of an Order:  (a) certifying this action as a class action pursuant to Rule 23(b)(3) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure; (b) appointing plaintiff's attorneys to represent the class; and (c) granting such other relief as this Court deems just.

Dated: New York, New York             THE HOWLEY LAW FIRM P.C.
       December 29, 2017


       By:__/s John Howley_____
           John Howley
           Leandro B. Lachica
       350 Fifth Avenue, 59th Floor
       New York, New York 10118
       (212) 601-2728
       *Attorneys for Plaintiff*