UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 --------------------------------------------------------------X
ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,

|  |  |
|---|---|
| Plaintiff, | 1:17 Civ. 1302 (NG) (JO) |

-v-

PROMPT NURSING EMPLOYMENT AGENCYLLC
d/b/a SENTOSA SERVICES,SENTOSACARE LLC,
SENTOSA NURSINGRECRUITMENT AGENCY,
BENJAMIN LANDA, BENT PHILIPSON, BERISH
RUBENSTEIN a/k/a : BARRY RUBENSTEIN,
FRANCIS LUYUN, GOLDEN GATE
REHABILITATION & HEALTH : CARE CENTER
LLC, and SPRING CREEK REHABILITATION AND
NURSING CENTER,

Defendants.

--------------------------------------------------------------X

# DEFENDANTS' MEMORANDUM OF LAW
# IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# Table of Contents

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT OF FACTS ............................................................................................. 1

SUMMARY OF ARGUMENTS IN OPPOSITION ................................................... 10

ARGUMENT .................................................................................................................. 12

POINT 1 - BECAUSE PLAINTIFF CANNOT SATISFY HER BURDEN UNDER
   RULE 23, PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE
   DENIED.................................................................................................... 13

 A. Plaintiff's Proposed Class is Not Ascertainable ...................................... 13

 B. Plaintiff Has Failed To Establish Commonality ..................................... 14

 C. Plaintiff Has Failed To Establish Typicality........................................... 17

 D. Plaintiff Has Failed To Show That Common Issues Predominate .......... 19

   i. Whether Each Employee Felt Threatened and Believed He/She Was  Unable to
    Resign Without Financial Harm Requires Individualized  Proof and
    Psychological Analysis ...................................................................20

   ii. Whether Each Employee Was Promised 40 Hours of Work Requires
    Individualized Proof and Analysis ................................................ 22

   iii. Determining Each Employee's Job Description Requires Individualized Proof
    and Analysis .................................................................................. 23

   iv. The Enforceability of Each Contract's Termination Amount And The
    Employer's Actual Damages (If Required)  Require Individualized Proof and
    Analysis......................................................................................... 24

   v. If the Termination Amount is Not Enforceable Then The Putative  Class
    Members' Damages Requires Individualized Proof and Analysis ................. 26

   vi. Whether Each Putative Class Member Agreed to Her Contractually Listed
    Hourly Rate Requires Individualized Proof and Analysis .............................. 28

E.   Plaintiff Cannot Adequately Represent the Interests of the Class Because Plaintiff Is Not Credible and Presented Contradictory  Testimony Concerning The Complaint ....................................................................................... 31

CONCLUSION ................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Interco, Inc.*,
719 F.2d 23 (2d Cir. 1983)...................................................................................27

*Attenborough v. Const. and Gen. Bldg. Laborers Local*
79, 238 F.R.D. 82 (S.D.N.Y. 2006) ....................................................................32

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)..................................................................................32

*In re Bally Total Fitness of Greater New York, Inc.*,
402 B.R. 616 (S.D.N.Y. 2009).............................................................................20

*Benner v. Becton Dickinson & Co.*,
214 F.R.D. 157 (S.D.N.Y. 2003) .........................................................................20

*Brecher v Laikin*,
430 F.Supp 103 (S.D.N.Y. 1977) ........................................................................22

*Cabrera v. 211 Garage Corp.*,
No. 05 CV 2272 (GBD), 2008 U.S. Dist. LEXIS 67050 (S.D.N.Y. Aug. 22,
2008) ....................................................................................................................13

*CGC Holding Co., Ltd. Liab. Co. v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ..........................................................................20

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541, 54969 S. Ct. 1221, 93 L. Ed 1528 (1949).....................................32

*Cohen v. Laiti*,
98 F.R.D. 581 (S.D.N.Y. 1983) ...........................................................................33

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).........................................................................................12

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*,
198 F.R.D. 41 (E.D.N.Y. 2000)...........................................................................20

*Dauphin v. Chestnut Ridge Transp., Inc.*,
2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009)....................................18

*Dauphin v. Chestnut Ridge Transp. Inc.*,
   No. 06 CV 2730, 2009 WL 2596636 (S.D.N.Y. Aug. 20, 2009) ...........................................33

*David v. Signal Int'l, LLC*,
   No. 08-cv-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) ...............................................17

*Edwards v. Publrs. Circulation Fulfillment, Inc.*,
   268 F.R.D. 181 (S.D.N.Y. 2010) .........................................................................15, 21, 24, 25

*Ellersick v. Monro Muffler Brake, Inc.*,
   No. 10-CV-6525-FPG-MWP, 2017 U.S. Dist. LEXIS 49841 (W.D.N.Y. Mar.
   31, 2017) .............................................................................................................................15

*In re Fosamax Prods. Liab. Litig.*,
   248 F.R.D. 389 (S.D.N.Y. 2008) .........................................................................................14

*Gomez v Bicknell*,
   302 A.D.2d 107 (2nd Dept 2002) ........................................................................................25

*Gordon v. Sonar Capital Mgmt. LLC*,
   92 F. Supp. 3d 193 (S.D.N.Y. 2015)....................................................................................17

*Harry R. Defler Corp. v Kleeman*,
   19 A.D.2d 396, 243 N.Y.S.2d 930, *affd* 19 NY2d 694............................................................25

*Harry R. Defler Corp. v Kleeman*,
   19 AD2d 396 (4th Dept 1963) ............................................................................................25

*Harte v. Ocwen Fin. Corp.*,
   No. 13-CV-5410, 2018 U.S. Dist. LEXIS 21843 (E.D.N.Y. Feb. 8, 2018)............................20

*Headley v. Church of Scientology Int'l*,
   687 F.3d 1173 (9th Cir. 2012) ............................................................................................17

*Hughes v. Ester C Co.*,
   317 F.R.D. 333 (E.D.N.Y. 2016).........................................................................................28

*JMD Holding Corp. v. Cong. Fin. Corp.*,
   828 N.E.2d 604 (2005)........................................................................................................26

*Johnson v. Nextel Communs. Inc.*,
   780 F.3d 128 (2d Cir. 2015).................................................................................................12

*Kline v. Wolf*,
   702 F.2d 400 (2d Cir. 1983)................................................................................................33

*Lewis v. Nat'l Fin. Sys., Inc.*,
   No. 06 CV 1308, 2007 WL 2455130 (E.D.N.Y. Aug. 23, 2007) ...........................................32

*Mazzei v. Money Store*,
 829 F.3d 260 (2d Cir. 2016)................................................................................28

*McLaughlin v. Am. Tobacco Co.*,
 522 F.3d 215 (2d Cir. 2008)................................................................................28

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*,
 90 F.3d 650 (2d Cir. 1996)..................................................................................31

*Morisky v. Public Service Elec. And Gas Co.*,
 111 F. Supp. 2d 493 (D.N.J. 2000) .....................................................................18

*Newman v. Newman*,
 245 A.D.2d 383, 665 N.Y.S.2d 423 (2d Dep't 1997)......................................6, 27

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 259 F.3d 154 (3d Cir. 2001)................................................................................28

*Panwar v. Access Therapies, Inc.*,
 No. 1:12-cv-00619-TWP-TAB, 2015 U.S. Dist. LEXIS 38117 (S.D. Ind. Mar.
 25, 2015) ..............................................................................................................22

*In re Petrobras Sec. Litig.*,
 862 F.3d 250 (2d Cir. 2017)................................................................................14

*In re Rail Freight Surcharge Antitrust Litig.*,
 725 F.3d 244 (D.C. Cir. 2013).............................................................................28

*Reyes v. Metromedia Software*,
 840 FSupp2d 752 (S.D.N.Y. 2012) .....................................................................31

*Rosales v. Hispanic Emple. Leasing Program, LLC*,
 06-cv-877, 2008 U.S. Dist. LEXIS 96417 (W.D. Mich., November 26, 2008) ....30

*Royal Park Invs. SA/NV v. Bank of N.Y. Mellon*,
 No. 1:14-cv-6502-GHW, 2017 U.S. Dist. LEXIS 140998 (S.D.N.Y. Aug. 30,
 2017) ....................................................................................................................14

*Schlessinger v. Reservists Comm. To Stop the War*,
 418 U.S. 208, 94 S. Ct. 2925 (1974)...................................................................33

*Sentosa Care, LLC et al v. Anilao, et al.*
 (Sup. Ct. Nassau Cty April 7, 2010) ...................................................................26

*SentosaCare LLC v. Anilao*,
 Index No. 6079/2006 ...............................................................................6, 26, 27

*Shore Bridge Corp. v State*,
  186 Misc 1005 (Ct Cl 1946) ........................................................................25

*Singleton v. Fifth Generation, Inc.*,
  No. 5:15-CV-474, 2017 U.S. Dist. LEXIS 170415 (N.D.N.Y. Sep. 27, 2017) .....................13

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ....................................................................32

*Spann v. AOL Time Warner, Inc.*,
  219 F.R.D. 307 (S.D.N.Y. 2003) ..................................................................18

*Spread Enters., Inc. v. First Data Merch. Servs. Corp.*,
  298 F.R.D. 54 (E.D.N.Y. 2014) ......................................................11, 13, 15, 17

*Truck Rent-A-Center, Inc. v Puritan Farms 2nd, Inc.*,
  41 NY2d 420 (1977) ...............................................................................26

*Velez v. Majik Cleaning Serv., Inc.*,
  No. 03 CV 8698 (SAS), 2005 WL 106895 (S.D.N.Y. Jan. 19, 2005) ...................................32

*Vengurlekar v. Silverline Techs., Ltd.*,
  220 F.R.D. 222 (S.D.N.Y. 2003) ..................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................13, 15, 16, 17

## Statutes

Trafficking Victims Protection Act .................................................................. *passim*

## Other Authorities

20 CFR 656.40(a) .........................................................................................30

20 CFR §656.40 .............................................................................................3

Department of Labor, In 2007 ..........................................................................2

Fed. R. Civ. P. 23(a)(3) ................................................................................ *passim*

Federal Rules of Civil Procedure Rule 23(b)(3) .................................................. *passim*

20 CFR 656.40 ............................................................................................29

Defendants Prompt Nursing Employment Agency LLC d/b/a Sentosa Services ("Prompt"), Sentosacare LLC, Sentosa Nursing Recruitment Agency ("SRA"), Benjamin Landa ("Landa"), Bent Philipson ("Philipson"), Berish Rubenstein a/k/a Barry Rubenstein ("Rubenstein"), Francis Luyun ("Luyun"), Golden Gate Rehabilitation & Healthcare Center LLC ("Golden Gate") and Spring Creek Rehabilitation and Nursing Center ("Spring Creek") submit this memorandum of law in opposition to Plaintiff's motion for an Order certifying this action as a class action pursuant to Rule 23(a), Rule 23(b)(2) or, in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

In 2007, defendant Golden Gate, and SRA, a licensed recruitment agency, presented information to a number of nurses in the Philippines concerning nursing employment opportunities in the United States (the "Presentation") (Paguirigan Dep. at 100) (Exh. A to the accompanying Declaration of Elliot Hahn ["Hahn Dec"]). Representatives of Golden Gate and SRA explained to the nurses that a three-year contract would be offered prior to their employment setting forth the terms and conditions of their employment including their duties and responsibilities; the hours they were expected to work; the hourly wage rate they were to receive for their services; a $25,000 termination amount they would be charged if they terminated their employment prior to the year anniversary of their employment; and that Golden Gate would pay all fees and expenses to obtain a VISA on behalf of that nurse, subject to the terms of the contract. (Paguirigan Dep. at 22; 28; 33; 138-139) (Hahn Dec., Exh. A).

Only SRA's sole proprietor defendant Luyun and Golden Gate's representative Philipson were at the Presentation, (Paguirigan Dep. at 96-109) (Hahn Dec., Exh. A). At the Presentation, Luyun and Philipson did not have any direct conversations with Plaintiff

{097079}

Paguirigan.  Since the Presentation in 2007, Plaintiff has admitted that she has never had any

contact with defendants Philipson and Landa; and that she was in the same room with defendant

Rubenstein once or twice but could not recall any direct conversations with him.  (Paguirigan

Dep. 105-106) (Hahn Dec., Exh. A).

After the Presentation, Plaintiff requested that Golden Gate and SRA submit an

application for a VISA on her behalf.  (Paguirigan Dep. at. 98) (Hahn Dec., Exh. A.)  As the

first step in applying for a VISA on behalf of Paguirigan, Golden Gate submitted to the

government a request for a Prevailing Wage Determination, which was the hourly wage rate

Paguirigan was required to be paid for her work when she received employment.  Golden Gate

received the wage determination, which reflected that Paguirigan was entitled to an hourly

wage rate of $26.87 per hour ("Prevailing Wage Determination").  Thereafter, Golden Gate and

SRA provided Plaintiff with a copy of the VISA Petition which included her Prevailing Wage

Determination.  (Paguirigan Dep. at 370-375) (Hahn Dec., Exh. A); Philipson Decl at ¶ 6.

The processing of the VISA Application is controlled by the United States Government,

and often takes between 6 and 9 years to complete.  In or about April 2015 (8 years after the

VISA Application was submitted), Plaintiff received an appointment with the United States

Consulate in the Philippines for her VISA Application interview.  (Paguirigan Dep. at 88-94 )

(Hahn Dec., Exh. A)  After receiving the interview letter but prior to the appointment,

Paguirigan requested that Golden Gate enter into an employment contract, which SRA provided

(the "Contract.").  Golden Gate provided the employment Contract to Paguirigan for execution.

This Contract contained a job offer cover letter, which specified that Paguirigan would receive

an hourly wage rate of $29.00. (Hahn Dec., Exh. E)  At all times, Plaintiff was aware that the

$29.00 rate was more than the Prevailing Wage Determination that she was entitled to receive.

At all times, the Contract including the job offer cover letter was sealed as a single document

with an eyelet.[1]  (Paguirigan Dep. at 21-25; 93-94; 445).  (Hahn Dec., Exh. A).

The Contract at Article IV, Section (1) provided:

> As of the Commencement Date, Employee will be paid a base
> salary in accordance with the prevailing wage for the geographic
> area in which the employee is assigned to work, as <u>determined</u> by
> the National Prevailing Wage and Helpdesk Center (NPWC) of the
> United States Department of Labor.[2]

(emphasis added).  The words "as determined" refers to the previously issued Prevailing Wage

Determination.  Thus, Paguirigan was fully aware that she would be entitled to $29.00 per hour

for any job opportunities that she received in the United States.

---

[1] In a brazen attempt to conceal the indisputable fact that she was fully aware and consented to the wage rate, it has been learned in discovery that Paguirigan removed the eyelet from the contract and produced the Contract during discovery without the cover letter attached.  Plaintiff separately presented the cover page of the contract as Paguirigan 000068 and the remainder of the contract as Paguirigan 000055-000064.  It was only during Plaintiff's deposition that she admitted that at all times the $29.00 cover page was attached to the remainder of the Contract and that she was aware and agreed to the hourly wage rate of $29.00 per hour. (Paguirigan Dep. at 89-91) (Hahn Dec., Exh. A)

[2] Pursuant to 20 CFR §656.40, only the Government may render a Prevailing Wage Determination and such determination is unique to each and every person based on a myriad of factors. *Id.*

After Plaintiff arrived in the United States, the Contract was assigned by Golden Gate to Prompt.[3]   The Contract at Article VIII Section 8 provided that it may be assigned at Golden Gate's sole discretion.[4]  Specifically, the Contract stated:

> Employer has the right, in its sole discretion, to assign this Agreement to another facility or nursing agency or to transfer the Employee to another nursing facility provided said facility or agency ("assignee") assumes all the obligations of the Employer for the term of the Agreement, including, but not limited to the obligation to provide the Employee with full-time employment and to pay the Employee the prevailing wage for the geographic area where the Employee is assigned.

After Plaintiff arrived in the United States and the Contract was assigned to Prompt, Plaintiff was notified of the assignment and requested to acknowledge that Prompt was her employer and that her hourly wage rate was $29.00.  Plaintiff knowingly, willfully and without any coercion or duress executed the Acknowledgement. A copy of the Notice of Acknowledgment of Pay Rate and Payday (the "Wage Acknowledgement") is attached to the Hahn Dec. as Exh. G.  The Wage Acknowledgment lists Prompt Services d/b/a Sentosa Services as Plaintiff's employer and $29.00 per hour as Plaintiff's pay rate.  *Id.*

 On June 22, 2015, Plaintiff began working for Prompt at defendant Spring Creek's nursing home.   Plaintiff was employed as a registered nurse and performed only the duties that were listed in the Contract.  (Paguirigan Dep. at 133) (Hahn Dec., Exh. A).

---

[3] Once again, Plaintiff ignores the express written documents and infers a nefarious motive that Prompt possessed for using the d/b/a Sentosa Services (see New York Department of State filed assumed name certificate attached to the Hahn Dec. as Exhibit F).

[4] Without any citation to any law, Plaintiff seems to imply that a verbal assignment is unlawful or ineffective.  This is simply not true.  Moreover, Plaintiff incorrectly states that there was no consideration for the assignment.  On the contrary, it is undisputed that Prompt was assigned the Contract in consideration of Prompt assuming all responsibility of the Contract.  Also, it is undisputed that Prompt employed Plaintiff, provided her with medical benefits pursuant to the Contract and paid Plaintiff her weekly payroll.  Defendant Rubinstein's references to not paying Golden Gate anything in exchange for the assignment refers to any monetary payment from Prompt to Golden Gate.  However, clearly legal consideration for the assignment exists.

On March 7, 2016, without prior notice, Plaintiff unexpectedly quit her job. At this time, Plaintiff neither claimed that Prompt had breached her employment contract in any way, nor served Prompt (or any other defendant) with a notice of default[5], as required by the Contract. The Contract provided at Article VI, Section 3:

> The Employee can terminate this contract if the Employer and/or its designee/assignee, after being informed by written notice of any alleged breach of this Agreement, fails to cure the alleged breach after thirty (30) days of such notice as stated in Article II. 8. above.

Plaintiff submitted a resignation letter in which she acknowledged that she owed the $25,000.00 for early termination of her Contract (the "Termination Amount"), which is annexed to the Hahn Dec. as Exh. H. Plaintiff was aware of the Termination Amount since her first meeting in 2007 with the SRA and Golden Gate. Plaintiff understood that SRA and Golden Gate incurred significant expenses in conducting the hiring process, including arranging for VISA Applications for each nurse and would incur significant additional expenses to replace her if Plaintiff failed to fulfill her Contract. (Paguirigan Dep. at 141-143).

For example, during her deposition, Plaintiff acknowledged that Golden Gate paid $3,685.50 for attorneys' fees, filing fees, visa fees, ICHP visa screen fees, airfare, and "miscellaneous" expenses on her behalf. (Paguirigan Dep. at 141-143 ); *see also* Exh. I. Plaintiff was also reimbursed for certain expenses laid out by her in connection with her relocation and two months of her rent was paid. In addition, SRA maintained an office in the Philippines to hire nurses. Other annual expenses of Golden Gate and Prompt to hire nurses

---

[5] Plaintiff had only one issue with her employment for which she notified Prompt and Prompt rectified her complaint. Plaintiff worked 5 shifts per week. Plaintiff complained that certain of her shifts were scheduled back-to-back. Prompt met with Plaintiff and the Spring Creek management, in an attempt to rectify this issue to Plaintiff's satisfaction (Paguirigan Dep. at 60-64 )

from the Philippines exceeds $600,000.00.   Finally, the cost of hiring a replacement nurse

from a staffing agency in 2015 was in excess of $43.00 per hour.  Plaintiff terminated her

contract after working only 9 months.  Therefore, the additional expense of hiring a nurse from

an agency ($43.00-29.00) exceeds $2,000.00 per month or $54,000.00 for the 27 months

remaining on Plaintiff's Contract.  Looking at any of these estimated figures, shows that the

Termination Amount is a reasonable estimate of expenses. [6]  The reasonableness of the

Termination Amount is underscored by the fact that the Termination Amount is reduced by

one-third after each year of employment.

Contrary to the false allegations in the Complaint, Plaintiff and other nurses testified

that defendants <u>never</u> threatened the Plaintiff, or any other nurse, in any way.  (Paguirigan

Dep. at 26-33; 404); (Valdez Dep. [Exh. D to Hahn Dec.] at 83; 104-105); (Bane Dep. [Exh. C

to Hahn Dec.]. at 60-61; 98 ); (Padernal Dep. [Exh B to Hahn Dec.] at 68).[7]  On the contrary,

Plaintiff and each of the nurses were told at the initial meeting in 2007 of the Termination

Amount and it was explained at that time that significant expenses would be expended to

procure a VISA and employment for Plaintiff and other nurses.

Upon terminating her employment with Prompt, Plaintiff procured a more lucrative

position with North Central Bronx Hospital, part of the New York City Health and Hospitals

---

[6]  Plaintiff misstates a May 20, 2010 decision by the New York State Supreme Court, Nassau County, in
*SentosaCare LLC v. Anilao*, Index No. 6079/2006, where the court denied both parties motions for summary
judgment and stated that the amount of damages represents a question of fact which must be determined at trial.  *Id*.
at p.6.  A copy of the *Anilao* decision is attached as Exhibit J to the Hahn Declaration.   More importantly, the
*Anilao* decision is not binding as a matter of law because that case was settled before trial and, therefore, the
decision is a nullity.  *See Newman v. Newman*, 245 A.D.2d 383, 665 N.Y.S.2d 423 (2d Dep't 1997) ("When an
action is discontinued, it is as if it had never been; everything done in the action is annulled and all prior orders in
the case are nullified.").

[7] It should be noted that whenever Plaintiff's brief cites to the complaint only, Plaintiff and other nurses' testimony
does not support or directly contradicts these allegations.  Given that Plaintiff and each nurse during their
depositions denied being threatened, or coerced to fulfill the contract, serious questions exist concerning the basis of
Plaintiff's counsel's certification of the complaint to this Court.

Corporation.  At her new position, Plaintiff was paid $36.00 per hour, received four weeks of paid vacation, overtime pay for holidays worked, "differential" pay for shifts after a certain time, and the right to participate in a pension plan.  (Paguirigan Dep. at 254-261) (Hahn Dec. Ex. A).

Plaintiff's termination of her employment has no correlation to the untrue allegations in the Complaint.  On the contrary, Plaintiff and other nurses testified during their depositions that they were unable or had difficulty procuring employment as nurses in the Philippines or in the United States, because they were not qualified to work in hospitals in the United States. They were only able to procure employment through SRA.  It is clear that the nurses used their employment at Prompt as a stepping stone to obtain a VISA and to obtain experience so that they could move to a better paying nursing position at an American hospital or move geographically closer to relatives in the States. *See* e.g. Valdez Dep. at 71; Bane Dep. at 31-32; Padernal Dep. at 53; 88 (Exhs. D, C, B to the Hahn Dec.).

Moreover, unbeknownst to SRA, Golden Gate and Prompt, some of the nurses executed the Contract*, knowing that they never intended to fulfil their employment commitment,* (Padernal Dep. at 53) ("At the beginning I was planning to finish like two years of my contract but then I ended up completing the one year only") or  nurse Bane who testified that he used SRA and Prompt as a "short term stepping stone" to get to his "ultimate goal" of coming to America.  Mr. Bane was able to obtain employment in a hospital for $112,000 per year.  But for Defendants' efforts and Bane's employment at Prompt, Bane would never have obtained his current high paying six-figure nursing job.  Similarly, nurse Padernal stated outright that the reason she wished to be employed by Defendants was because it would be a "steppingstone" for her career.  (Padernal Dep. at 88).

In 2016, Prompt commenced lawsuits against Plaintiff and two other nurses, Jericson Valdez and April Sullivan Francisco, for damages.  These lawsuits were the first time that any action had been brought by Prompt (or any other defendants) since the 2007 lawsuits.[8] Prior to commencing the actions, Prompt never threatened Plaintiff or any other nurse, a fact conceded by each of the deposed nurses, including Plaintiff during their depositions. (Paguirigan Dep. at 26-33; 404); (Valdez Dep. at 83; 104-105); (Bane Dep. at 60-61; 98); (Padernal Dep. at 68).  Plaintiff and the other nurses were never threatened with any lawsuits and only had knowledge of the 2007 incident (which far pre-dated their employment with Prompt)  through news reports well before they began working for Prompt.  Each nurse decided on their own volition to seek employment with the defendants, notwithstanding this decade-old incident.  (Paguirigan Dep. at 226-228); (Valdez Dep. at 31-32; 48-49); (Bane Dep. at 68-70); (Padernal Dep. at 78).  For her part, Plaintiff was not familiar with any of the nurses involved in the lawsuits and could not even recognize their names.  (Paguirigan Dep. at 322-324).  Plaintiff <u>never</u> heard about the incident with the 27 nurses other than in news reports in 2007 (Paguirigan Dep. at 228).  That incident had no bearing on her accepting a position with defendants, and certainly had no bearing on whether or not she would be able to leave her position.   Nurse Bane affirmatively testified that had he been "bothered by that in the first place, [he] would have not signed the contract in the first place."  Bane Dep. 92. Similarly, nurse Padernal had the following exchange with her own attorney at her deposition on page 88:

---

[8] Once again, Plaintiff's Memorandum of Law inaccurately depicts the 2007 lawsuit as 27 lawsuits.  In fact, in 2007, one consolidated action went forward (before it was settled) because various nurses and other professionals staged a walk out of a pediatric unit and threatened to leave disabled and ill children without care. The complaint also inaccurately depicts a single complaint to the Department of Education in 2007. Nursing facilities and its professionals are all "mandatory reporters" and are required to report malfeasance to the appropriate authorities. Plaintiff, as a registered nurse, is also a mandatory reporter and admits that failure in patient care must be reported. (Paguirigan Dep. at 72)

Q.  Okay.  If you knew that someone associated with Sentosa had brought cases against other nurses, then why did you agree to work for Sentosa?

A.  First of all, as I have mentioned, I never landed a nursing job in the Philippines.  It's only Sentosa is hiring nurses without any experience.

The testimony offered by Plaintiff and the other nurses unequivocally establishes that the 2007 incident with the 27 nurses has absolutely no relevance to the instant action, and is included in the complaint and in Plaintiff's certification motion merely as an attempt to smear defendants in this action without any justification.[9]

Prompt took no action to interfere with Plaintiff's new employment and was only seeking to enforce its lawful contractual rights.  Plaintiff admits that she requested that significant funds and resources be expended on her behalf and that she agreed to pay the Termination Amount.  (Paguirigan Dep. at 143; 167; 169).  Plaintiff admits that she benefitted from the services provided by SRA, Golden Gate and Prompt and that she knew she would owe the Termination Amount if she did not complete the contract term.  (Paguirigan Dep. at 358).

Plaintiff, and the other nurses employed by Prompt, are proficient in the English language, each beginning to speak English in their early formative years.  (Paguirigan Dep. at 9) (conceding she spoke English as soon as she began speaking at the age of one or two); (Valdez Dep. at 8) (began to speak English in primary school); (Padernal Dep. at 2) (began speaking English at around age 5); (Bane Dep. at 5-6) (confirming fluency in English).  They

---

[9] Nurses Bane, Padernal and Valdez all provided in discovery sworn witness statements which formulaically recite that defendant Luyun told them that defendants had sued other nurses that left their employment without completing or buying out their contract, and that this caused them to fear leaving their position.  These witness statements were conclusively refuted by the testimony of Plaintiff and the other nurses who testified that they never heard during their employment about the issue of other nurses being sued, and that they knew about this issue well prior to accepting employment with defendants.  These demonstratively false witness statements should not be given consideration by the Court in the event they are improperly submitted on reply by Plaintiff.

are also proficient at using the Internet and Plaintiff possessed her own laptop computer.

(Paguirigan Dep. at 237-238; 250; 252; 306; Valdez Dep. at 31; Bane Dep. at 15; Padernal

Dep. at 72). Each completed higher education courses, and Plaintiff completed medical

school.

## SUMMARY OF ARGUMENTS IN OPPOSITION

This is a simple employment dispute. Plaintiff, a nurse from the Philippines, came to the

United States to work following an 8 year VISA application process – during which the

Defendants spent time, money and resources to secure a visa on her behalf. However, 9 months

after arriving in the United States, Plaintiff resigned from her job in breach of her employment

agreement. As a disgruntled former employee, Paguirigan has engineered this class action,

making outlandish allegations in the Complaint (which were recanted during her deposition)

against the Defendants, raising issues never once raised before. Paguirigan alleges that the

Defendants violated the Trafficking Victims Protection Act ("TVPA") by subjecting her and

other nurses to an involuntary servitude. In effect, Plaintiff complains that she was an indentured

servant because, although she worked only 35 hours per week and made over $50,000 per year,

the Contract, which she freely entered into, had a liquidated damages clause that sought to

reasonably compensate Defendants for her breach. Even though she resigned only 9 months

after starting her nursing job, Plaintiff's principal claim (under the TVPA) is that she felt

intimidated and coerced to continue working for the Defendants because she believed she would

suffer serious financial harm if she quit. Plaintiff also protests that the very wage rate that she

was paid, and to which she agreed, is unfair.

The material undisputed facts in this case are that Plaintiff was fully aware of and

voluntarily agreed to the employment contract terms, including the liquidated damage provision.  Plaintiff as well as other nurses testified that the Defendants never threatened them at any time or in any manner.  *See* Paguirigan Dep. at 26-33, 404; Valdez Dep. at 83, 104-105; Bane Dep. at 60-61, 98; Padernal Dep. at 68.

In short, Plaintiff asks the Court to certify a class like no other: "**ALL nurses who were recruited by the Defendants in the Philippines and were employed by the defendants anywhere in the United States, at any time since December 23, 2008.**" (Emphasis added). But this proposed class suffers fatal flaws preventing Plaintiff from satisfying her burden under Rule 23.

Before the Court can certify Plaintiff's proposed class,  she must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  *Spread Enters., Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 66-67 (E.D.N.Y. 2014).  In addition, Plaintiff must demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" or that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* at 68.  Plaintiff has not and cannot meet her burden of proof for the following reasons.

*First*, Plaintiff's class cannot be ***ascertained*** based on objective criteria. Plaintiff casts a very wide net to include virtually all former and current employees of the Defendants, including those who never felt intimidated or coerced to continue working for the Defendants, and those

who never had a desire to quit or felt their wage rate was inadequate.

*Second*, Plaintiff cannot demonstrate that common issues of law and fact *predominate* over questions affecting only individual members of the putative class.  By contrast, Plaintiff's claim that she felt coerced requires an individualized inquiry that precludes proceeding on a class-wide basis.  Some of these highly individualized and fact-intensive inquiries include determining whether: (1) each putative class member was threatened with a lawsuit if they breached the contract – the lynchpin of Plaintiff's TVPA claim and psychologically felt intimidated by this threat; (2) each employee was promised 40 hours of work per week; (3) each employee performed the same duties and responsibilities; and (4) each employee's damages assessment can be determined using evidence that is common to all members of the class.

*Third*, Plaintiff cannot establish the required elements of a Rule 23 class - *commonality, typicality* and *adequacy* because the facts and circumstances underlying  Paguirigan' s claims and those of the potential class members, are materially different.  And Plaintiff, due to her inconsistent deposition testimony and contract breach, is subject to unique defenses, which might become the focus of the litigation.

For these reasons, Plaintiff's class certification motion should be denied.

## ARGUMENT

 "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Communs. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Rule 23 "does not set forth a mere pleading standard," rather "[e]videntiary proof" is required. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). The Court may certify a class only if it "is satisfied, after a

rigorous analysis," that the Rule's requirements are met. *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 350-51 (2011); *Cabrera v. 211 Garage Corp.*, No. 05 CV 2272 (GBD), 2008 U.S.

Dist. LEXIS 67050, at *7 (S.D.N.Y. Aug. 22, 2008) ("[P]laintiffs seeking class certification

must go beyond the allegations embodied in the pleadings and provide the court with

specific facts justifying certification").

To satisfy Rule 23(a), a class proponent must demonstrate: (1) numerosity, (2)

commonality of legal and factual issues, (3) typicality of the claims and defenses of the class

representative, and (4) adequacy of representation. *Spread Enters., Inc.*, 298 F.R.D. at 66-

67. Further, courts have consistently held that a class must be ascertainable, that is, "defined

using objective criteria that establish a membership with definite boundaries." *Singleton v.

Fifth Generation, Inc.*, No. 5:15-CV-474 (BKS/TWD), 2017 U.S. Dist. LEXIS 170415, at

*41 (N.D.N.Y. Sep. 27, 2017).

## POINT I

### BECAUSE PLAINTIFF CANNOT SATISFY HER BURDEN UNDER RULE 23, PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED.

#### A. Plaintiff's Proposed Class is Not Ascertainable

To be ascertainable, Plaintiff's putative class, "objective[ly]" defined and must have

"definite boundaries." *Royal Park Invs. SA/NV v. Bank of N.Y. Mellon*, No. 1:14-cv-6502-GHW,

2017 U.S. Dist. LEXIS 140998, at *12 (S.D.N.Y. Aug. 30, 2017). "A class should not be

maintained without a clear sense of who is suing about what." *In re Petrobras Sec. Litig.*, 862

F.3d 250, 269 (2d Cir. 2017); *see also In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 397-98

(S.D.N.Y. 2008) (denying class certification because there were too many individual questions of

fact particular to each class member's claim and the class representatives failed to define a proper class).

Here, Plaintiff's putative class is vague and fails to sufficiently identify the specific employees who would be members.  Paguirigan' s proposed class definition bears little connection to the claims in this case.  For starters, Plaintiff has asserted that Defendants coerced her to work for them by imposing the liquidated damages provision in her employment agreement.  Yet Plaintiff seeks to certify a class "comprised of all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008."  Pl. Mem. at 11.  With her fuzzy class definition, Plaintiff casts a very wide net to include virtually all former and current employees of the Defendants.  Even if a current or former employee never entered into a contract, felt financially threatened or coerced, had no desire to quit their jobs, or felt that their wage rate was inadequate, the employee would nevertheless be part of the putative class as defined by Plaintiff.  Because ascertaining Plaintiff's proposed class requires a necessarily subjective determination, Plaintiff's proposed class is not ascertainable.

### B.  Plaintiff Has Failed To Establish Commonality

To satisfy the commonality requirement under Rule 23(a), Plaintiff must prove that there are common issues of law or fact that affect all putative class members.  *Spread Enters.*, *Inc.*, 298 F.R.D. at 67.  The common question must be "at the core" of each of the causes of action alleged and must be susceptible to "generalized proof."  *Id.*  Where individualized evidence is necessary to determine certain threshold issues, the action is not appropriately determined on a class wide basis.  *See Edwards v. Publrs. Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 184 (S.D.N.Y. 2010) (finding that commonality was not established because the issues in the case

were not subject to class-wide evidence and common proof); *Spread Enters.*, *Inc.*, 298 F.R.D. at 67 ("what really matters to class certification is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation") (citations omitted)); *Ellersick v. Monro Muffler Brake, Inc.*, No. 10-CV-6525-FPG-MWP, 2017 U.S. Dist. LEXIS 49841, at *31 (W.D.N.Y. Mar. 31, 2017) ("evidence regarding the hours worked by each technician will be highly individualized and is not subject to common proof").

Plaintiff's TVPA claim requires individualized proof and analysis, and therefore, her TVPA claims do not satisfy the commonality requirement of Rule 23(a)(2).  Commonality "requires the Plaintiff to demonstrate that each of the class members have suffered the same injury." *Wal-Mart, Stores, Inc.*, 564 U.S. at 350 (citation omitted).  In other words, "[t]heir claims must depend on a common contention" which "must be of such a nature that it is capable of class wide resolution." *Id.*

The U.S. Supreme Court has been crystal clear that merely alleging "that [class-members] have all suffered a violation of the same provision of law," is insufficient to satisfy the commonality requirement. *Id.*  Plaintiff cannot satisfy the commonality requirement by simply alleging that all class-members suffered a TVPA § 1589 injury.

Moreover, Plaintiff and each of the putative class members whose depositions were taken in this case, expressly contradict the claims in the Complaint that they were threatened or coerced in any manner.  (Paguirigan Dep. at 26-33; 404 ); (Valdez Dep. at 83; 104-105); (Bane Dep. at 60-61; 98 ); (Padernal Dep. at 68).  Plaintiff seems to argue in her motion that the Termination Amount in the Contract itself constitutes a "threat" within the meaning of § 1589.

However, this question, is not susceptible of producing "common answers" because determining whether and when each individual employee felt threatened or coerced requires an individualized assessment of the state of mind of each member of the putative class. *See Wal-Mart*, 564 U.S. at 350.

For instance, nurse Padernal testified that she entered into the Contract with the intent of not satisfying the three-year commitment and always intended to pay the Termination Amount damages.  (Padernal Dep at 53).  It is highly unlikely that Padernal felt threatened since from the start of her employment she planned to breach the Contract at the Defendant's expense.

Plaintiff's theory depends on the factually unsupported and implausible assumption that each and every putative class member reached the same conclusion that breaching the Contract and being required to pay the Termination Amount amounted to involuntary servitude.  The determination of what, if anything, compelled each putative class member to perform or not perform their Contract would require precisely the individualized inquiry that is not susceptible to "class wide resolution." *Wal-Mart*, *Stores, Inc.*, 564 U.S. at 350.

Section 1589's text is clear that it only proscribes the listed conduct—e.g., "threats of physical restraint" or "threats of serious harm"—when "the labor or services of a person" are obtained "by means of" that conduct.  *See* § 1589(a)(1)-(4).  This language requires that the defendant's alleged conduct have caused the Plaintiff to perform "labor or services."  *See* § 1589(a); *see, e.g., Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179-80 (9th Cir. 2012).  Proving that a defendant's alleged conduct caused a Plaintiff to perform labor or services is a highly individualized inquiry, which requires individualized proof.  Proving the required causal connection in this case will require a highly-individualized inquiry into the psychological reasons why each of the putative class members remained employed and did not breach their

respective Contract.

### C.  Plaintiff Has Failed To Establish Typicality

Plaintiff is required to demonstrate that her claims are typical of the claims of the class that she seeks to represent.  *Spread Enters.*, *Inc.*, 298 F.R.D. at 68.  Moreover, regardless of whether the issue is framed in terms of the typicality of the representative's claims, or the adequacy of its representation, "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (citation omitted).  *Vengurlekar v. Silverline Techs., Ltd.,* 220 F.R.D. 222, 227 (S.D.N.Y. 2003) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation") (citation omitted). Additionally, courts have held that fact specific inquiries required to determine if an individual is properly classified, as, for instance, exempt from overtime obligations, can preclude typicality.  *Morisky v. Public Service Elec. And Gas Co.,* 111 F. Supp. 2d 493, 500 (D.N.J. 2000).

Here, due to the significant inconsistencies between the Complaint, the documents and Plaintiff's deposition testimony as well as the inconsistencies within her deposition itself, Paguirigan will undoubtedly be preoccupied with unique defenses to her underlying claims.  *See Dauphin v. Chestnut Ridge Transp., Inc.*, 2009 U.S. Dist. LEXIS 74483, at *10 (S.D.N.Y. Aug. 20, 2009) ("rejecting class certification and noting that "plaintiffs' interstate travel is a unique defense that threatens to become the focus of this litigation"); *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 320 (S.D.N.Y. 2003) (Plaintiffs' failed to satisfy the typicality requirement "as a result of the individualized inquiry required," which threaten to "overshadow[] issues common to the Class").  Finally, unlike other putative class members, Plaintiff is subject to counterclaims for

breaching her Contract.[10]

There is no evidence that the Plaintiff's claims are factually "typical" of TVPA claims of the other putative class members. *See* Fed. R. Civ. P. 23(a)(3). Although Plaintiff, Valdez and Francisco were sued in 2016 after they left their employment, in the nine previous years before, no other employee who breached their contract was sued. To the extent Plaintiff claims to have perceived a "threat," this perception is subjective, and will turn on psychological factors of each individual in the putative class.

Moreover, in addition to the individualized causation issue, Plaintiff seeks class-wide compensatory and punitive damages as well as restitution for the alleged § 1589 violation. Plaintiff makes no effort to contend that the TVPA damages she seeks present a question that can be resolved on a class-wide basis nor does she address damages in the context of the Rule 23(b)(3) argument. While individualized damages do not automatically preclude class certification, "predominance may be destroyed if individualized issues will overwhelm those questions common to the class[.]" *Wallace B. Roderick Revocable Living Tr. v. XTO Energy*, Inc., 725 F.3d 1213, 1220 (10th Cir. 2013) ("[I]ndividualized damage determinations cut against class certification under Rule 23(b)(3)") (citation omitted).

Establishing damages for alleged § 1589 TVPA violations would necessarily be an intensely individualized determination, one dependent on which of the numerous possible proscribed "means" in § 1589(a) was implicated by the facts of each putative class-member's case. Indeed, even if a jury were to conclude that the Termination Amount constituted a "threat" proscribed by § 1589, any damages assessment would necessarily need to inquire into whether

---

[10] Even if the Court would choose not to enforce the Termination Amount, Plaintiff would be liable for actual damages and all attorney's fees incurred by Prompt pursuant to the terms of the Contract. See Article VII, Paragraph 4 of Contract (Hahn Dec. Exh. E).

any of the other means of § 1589(a) were violated.  Calculating damages for any employee would require proof of these occurrences, but none of these issues are susceptible to class-wide determination.  Further individualized assessment would be required for those putative class-members who attempt to prove their entitlement to punitive damages.  Thus, each of the putative class-members' damages inquiries would devolve into mini-trials on what additional portions of § 1589 may have been violated vis-á-vis a particular employee, and whether that employee was entitled to punitive damages.  Plaintiff, however, has not indicated any means by which these damages could be uniformly calculated—because none exists.

In short, the highly-individualized questions inherent in § 1589's causal requirement, and in a damages assessment, "are more prevalent [and] important," *CGC Holding Co., Ltd. Liab. Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014), than any common issue that might exist.  The Court should therefore deny certification of Plaintiffs' proposed TVPA class.

### D.  Plaintiff Has Failed To Show That Common Issues Predominate

Predominance is "the hardest requirement for [a] class to meet, as it contemplates that there are interrelated individual and common legal issues."  *Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2018 U.S. Dist. LEXIS 21843, at *87 (E.D.N.Y. Feb. 8, 2018).  The court has to "determine whether the same evidence will suffice for each member to make a prima facie showing or whether the issues are generally not susceptible to class-wide proof."  *Id.*  To be sure, Plaintiff's burden of proof as to the predominance requirement is more demanding than its burden as to commonality.  In this respect, a court should deny certification where there are individual issues of fact.  *Benner v. Becton Dickinson & Co.,* 214 F.R.D. 157, 168 (S.D.N.Y. 2003); *see also In re Bally Total Fitness of Greater New York, Inc.,* 402 B.R. 616, 622 (S.D.N.Y. 2009) (extensive individual analysis was required for each potential putative class member

resulting in the need for "a series of highly disputed mini-trials"); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.,* 198 F.R.D. 41, 48 (E.D.N.Y. 2000) ("the computation of damages…would be a complex, highly individualized task, requiring separate 'mini-trials' of a large number of claims").

To meet her burden under the predominance requirement, "[P]laintiff[] must show that those issues in the proposed action that are "subject to generalized proof outweigh those issues that are subject to individualized proof." *Edwards,* 268 F.R.D. at 183.

Here, Plaintiff's proposed class cannot be certified because individual issues predominate, as to each class member, requiring individual proof and analysis.

### i.    Whether Each Employee Felt Threatened and Believed He/She Was Unable to Resign Without Financial Harm Requires Individualized Proof and Psychological Analysis

There are individualized questions as to whether each putative class member felt threatened with a lawsuit if they breached the Contract and failed to pay the Termination Amount.

First, Plaintiff admitted under oath during her deposition that she was never threatened with a lawsuit nor did she have any knowledge of the 2007 lawsuit – which occurred 8 years before she started to work at Prompt—other than from news reports predating her employment. Paguirigan Dep. at 26-33, 404.  In fact, Plaintiff testified that she fully understood the implications of the Termination Amount at the time that she executed the Contract. *Id.* at 33; 166-167, and the Termination Amount was never mentioned after she arrived in the United States and commenced her employment. *Id.*

In addition, Plaintiff admitted at her deposition that she had no knowledge about the 2007 lawsuits (other than through news reports well before her employment), was never threatened

with any type of government reporting concerning her license and could not even recognize any of the defendants in the 2007 lawsuits. *Id.* at 322-324.  The only time Plaintiff or other putative class members heard about the 2007 lawsuits was in the Philippines' news, years before Plaintiff and other putative class members executed their Contracts.   Similarly, Nurse Bane testified that he was not concerned in any way about the 2007 lawsuits and voluntarily executed the Contract with full knowledge of the Termination Amount.  Bane Dep. 92; 77

Second, under Plaintiff's theory of the case, each of the putative class members would be required to establish that they were threatened, felt intimidated and coerced, and were unable to leave their employment as a result of the threats.  However, conspicuously absent in the record is any evidence that any employee was threatened or coerced into fulfilling their employment contract.  In fact, the other putative class members who testified all stated that they were never threatened. *Supra* at p. 6.

Third, as discussed below, the Termination Amount is permissible, and as a matter of law, the employer's exercise of its lawful rights cannot be considered "threatening" or economic duress. *See Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 U.S. Dist. LEXIS 38117, at *5 (S.D. Ind. Mar. 25, 2015).  Even if the Termination Amount is void (which it is not), as a matter of law the employee is entitled to actual damages incurred. *See Brecher v Laikin*, 430 F.Supp 103, 106 (S.D.N.Y. 1977) ("[i]f the clause is rejected as being a penalty, the recovery is limited to actual damages proven." [citations omitted]); *see also* 3 Farnsworth, Contracts 12.18, at 304 [3d ed] (where a liquidated damages provision is an unenforceable penalty, "the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of that agreement, just as if the provision had not been included").  Accordingly, Prompt's suit against the Plaintiff for damages is legally cognizable and cannot be

considered as an impermissible threat or economic duress.[11]  *See Panwar*,  2015 U.S. Dist.
LEXIS 38117, at *5 ("Plaintiffs conflate the 'use' of legal process with the 'abuse' of legal
process…It is not an abuse of legal process to enforce valid contractual rights against individuals
who no longer wish to be bound by the terms of an agreement they voluntarily signed. By
Plaintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of
process, which would be an absurd outcome. Thus, the Court concludes that neither the
compliance with immigration laws nor the enforcement of contract rights constituted an 'abuse
of law or legal process' for purposes of TVPA liability.

Finally, contrary to the picture painted by the complaint, not every member of the class
was threatened or coerced into fulfilling their contract.  As set forth above, nurse Padernal
admitted during her deposition that she never intended to complete the three-year Contract, and
nurse Bane admitted that he used the Contract to induce the employer to petition the VISA for
him so that he could enter the United States, and ultimately locate employment in a hospital.

### ii.    Whether Each Employee Was Promised 40 Hours of Work Requires Individualized Proof and Analysis

Plaintiff cannot satisfy her burden of establishing that there are common questions as to
whether each employee was promised 40 hours of work per week.  First, Plaintiff and other
putative class members testified that they had no interest in working more than 35 hours of work
each week.  Paguirigan Dep. at 156-160; Valdez Dep. 76-77; Bane Dep. at 67-68; Padernal Dep.
at 41-42.  Second, the Contract does not require the employer to provide 40 hours of work each
week.  Rather, the Contract leaves it to the Employer's discretion to set the amount of hours.
Article 4, Section 3 of Contract (Exh. E).  Third, the Contract requires each employee to serve

---

[11] Plaintiff clearly understood that the employer would be damaged and admitted during her testimony that she owed Prompt its damages. (Paguirigan Dep. at 356)

notice of a breach and give the Employer the opportunity to cure the breach.  Contract, Article VI, Sections 3-5.

Even if Plaintiff had a claim, which she does not, at best each putative class member would be required to establish that (i) he/she was willing to work 40 hours per week; (ii) he/she was promised 40 hours of work each week; (iii) he/she served Prompt with notice pursuant to the terms of the Contract that they will leave (Article VI, Sections 3-5); and (iv) Prompt failed to cure the alleged breach (Contract, Article VI, Section 3).  These individualized determinations could not be adjudicated on a class-wide basis.

### iii. Determining Each Employee's Job Description Requires Individualized Proof and Analysis

Plaintiff claims that she was a Nurse Manager and therefore entitled to a prevailing wage higher than that of a registered nurse.  First, as discussed below the job description is belied by the description utilized by the Job Classification Guide known as the O*Net OnLine Summary Report, prepared with the information from the Department of Labor which delineates the distinctions between Registered Nurses and other managerial-type nursing positions. Hahn Dec. at Exh. K.  Plaintiff testified that she did not meet the criterion for any part of the job description as a manager.  Second, it is virtually impossible for all of the putative class members to be Supervisors/Managers and there being no registered nurses to supervise.  Third, a detailed analysis would be required to be made  as to each putative class member's job description. Finally, as discussed above only the government can issue a Prevailing Wage Determination.

This issue is similar to the one in *Edwards* where the Court denied class certification.  In *Edwards,* the Plaintiffs sought certification of a Rule 23 class of delivery truck drivers, asserting that the issue of whether the potential members of the class were misclassified as independent

contractors was susceptible to class wide proof and that common issues predominate.  *Edwards,* 2010 WL 2428083, at *1.  The court held that the issue of whether the members of the putative class were misclassified could not be resolved by examining representative proof and that "an individualized assessment would be necessary."  *Edwards*, 268 F.R.D. at 188-89.

### iv.   The Enforceability of Each Contract's Termination Amount And The Employer's Actual Damages (If Required) Require Individualized Proof and Analysis

As a matter of New York law, the employer is entitled to recover actual damages regarding Plaintiff's and each putative class member's breach of the Contract.  *See Gomez v Bicknell*, 302 A.D.2d 107, 113-114 (2nd Dept 2002);  *Harry R. Defler Corp. v Kleeman*, 19 AD2d 396, 402-404 (4th Dept 1963).  *Harry R. Defler Corp. v Kleeman,* 19 A.D.2d 396, 403-404, 243 N.Y.S.2d 930, *affd* 19 NY2d 694.  In this instance, the employer would be entitled to (i) the funds that it paid directly for Plaintiff's VISA Application and other direct expenses; (ii) its overhead and other expenses in maintaining business and ability to recruit the foreign nurses; and (iii) its costs in replacing the breaching employee.

Plaintiff's own sworn deposition testimony establishes that the employer's damages exceed the $25,000 Termination Amount.  Plaintiff was paid $29.00 per hour by Prompt, yet, procured employment after breaching her Contract for $36.00 per hour.[12]  In 2015, the cost of procuring a registered nurse from a staffing agency to fulfill the same job as Plaintiff exceeded

---

[12] In addition, Plaintiff's new employer paid her benefits of four weeks paid vacation.  Nurse Bane testified that after leaving Prompt he is employed and earns approximately $112,000 per annum.   Plaintiff's entire claim turns contract law on its head -- Plaintiff admits that she received all of the benefits of the bargain of the Contract, yet, she argues that she is not required to live up to her end of the bargain.  "It is unreasonable to suppose that the parties intended to enter into obligations providing for the performance of the work by [one party] under a penalty for nonperformance within a given period which yet left it optional for the [other party] to facilitate or retard such work at its pleasure or discretion. Any other construction would destroy the mutuality of the agreement, and put it practically in the power of one party to defeat the performance by the other." *Shore Bridge Corp. v State*, 186 Misc 1005, 1012 (Ct Cl 1946)

$43.00 per hour.  (Philipson Dec. ¶ 16).

Whether we use Plaintiff's $36.00 per hour figure (that she received at her new job) or the $43.00 per hour figure, the additional cost of a new nurse alone exceeds $25,000.00.   The employer clearly lost more than $25,000 when Plaintiff unilaterally and prematurely terminated her Contract.  The employer's loss exceeded $25,000.

The Termination Amount is enforceable.  New York courts favor freedom of contract and generally enforce liquidated damages clauses.  *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 610 (2005).  Under New York law, "a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Center, Inc. v Puritan Farms 2nd, Inc.*, 41 NY2d 420, 424 (1977).  Moreover, a liquidated damages clause is enforceable despite the fact that the actual loss may be much less than the sum agreed upon.  *Id.*

Plaintiff misstates the Nassau County Supreme Court holding in *Sentosa Care, LLC et al v. Anilao, et al.* (Sup. Ct. Nassau Cty April 7, 2010), a copy of which is attached to the Hahn Dec. as Exhibit J.  First, in *Anilao*, the Court was faced with a contract that had employment terms that were different than the Contracts in this case.  Second, the *Anilao* court denied the employers <u>and</u> the employees' summary judgment and determined that questions of fact existed.  The *Anilao* court did <u>not</u> determine that the liquated damages clause was a penalty.  After discussing at length in *dicta* the general rules concerning liquidated damages the *Anilao* court denied the employer's motion for summary judgment to enforce the liquidated damages and denied the employees' cross-motions to dismiss.  The *Anilao* court set the damages issue for trial and stated:

In   this   case,   the   liquidated   damages   provision   at   issue   is

{097079}                                    25

> unenforceable as Plaintiffs' damages flowing from any proven
> breach by defendant Nurses will be easily ascertained at trial.

Order at 6 (Exh. J).  Furthermore, the *Anilao* decision does not have res judicata effect for two

reasons.  First, the Contracts in this case, and the relevant contracts in *Anilao*, are not identical,

nor are the parties identical.  Second, the *Anilao* case was discontinued by agreement of the

parties.  As a matter of law, once the *Anilao* case was discontinued, any prior Orders are a

nullity.  *See Newman v. Newman*, 245 A.D.2d 383, 665 N.Y.S.2d 423 (2d Dep't 1997) ("When

an action is discontinued, it is as if it had never been; everything done in the action is annulled

and all prior orders in the case are nullified.").

Although it is obvious that the Termination Amount, clearly meets the "estimate of

damages" required by New York law, given the individualized analysis needed, this issue is not

appropriate for class representative determination.

### v.   If the Termination Amount is Not Enforceable Then The Putative Class Members' Damages Requires Individualized Proof and Analysis

In *Abrams v. Interco, Inc.*, 719 F.2d 23 (2d Cir. 1983), the Second Circuit affirmed the

district court's conclusion that the predominance requirement was not satisfied in light of

complex, individual damages. As the court explained, the amount of each individual's damages

"would be complicated by the scores of different products involved, varying local market

conditions, [and] fluctuations over time," so as to constitute a "serious problem" and defeat

predominance. *Id.* at 31.

Courts have consistently held that a Plaintiff's inability to prove class wide injury

through common evidence is, alone, grounds for denying Rule 23(b)(3) certification based on a

lack of predominance. *See Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016)

(decertifying where required privity could not be "prove[n] through class-wide evidence"); *In re Rail Freight Surcharge Antitrust Litig*., 725 F.3d 244, 252 (D.C. Cir. 2013) (courts "expect the common evidence to show all class members suffered some injury"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 188 (3d Cir. 2001) (Plaintiff must "prove each investor was harmed by the defendants' practice"). A need to calculate damages on an individual basis also weighs against predominance. *See McLaughlin v. Am. Tobacco Co*., 522 F.3d 215, 232 (2d Cir. 2008) (rejecting certification where damages methodology was "used, as here, to mask the prevalence of individual issues"); *Hughes v. Ester C Co*., 317 F.R.D. 333, 356 (E.D.N.Y. 2016) ("Plaintiffs have not demonstrated that damages are calculable on a class wide basis and therefore individualized questions of fact or law predominate.").

Here, the damages inquiry would require individualized assessments. Plaintiff does not allege any common damages for Plaintiff and the putative class members. According to the Complaint, even a former employee who was threatened or felt coerced to stay employed would be a class member, despite having no damages which they would have suffered. Similarly, a former employee who was always paid in full what they were owed, who never wanted to quit, who perhaps signed more than one contract containing a perfectly enforceable liquidated damage clause, would somehow be included as a class member in a class of Plaintiffs asserting forced labor and breach of contract. Yet, once again that putative class member would not have suffered any damages.

Even an employee who signed the Contract and was not otherwise harmed in any way by any action of any defendant would be a class member without any damages. A person like this would have suffered no damages whatsoever simply because of the existence of the Termination Amount. That is because the only relevance of the Termination Amount under Plaintiff's theory

of the case is that it prevents an employee from leaving who otherwise desires to leave.

Finally, even if an employee wanted to resign, the measure of damages (to the extent that it could be computed) would be different for each putative class member.  Furthermore, any damage assessment in favor of a putative class member would require an offset of the employer's damages for the employee's breach of contract.  Given that the Termination Amount was reduced by one-third each year, it is probable that the actual damages may exceed the Termination Amount for many, if not all, of the putative class members.

Plaintiff has failed to show that to show that causation, injury, or damages predominates and can be assessed on a class-wide basis.

### vi.    Whether Each Putative Class Member
Agreed to Her Contractually Listed Hourly Rate
Requires Individualized Proof and Analysis

It is quite telling that Plaintiff does not make any claim for her prevailing wages under the law.  The reason is simple – the law uses the Prevailing Wage Determination which was issued by the government when the application is filed, in determining the prevailing wage rate that a worker is entitled to receive, even if the individual does not start working until years after the application is filed. *See Rosales v. Hispanic Emple. Leasing Program, LLC*, 06-cv-877, 2008 U.S. Dist. LEXIS 96417 at *5-6 (W.D. Mich., November 26, 2008).

Plaintiff miscomprehends the VISA Application process and the requirement for the Prevailing Wage Determination.  First, 20 CFR 656.40, requires for each and every putative class member to have a <u>government</u> determined Prevailing Wage Determination.  These determinations are not interchangeable.  20 CFR 656.40(a) provides in pertinent part:

> Application process. The <u>employer</u> must request a <u>PWD</u> from the
> NPC, on a form or in a manner prescribed by OFLC. Prior to

> January 1, 2010, the SWA having jurisdiction over the <u>area of intended employment</u> shall continue to receive and process <u>prevailing wage determination</u> requests in accordance with the regulatory provisions and <u>Department</u> guidance in effect prior to January 1, 2009. On or after January 1, 2010, the NPC shall receive and process <u>prevailing wage determination</u> requests in accordance with these regulations and with <u>Department</u> guidance. <u>The NPC will provide the employer with an appropriate prevailing wage rate. The NPC shall determine the wage in accordance with sec. 212(t) of the INA</u>.

(emphasis added).

In fact, Plaintiff and each of the putative class members received a Prevailing Wage Determination which was then submitted to the United States Government as part of the VISA Application.  Plaintiff claims that the prevailing wage due to her and the other putative class members would be the prevailing wage which existed at the time of their employment began.  As a matter of law, this is incorrect.  *Rosales, supra*.

Plaintiff's claim that she was underpaid the required prevailing wage rate is equally incorrect.  First, as discussed above, the front page of the Contract and the Wage Acknowledgment executed by Plaintiff lists the $29.00 hourly rate.  Second, the Contract refers to the Prevailing Wage Determination:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as <u>determined</u> by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

(emphasis added).  The words "As of the Commencement Date" refer to when Plaintiff would receive the $29.00 per hour, because for 4 weeks prior to the Commencement Date, Plaintiff was entitled to only $12 per hour.  (Contract at Article IV, Section 2).  The reference to "as determined" refers to the already determined Prevailing Wage Determination, which was

submitted with Plaintiff's VISA Application prior to the Contract.

> When parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. That rule imparts stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses . . . infirmity . . . of memory . . . [and] the fear that the jury will improperly evaluate the extrinsic evidence…

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 660 (2d Cir. 1996) (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).

Plaintiff does not offer any testimony that Defendants' plain reading of the Contract is incorrect.  On the contrary, Plaintiff consistently testified during her deposition that she understood she was to receive $29.00 per hour.  In fact, after executing the Contract, and the Contract was assigned to Prompt, Paguirigan executed the Wage Acknowledgment which provided for the same $29.00 rate.

Even if Plaintiff offered an alternative explanation for what she knew or expected, there would exist a question of fact as to the Contract's terms and whether all of the other class members shared Plaintiffs' understanding and expectation.  *Reyes v. Metromedia Software*, 840 F.Supp.2d 752 (S.D.N.Y. 2012) ("If a court determines that a contractual provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." [quotes omitted]). This question of fact would exist for each putative class member separately and require a trial for each putative class member to determine each member's own understanding.

Finally, even if Plaintiff were correct concerning the date of the applicable prevailing wage (which she is not), each employee would require a separate trial to establish the correct

prevailing wage for that employee.

### E.  Plaintiff Cannot Adequately Represent the Interests of the Class Because Plaintiff Is Not Credible and Presented Contradictory Testimony Concerning The Complaint

In examining whether a plaintiff is a fair and adequate representative, courts consider (i) whether the proposed plaintiff  is credible; (ii) whether the proposed plaintiff has adequate knowledge of the case and  is actively involved in prosecuting the lawsuit; and (iii) whether the interests of the proposed plaintiff are in conflict with those of the rest of the class.  *See Attenborough v. Const. and Gen. Bldg. Laborers Local* 79, 238 F.R.D. 82 (S.D.N.Y. 2006); *see also Spagnola v. Chubb Corp.,* 264 F.R.D. 76 (S.D.N.Y. 2010); *Lewis v. Nat'l Fin. Sys., Inc.,* No. 06 CV 1308, 2007 WL 2455130 (E.D.N.Y. Aug. 23, 2007); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 54969 S. Ct. 1221, 93 L. Ed 1528 (1949) (class representative is a fiduciary and interests of the class are "dependent upon due diligence wisdom and integrity"); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir. 2000).  Moreover, a court may consider whether a class representative is "of sufficient moral character to represent a class." *Velez v. Majik Cleaning Serv., Inc.,* No. 03 CV 8698 (SAS), 2005 WL 106895, at *3 (S.D.N.Y. Jan. 19, 2005).  Adequacy of representation requires that the class representative "possess the same interest and suffer the same injury" as the putative class members. *Schlessinger v. Reservists Comm. To Stop the War,* 418 U.S. 208, 216, 94 S. Ct. 2925, 2930 (1974).[13]

The inconsistencies between Plaintiff's sworn deposition testimony and the Complaint, as

---

[13]     To determine whether a plaintiff is an adequate representative, courts consider whether a class representative is subject to "unique defenses which threaten to become the focus of the litigation." *See Dauphin v. Chestnut Ridge Transp. Inc.,* No. 06 CV 2730, 2009 WL 2596636, at *3 (S.D.N.Y. Aug. 20, 2009); *see also* Section I(B).

well as the blatant contradictions within her own testimony, demonstrate a lack of credibility and trustworthiness of the Plaintiff.[14]  *See Cohen v. Laiti,* 98 F.R.D. 581, 582-83 (S.D.N.Y. 1983) (finding Plaintiff to be an inadequate lead Plaintiff where there where multiple contradictions between Plaintiff's testimony and the allegations in the complaint) (*citing Kline v. Wolf,* 702 F.2d 400, 402-03 (2d Cir. 1983)).[15]

In  her Complaint, Plaintiff alleges that she (i) was threatened and was unable to terminate her employment; (ii) felt threatened because in 2007, certain defendants sued other nurses for breach of employment agreement when the nurses staged a "walk out" and endangered pediatric ill and disabled patients; (iii) was promised employment of 40 hours per week; (iv) worked as a nurse manager and was therefore entitled to a higher rate; (v) did not know that Prompt d/b/a Sentosa Services was her employer; and (vi) did not know that her agreed hourly fee was $29.00 but was promised the prevailing wage which was in effect on June 18, 2015.

In contrast to the above allegations, Plaintiff testified under oath, at her deposition that:

- She was never threatened in any manner (Paguirigan Dep. 26-33; 404);

- She had no knowledge concerning the 2007 lawsuits and vaguely only heard about it in about 2007 in the Philippines' news, <u>eight years</u> prior to entering into any agreement Golden Gate. (Paguirigan Dep. 226-228);

---

[14]     During Plaintiff's deposition, she repeatedly changed her own testimony, gave directly contradictory answers and confirmed misrepresentations previously made in the complaint.  *See* Exh. A at pp. 26-33; 404 (confirming she was never threatened, contrary to facts of the complaint); pp. 156-160 (admitting she never wanted to work more than 35 hours per week, while complaint states claims based on defendants' alleged failure to provide more than 35 hours per week to Plaintiff and putative class members); 76-77 (contradicting herself about number of nurses who worked along with her).  Plaintiff's deposition testimony is also inconsistent with the documentary evidence submitted herein.  As set forth above, the cover page attached to the remainder of her contract with a metal eyelet was disassembled and produced in discovery separate and apart from the remaining pages.

[15]     In *Kline,* the court found that based on the Plaintiffs' deposition testimony, they "were vulnerable to serious attacks upon their credibility, and that "the remaining members of the class could be severely damaged by Plaintiffs' representations of them."  Even if a Plaintiff's inconsistent testimony "was the product of an innocent mistake," it would still question Plaintiff's credibility.  *Kline,* 702 F.2d at 403.

- She was never promised 40 hours of work each week, and in fact, did not want to work more than 35 hours per week. (Paguirigan Dep. 156-160; 162);

- She was asked to perform the precise duties listed in her Contract and she never acted as a Nursing Manager/Supervisor[16] nor did she fulfill any of the job descriptions set forth in "O*Net OnLine Summary Report for the higher paid position of Medical and Health Services Manager. (Paguirigan Dep. 133; 68-71);

- She was aware that her Contract expressly provided that it may be assigned and was assigned to Prompt d/b/a Sentosa Services who at all times was her employer (see Notice of Acknowledgement of Pay Rate and Payday, Exh. G)

- She was aware of her Prevailing Wage Determination which was set by the government in 2007 and Plaintiff was provided with a copy of her VISA Application (Paguirigan Dep. 370-375);

- She was aware that the front page which was attached to the Contract that she signed, set forth the contractual wage rate of $29.00 that she was to be paid. (Paguirigan Dep. 23-25; 93-94) Exh E; and

- She never even heard the term "prevailing wage" until her predeparture orientation in 2015. (Paguirigan Dep. 362).

The multiple contradictions between Plaintiff's sworn deposition testimony, and the allegations in her complaint, clearly demonstrate that Paguirigan has a significant credibility issue, lacks the required integrity to serve as a fiduciary and is, therefore, an inadequate class representative.

---

[16] Plaintiff's entire allegation rests upon her "employment identification badge" which stated her position as "Nurse Manager." The title does not establish that Plaintiff performed any managerial services; on the contrary, the "Manager" title only addressed that as a registered nurse she supervised the certified nursing assistants who assist all registered nurses. New York Department of Health regulations to not list any position of "Nurse Manger." To the extent Plaintiff claims that she was a supervisor entitled to a greater prevailing wage, Plaintiff must establish that her duties complied with the requirements of O*Net OnLine, which establishes the statutory designation for each position. Plaintiff testified at length that she did not provide any supervisory services and did not meet the requirements of a Medical and Health Services Manager. (Paguirigan Dep. 68-71). Plaintiff was supervised by a nursing supervisor, director of nursing services and a licensed nursing home administrator. Moreover, any dispute with Plaintiff's Prevailing Wage Determination must be made with the government who issues such determinations. Plaintiff received the Prevailing Wage Determination in 2007 and never objected to it or filed an appeal with the government.

## **CONCLUSION**

It is respectfully submitted that Plaintiff's Motion for Class Certification under FRCP 23(a) and either 23(b)(2) or (b)(3) should be denied based on Plaintiffs' failure to demonstrate that: (1) the putative class can be ascertained based on objective criteria; (2) Plaintiffs' failure to demonstrate that she is a fair and adequate representative of the class based on her lack of creditability as demonstrated by the material contradictions between her sworn deposition testimony and the allegations in her complaint; and (3) Plaintiffs' failure to demonstrate that her claims are typical of the claims of each member of the class and that common questions of law and fact predominate over questions affecting each individual in the putative class. Based on the foregoing, Defendants respectfully request that this Court deny Plaintiff's Motion for Class Certification in its entirety.

Dated: Brooklyn, New York
        March 7, 2018

                                        **HAHN EISENBERGER PLLC**

                                        By:____/s/ Elliot Hahn_____
                                                Seth Eisenberger (SE-6769)
                                                Elliot Hahn (EH-6087)
                                        Hahn Eisenberger PLLC
                                        969 East 27th Street
                                        Brooklyn, New York 11210
                                        347-410-5800
                                        mail@hahneisenberger.com

                                                        &

{097079}                                34

**ROBINSON BROG LEINWAND**
**GREENE GENOVESE & GLUCK, P.C.**

By: ___/s/ Alan M. Pollack___
       Sheldon Eisenberger (SE-2021)
       Alan M. Pollack (AMP-3759)
       Tarique Collins (TC-4744)
875 Third Avenue, 9th Floor
New York, NY 10022
212-603-6300

*Attorneys for Defendants*