UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROSE ANN PAGUIRIGAN, individually and on
behalf of all others similarly situated,

        Plaintiff,

- against -

PROMPT NURSING EMPLOYMENT AGENCY
LLC d/b/a/ SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,

        Defendants.
-----------------------------------------------------------x

**OPINION and ORDER**

No. 17-cv-1302 (NG) (JO)

**GERSHON, United States District Judge:**

Plaintiff Rose Ann Paguirigan brings claims for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 *et seq.*, and declaratory judgment against defendants Prompt Nursing Employment Agency LLC ("Prompt Nursing"), Sentosacare LLC ("Sentosacare"), Sentosa Nursing Recruitment Agency ("Sentosa Agency"), Benjamin Landa ("Landa"), Bent Philipson ("Philipson"), Berish Rubenstein ("Rubenstein"), Francis Luyan ("Luyan"), Golden Gate Rehabilitation and Health Care Center LLC ("Golden Gate"), and Spring Creek Rehabilitation and Nursing Center ("Spring Creek"). Plaintiff also brings a breach of contract claim against Prompt Nursing, Landa, Philipson, and Rubenstein.

All defendants previously moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all TVPA claims and the declaratory judgment claim; and defendants Landa, Philipson, and Rubenstein moved to dismiss the breach of contract claim. I denied the motion to dismiss in full.

1

*Paguirigan v. Prompt Nursing Employment Agency LLC*, 286 F.Supp.3d 430 (E.D.N.Y. 2017). Plaintiff now moves pursuant to Federal Rule of Civil Procedure 23 to certify a class comprised of "all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008." Pl.'s Br. at 11. For the reasons set forth below, I grant plaintiff's motion to certify this class under Rule 23(b)(3) against all defendants and with respect to all claims. Pursuant to Rule 23(g), I appoint plaintiff's counsel as class counsel.

I.      **Factual Background**

A.      **Plaintiff's Hiring and Employment**

Unless otherwise noted, the facts described are undisputed. Plaintiff is a Filipino national who, beginning in 2006, was recruited in the Philippines by Luyun, Philipson, and Sentosa Agency to work for a nursing home in New York owned and operated by defendants. Luyun is the sole proprietor of Sentosa Agency, a recruitment agency located in the Philippines that recruits nurses to work in the United States. The parties' papers are ambiguous as to Philipson's exact role in the recruitment process, but he recruited plaintiff in his capacity as a "representative" of defendant Golden Gate.

In 2007, defendants submitted a visa application on plaintiff's behalf to federal authorities. The visa application included a prevailing wage determination as of that time. Plaintiff's prevailing wage determination for her employment as a nurse in New York was $26.87 per hour.

It took eight years for plaintiff's visa application to be approved and for her to receive an interview with the United States Consulate in the Philippines. At the time of the interview, the Consulate required confirmation that a job was still available for the visa applicant. On April 22, 2015—after receiving notification of the interview, but before the interview itself—plaintiff signed

2

a three-year employment contract to work for defendant Golden Gate, a nursing home on Staten Island owned and operated by defendants. Landa, Chief Executive Officer and Managing Partner of Golden Gate, signed the contract as the employer.

There are three features of the employment arrangement that are of particular relevance to this action. First, Section IV(1) of the contract contains the following provision regarding wages:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

The contract defines "Commencement Date" as "the date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training . . . ." The provisions specifying the wage and defining "Commencement Date" are identical in all of the employment contracts defendants produced in this action.

Second, physically affixed to the front of the employment contract at the time of plaintiff's signing was a cover letter on Golden Gate stationery from defendant Landa to the Consul. The letter states that Golden Gate offered plaintiff a position as a Registered Nurse for $29.00 per hour. While plaintiff's signature appears on every page of the employment contract, plaintiff's signature does not appear on the cover letter. This appears to have been standard practice for defendants: all of the employment contracts produced by defendants in this case include letters to the Consul affixed to the front. All of the contracts are signed on each page by the employee, but none of the affixed cover letters are signed by the employee.

Third, the employment contract required plaintiff to pay a contract termination fee—the contract calls it "Liquidated Damages"—of up to $25,000 if she left defendants' employment

before the end of the contract term.[1] The contract termination fee is standard in all of the contracts defendants produced in this action.[2] This provision of the contract also required the employee to execute a confession of judgment for $25,000, which the employee agreed could be filed in court in the event that the employee failed to complete the employment term. Defendants claim the purpose of the contract termination fee is to compensate for numerous expenses associated with the hiring of Filipino nurses. Plaintiff and other Filipino nurses were required to sign an acknowledgment of the costs defendants expended in their recruitment. The acknowledgment plaintiff signed states that defendants paid a total of $3,685 for attorneys' fees, filing fees, visa fees, airfare, and miscellaneous fees in connection with her hiring and travel to the United States. Defendants also paid for some additional relocation expenses and two months of rent upon plaintiff's arrival in the United States.

After plaintiff signed the employment contract, defendant Golden Gate verbally assigned the contract to defendant Prompt Nursing, a staffing agency with offices in New York. On June 22, 2015, plaintiff began working at defendant Spring Creek, a nursing home in Brooklyn owned by defendants. On March 7, 2016, plaintiff quit her job.

---

[1] Plaintiff's employment contract provides the following with regard to the amount of the contract termination fee:
> The afore-cited liquidated damages of Twenty Five Thousand Dollars ($25,000.00) in case of pre-termination of employment/breach of contract within the three (3) year period shall be computed as follows:
> > Within Year 1 – the liquidated damages is $25,000.00
> > Within Year 2 – the liquidated damages is $16,666.67
> > Within Year 3 – the liquidated damages is $8,333.34

[2] In some of the contracts the termination fee is called "liquidated damages/reimbursement of expenses." *E.g.*, Contract of Wilwen Antigua, at 8. Otherwise, the contract termination fee provision is the same in all contracts.

4

## B. Defendants' Enforcement through Legal Process

Plaintiff alleges that defendants have abused the law or legal process as a means of coercing foreign nurses, including plaintiff, to continue working for defendants. While defendants dispute that their actions amount to abuse of legal process, they do not dispute that they have pursued legal action.

In April 2006, 10 nurses, recruited by Sentosa Agency in the Philippines and employed by Sentosa Care in New York, resigned their employment. *See Matter of Vinluan v. Doyle*, 60 A.D.3d 237, 240 (2d Dep't 2009). All of the nurses had signed employment contracts requiring them to pay a $25,000 contract termination fee if they left their employment before the end of a three-year term. *Id*. In response to the resignations, defendants filed a complaint with the New York State Education Department alleging that the nurses had abandoned their patients by simultaneously resigning without adequate notice. *Id.* at 242. The Education Department conducted an investigation and in September 2006 concluded that none of the nurses had committed professional misconduct. *Id.* In March 2007, a Suffolk County grand jury criminally indicted the nurses and their attorney on charges of conspiracy to endanger the welfare of a child and endangering the welfare of a physically-disabled person.[3] *Id.* The nurses and their attorney sought a writ of prohibition to halt the criminal proceeding. *Id.* at 243. The New York State Supreme Court, Appellate Division, Second Department, granted the writ, holding that the prosecution would violate the nurses' Thirteenth Amendment rights and their attorney's First Amendment right. *Id.* at 249-50.

---

[3] The same group of 10 nurses and their attorney subsequently filed a lawsuit alleging that the Suffolk County District Attorney, as well as defendants to this action Sentosa Care, Prompt Nursing, Luyun, Philipson, and Rubinsten, had wrongfully orchestrated the prosecution. That case is still separately pending in this district. *Anilao v. Spota*, 10-cv-32 (JFB) (AKT).

Related to that incident, defendants SentosaCare LLC, Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate, brought a civil lawsuit against 38 Filipino nurses who had resigned their employment, including the 10 who were criminally indicted, to enforce the $25,000 "Liquidated Damages" provision. *SentosaCare LLC v. Anilao*. No. 6079/06 (N.Y. Sup. Ct. Nassau Cty. May 20, 2010). The court found that the liquidated damages provision was unenforceable because contract damages could be easily proven at trial, and the parties had unequal bargaining power in negotiating the contracts. *Id.* at *6.

In 2016, defendant Prompt Nursing sued plaintiff and two other Filipino nurses, Jericson Valdez and April Sullivan Francisco, to enforce the $25,000 contract termination fees. The lawsuits also sought $250,000 in damages for tortious interference with contract and prospective business relations. (Defendants acknowledge they brought these lawsuits, but no further information is provided in the papers.) Overall, plaintiff alleges that these legal actions are demonstrative of defendants' practice of using legal action to coerce foreign nurses, including plaintiff, to continue working for defendants.

## II. Discussion

### A. Plaintiff's Claims

Plaintiff sues on behalf of all nurses who were recruited by defendants in the Philippines and were employed by defendants in the United States at any time since December 23, 2008. Plaintiff brings claims for violation of the TVPA, 18 U.S.C. § 1589 (forced labor); violation of the TVPA, § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor); conspiracy to violate the TVPA, 18 U.S.C. § 1594(b); attempt to violate the TVPA, 18 U.S.C. § 1594(a); breach of contract; and declaratory judgment as to the enforceability of the termination fee and confession of judgment.

Before beginning an analysis under Federal Rule of Civil Procedure 23, it is helpful to describe the theory of plaintiff's claims.

Plaintiff's breach of contract claim is premised on the following: Her contract, as well as the contracts of all putative class members, specifies that the employee's hourly wage would be the prevailing wage as of the "Commencement Date." The contract defines "Commencement Date" as "the date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training." Thus, plaintiff argues that the contract requires payment of the prevailing wage as of the date she began working. Because defendants paid a wage less than that wage, plaintiff asserts defendants breached the contract.

The remainder of plaintiff's claims fit into a theory related to the $25,000 contract termination fee and its allegedly true purpose. The $25,000 fee is not, plaintiff argues, truly "liquidated damages" because the amount is far greater than defendants' actual costs and, following the *Anilao* decision, defendants knew the fee was not enforceable. Instead, plaintiff alleges, defendants used the $25,000 fee and threats of legal action to pressure her and the putative class members to continue working, in violation of various provisions of the TVPA.

**B.      Class Action Standard**

Class certification is governed by Federal Rule of Civil Procedure 23. Under Rule 23(a), the party seeking certification must demonstrate, first, that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

7

Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b). Here, plaintiff primarily argues that her case meets the requirements of Rule 23(b)(3): that is, that questions of law or fact common to class members predominate over questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

## C. Rule 23(a) Prerequisites

### 1. Numerosity

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." Numerosity is presumed by a class consisting of at least 40 members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Defendants have produced employment records for more than 200 nurses who were recruited in the Philippines and were employed by the defendants in the United States after December 23, 2008. Plaintiff's proposed class is thus sufficiently large, and joinder is impracticable. Numerosity is satisfied.[4]

---

[4] In addition to the express requirements of Rule 23(a), the Court of Appeals for the Second Circuit has recognized an implied requirement of ascertainability. Ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Securities*, 862 F.3d 250, 264 (2d Cir. 2017). Here, the proposed class consists of all nurses recruited by the defendants in the Philippines and employed by the defendants in the United States at any time since December 23, 2008. Membership in the proposed class does not depend on whether a nurse remained employed through the contract term, was fired, or quit. The records defendants produced in this case establish that more than 200 nurses signed standard contracts in the Philippines for employment in the United States. The identity of each member of the proposed class can readily be determined based on defendants' own records. Ascertainability thus poses no hurdle to class certification.

## 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Commonality means not merely that the class members have all suffered a violation of the same provision of law, but "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). The claims of the putative class members "must depend upon a common contention of such a nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Thus, "[w]hat matters to class certification . . . is not the raising of common questions—even in droves, but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotations marks and citations omitted). In other words, the key inquiry under *Dukes* is "whether the disputed issue could be resolved through common *proof*." *Morangelli v. Chemed Corp.*, 2013 WL 1212790, at *4 (E.D.N.Y. Mar. 25, 2013).

The common issues of law and fact raised by plaintiff's claims include: (1) whether defendants' standard employment contracts require payment of the prevailing wage as of the date the employee started working or the date the contract was signed; (2) whether an employee's acknowledgment of her wage is a waiver of the right to receive a prevailing wage as of the date the employee started working; (3) whether *Anilao* collaterally estops defendants from arguing that the $25,000 contract termination fee is enforceable as liquidated damages; (4) whether the $25,000 contract termination fee is otherwise unenforceable as a matter of law; (5) whether defendants used the $25,000 contract termination fee and undue legal proceedings against some nurses to coerce all nurses to continue working; (6) whether each defendant joined and/or benefitted from a venture

that violated the TVPA; and (7) whether Prompt Nursing's corporate veil may be pierced to impose liability on Landa, Philipson, and Rubenstein. These questions are capable of classwide resolution.

For example, an answer concerning defendants' wage obligation will depend upon interpretation of the wage provision in defendants' standard contract. The determination of this question will be a classwide one identical across the class because all putative class members signed a contract with the same prevailing wage provision. If it is determined, as plaintiff contends, that the contract requires payment of the prevailing wage as of the date an employee started working, this determination will resolve an issue central to the breach of contract claim—with one stroke—for all putative class members. Likewise, the issue would also be resolved classwide if defendants prevail in their argument concerning the contract's meaning.[5] Thus plaintiff's claims raise questions common to the proposed class.

### 3. *Typicality*

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Like commonality, typicality serves as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw.*, 457 U.S. at 157 n.13. Typicality is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *Robidoux v. Celani*, 987 F.2d 931, 936 (2d. Cir. 1993).

---

[5] Defendants raise an argument concerning the TVPA's legal standard under the commonality requirement and under the predominance requirement of Rule 23(b)(3). Their argument is addressed in the section concerning predominance.

When it is alleged that the same unlawful conduct was directed at or affected the named plaintiff as well as the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims. *Id.* at 937.

Defendants argue that plaintiff is not typical of the class for three reasons: first, because she will be subject to defenses unique to her underlying claims; second, because plaintiff's TVPA claims are factually distinct from those of her fellow class members; and third, because plaintiff is subject to a counterclaim for breach of contract.

First, defendants contend that there are "significant inconsistencies" between the allegations in the Complaint and plaintiff's deposition testimony that will force her to put forth unique defenses that threaten to become the focus of the litigation. The most significant inconsistency that defendants suggest is that the Complaint alleges that defendants threatened nurses with enforcement of the $25,000 termination fee, while plaintiff testified that she was not overtly threatened while working for defendants. Though plaintiff did not describe overt threats, she testified that defendants emphasized the termination fee during the recruitment process and she was aware of defendants' lawsuits and professional disciplinary complaints against other Filipino nurses. The parties do not dispute that defendants actually sued plaintiff, both for the $25,000 termination fee and $250,000 in damages for tortious interference. Thus, plaintiff's testimony does not on its face appear to be inconsistent with the Complaint.[6]

---

[6] Defendants list numerous other purported inconsistencies between the Complaint and plaintiff's testimony. For example, defendants incorrectly assert that the Complaint alleges that plaintiff did not know that she would be paid $29 per hour, while plaintiff acknowledged in her deposition that she knew about this wage rate. Defs' Opp'n Br. at 32. The Complaint in fact alleges that plaintiff was paid $29 per hour, but was entitled to a higher wage. Compl. ¶¶ 25-27. Plaintiff's testimony comports with this allegation and she does not deny being told her wage would be $29 per hour. After reviewing the Complaint and plaintiff's testimony, I find that none of the purported "inconsistencies" defendants list in their brief are substantial.

Defendants' second argument—that plaintiff's TVPA claims are factually distinct from those of the proposed class—is incorrect. The basic facts underlying plaintiff's claims are uniform in comparison to other members of the proposed class. Plaintiff and all putative class members were recruited by defendants in the Philippines, signed contracts containing the same wage and termination provisions, and were subject to the same working conditions at defendants' nursing homes. Although plaintiff differs from some members of the proposed class in that she actually quit her job and was sued for the contract termination amount, her claims do not turn on those facts. Her claims turn on her recruitment, her employment contract, and her treatment while in defendants' employ. In these regards, her experience was entirely typical of the proposed class.

Finally, defendants argue that, unlike other putative class members, plaintiff is subject to a counterclaim for breach of her employment contract and therefore will be "preoccupied with unique defenses." Specifically, defendants argue that, if I conclude that the contract termination fee is unenforceable, plaintiff would be liable for actual damages and attorneys' fees incurred pursuant to the terms of the employment contract, consideration of which would overshadow common issues.[7] Although defendants are correct that the counterclaim concerns only plaintiff and not absent class members, defendants fail to identify anything about plaintiff's defense to the counterclaim that would be inconsistent with the proposed class's interests. Additionally, I conclude that, because the counterclaim is a minor issue in comparison to the main issues in this

---

On this point, I note that defendants' citation of *Kline v. Wolf*, 702 F.2d 400 (2d. Cir. 1983), is inapposite. In that case, the plaintiff's credibility was called into doubt because he testified to relying on a report that he later admitted did not exist at the time of his alleged reliance. *Id.* at 402-03. The purported inconsistencies here do not rise to that level.

[7] Defendants other arguments concerning calculation of individual damages are considered under Rule 23(b)(3). *See Dukes*, 563 U.S. 338, 362 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3).").

case that are common, plaintiff remains typical of the proposed class. Accordingly, I reject defendants' arguments and conclude that typicality is satisfied.

4. *Adequacy of Representation*

Rule 23(a)(4) requires a plaintiff to demonstrate that the proposed action will fairly and adequately protect the interests of the class. Formerly, this test encompassed two determinations: first, that there is an absence of conflict and antagonistic interests between the named plaintiff and putative class members, and second, that plaintiffs' counsel is qualified, experienced, and capable. However, the Advisory Committee Notes to the 2003 Amendments to Federal Rule 23(g) state that appointment of class counsel is governed by Rule 23(g) rather than Rule 23(a)(4). *See Attenborough v. Const. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y. 2006). I thus analyze the adequacy of the proposed class representative and adequacy of counsel separately.

As to the former, there is no evidence of any conflict of interest among class members. Defendants' argument against plaintiff's adequacy largely tracks their argument against typicality, that is, that plaintiff is not an adequate class representative because of "inconsistencies" between the allegations in the Complaint and her testimony. Having already considered and rejected this argument, I decline to consider it again, and find that plaintiff is adequate to represent the interests of the class.

Defendants make no argument against the appointment of plaintiff's counsel as class counsel. Notwithstanding the lack of objection, I have considered whether plaintiff's counsel is adequate under Rule 23(g)(1) and (4). In concluding that plaintiff's counsel is adequate to represent the class, I note that plaintiff's lead attorney, John Howley, is an experienced labor lawyer who has argued before the United States Supreme Court and the Court of Appeals for the Second Circuit. Mr. Howley has also lived, worked, and studied in the Philippines and speaks two

Philippine dialects spoken by plaintiff and the putative class members. Plaintiff's co-counsel Leandro B. Lachica, who is admitted to practice law in the Philippines and in New York State, was formerly a Consul and Legal Officer with the Philippine Consulate in New York City where he was responsible for assisting Philippine national with U.S. employment and immigration issues.

### D. Rule 23(b) Prerequisites

Under Rule 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### 1. *Predominance of Common Questions*

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d. Cir. 2002). This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Plaintiff asserts that common questions predominate over individual issues both in number and importance because her claims arise out of the same nucleus of operative facts that affected the proposed class, namely her recruitment and employment by defendants. Defendants argue that individual issues predominate primarily because the TVPA claims require an examination of whether each individual putative class member felt threated, intimidated, or coerced by defendants' conduct. Defendants also raise a number of other issues that, as discussed below, relate to calculation of damages.

### a. TVPA

To establish a claim of forced labor under TVPA § 1589(a), plaintiff must show that defendants knowingly provided or obtained her labor or services by means of "serious harm or threats of serious harm," "the abuse or threatened abuse of law or legal process," or "any scheme, plan, or pattern intended to cause [her] to believe that, if [she] did not perform such labor or services, that [she] or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).[8] The TVPA defines serious harm as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel *a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm." § 1589(c)(2) (emphasis added). The "threat of financial harm constitutes serious harm within the meaning of the TVPA." *Paguirigan*, 286 F.Supp.3d at 438 (citing *United States v. Dann*, 652 F.3d 1160, 1170-1171 (9th Cir. 2011)); *accord Javier v. Beck*, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014).

The TVPA's explicit statutory language makes clear that a "reasonable person" standard applies in determining whether a particular harm (or threat of harm) is sufficiently serious to compel an individual to continue performing labor or services. Thus, defendant's contention that adjudication of plaintiff's claims would require an individualized consideration of each putative class member is mistaken. The question is not whether each individual felt compelled to continue her employment as a result of defendants' conduct, but whether a reasonable person of the same background and in the same circumstances would find that conduct a threat of serious harm

---

[8] Plaintiff does not allege that she was subjected to actual force, physical restraint, or threats of force or physical restraint and does not bring a claim under § 1589(a)(1).

15

sufficient to compel continued work. This question is common to all putative class members who shared background characteristics including national origin, profession, and approximate level of education, and shared the circumstance of being employed by defendants in New York.

*Tanedo v. East Baton Rouge Parish School Board*, 2011 WL 7095434, at *6 (C.D. Cal. Dec. 12, 2011), considered the identical issue in a strikingly similar fact pattern on a class certification motion concerning teachers. Plaintiffs in that case, like plaintiffs in this case, were recruited in the Philippines under contracts promising a visa and employment in the United States. *Id.* at *1. In *Tanedo*, plaintiffs brought a class-action lawsuit alleging that their recruiters and employers violated the TVPA through a scheme of hidden fees and contracts that compelled the plaintiffs to work. *Id.* at *8. In concluding that common questions predominated in the TVPA claims, the court explained:

> Because the analysis of claimed TVPA inquiry will focus on the Defendants' intent with respect to any threats made against Plaintiffs, and on a reasonable person's perception of those threats, the TVPA inquiry will not turn on, or require, individualized determinations. Thus, the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions.

*Id.* This analysis is the correct framework for considering plaintiff's TVPA claims.

Defendants urge me to consider *Panwar v. Access Therapies, Inc.*, 2015 WL 329013 (S.D. Ind. Jan 22, 2015), where a district court denied plaintiff's motion for class certification of TVPA claims. *Panwar* is factually different from this case. There, the employees were recruited from different countries, signed different contracts, worked in different states and under different working conditions, and were subject to different termination penalties. *See id.* at *6 (distinguishing *Tanedo* on the grounds that those class members "were recruited in the same manner, paid the same fees, signed the same contracts, worked in the same state, and were subject

to the same working conditions") (internal quotation marks omitted). The plaintiffs in the instant case have entirely cohesive backgrounds.

Finally, defendants assert that individual questions predominate as to the TVPA claim because a damages inquiry would have to be specific to each class member. To the extent that claims for punitive and emotional distress damages under the TVPA require individualized determinations, individual damages calculations do not preclude class certification. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015). And, considering the numerous questions common to the class, I find that the possible need for specific damages determinations does not predominate. *Cf.* Fed. R. Civ. P. 23(b)(3) Advisory Committee's Note to 1966 amendment ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."). Therefore, I conclude that common questions predominate over individual issues with respect to the TVPA claims.

### b. *Breach of Contract*

Plaintiff's breach of contract claim is rooted in the wage provision of her employment contract, a provision that is standard across all contracts of the proposed class. As already described, her claim is that defendants breached this provision by failing to pay her, and all putative class members, a prevailing wage *as of the date she started working*. Defendants interpret the contract provision as specifying a prevailing wage *as of the date the employee signed the contract*. Defendants do not dispute that they applied their interpretation in determining the wage to pay all putative class members. Thus, the predominant issue in the breach of contract claim is clearly: "Do

the employment contracts require payment of the prevailing wage as of the date the employee started working or the date the contract was signed?" This is a common question.[9]

The secondary issue—raised as an affirmative defense—in the breach of contract claim is whether plaintiff waived her right to receive the prevailing wage as of the date she started working by receiving an offer letter stating a lesser wage and later signing a wage acknowledgment form specifying that wage. This issue is relevant to each putative class member whose recruitment consisted of receiving the same type of offer letter and signing the same type of wage acknowledgment. Thus, the core questions raised by both plaintiff's breach of contract claim and defendants' affirmative defense of waiver are common across the proposed class.

In arguing that individual issues predominate, defendants raise a number of issues that all relate to calculation of damages. If plaintiff prevails on her breach of contract claim, she and class members would be entitled to the difference between the wages they were actually paid and the prevailing wage as of the commencement of their employment. This formula can be applied on a class-wide basis using defendants' payroll records and data from the U.S. Department of Labor's wage library.[10]

Defendants' reliance on *Abrams v. Interco Inc.*, 719 F.2d 23 (2d Cir. 1983), for the proposition that complex damage calculation preclude class certification is unavailing because

---

[9] The Complaint also includes an allegation that defendants breached the contract provision requiring that they employ plaintiff "full time" by giving her only 35 hours of work per week. Plaintiff has not pressed this issue. In any event, the issue is common to the proposed class as the "full time" language appears in all contracts produced in this action.

[10] An additional issue defendants raise is that resolution of plaintiff's claim requires a determination of whether she was employed as a nurse manager, which defendants argue requires individualized proof. Plaintiff in fact alleges that defendants had a practice of misclassifying nurse managers as registered nurses in order to pay those employees lower wages. Insofar as plaintiff proves that defendants had this practice, this issue can be accounted for in a class-wide damages formula and would not predominate over the common issues.

*Abrams* is irrelevant to this case. *Abrams* concerned an apparel manufacturer's alleged price-fixing of clothing and footwear sold at thousands of retail stores nationwide over a four-year period. Although the district court did not address damages, the appeals court, in affirming denial of class certification, noted that calculation of damages posed a manageability problem to the case because of the difficulty of calculating free-market prices on so many different products, sold in different markets, over a long period of time. *Id.* at 31. None of these factors is present in this case, where prevailing wages can be readily determined. Thus, the calculation of any individual's breach of contract damages would not predominate over issues that are common to the class.

### 2. *Superiority of Class Action*

The final consideration is whether a class action is the superior method of adjudicating this controversy. In determining whether the superiority requirement is satisfied, courts balance, "in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 91 (S.D.N.Y. 2007), *aff'd* 838 F.3d 223 (2d Cir. 2016). Rule 23(b)(3) provides a list of factors to be considered in this assessment:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

A class action is the superior method of litigating plaintiff's claims. The potential class members are foreign nationals who are likely unfamiliar with the U.S. legal system. Many may be unaware—as plaintiff was—that their wages were calculated based on the prevailing wage from

years before they started working. It is desirable to concentrate the claims in this district where defendants conducted their business and many class members worked. Class-wide litigation will reduce costs for all parties. Finally, the management of this case as a class action is entirely straightforward as it turns principally on common questions of fact and law concerning standard employment contracts.

Accordingly, the prerequisites of Rule 23(b)(3) are satisfied.

### III. Conclusion

Plaintiff's motion to certify a class comprised of all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008 is granted against all defendants and with respect to all claims under Rule 23(b)(3). Plaintiff's counsel is appointed class counsel pursuant to Rule 23(g).

Plaintiff is directed to submit, within 30 days of the date of this Order, a proposed form of notice in accordance with Rule 23(c)(2)(B).

**SO ORDERED.**

/s/ *Nina Gershon*
**NINA GERSHON**
**United States District Judge**

Dated: September _11_, 2018
Brooklyn, New York