UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 ---------------------------------------------------------------X
ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,

                     Plaintiff,                 17 Civ. 1302 (NG) (JO)

      -v-

PROMPT NURSING EMPLOYMENT AGENCY
LLC d/b/a SENTOSA SERVICES, SENTOSACARE
LLC, SENTOSA NURSING RECRUITMENT
AGENCY, BENJAMIN LANDA, BENT PHILIPSON,
BERISH RUBENSTEIN a/k/a: BARRY
RUBENSTEIN, FRANCIS LUYUN, GOLDEN GATE
REHABILITATION & HEALTH CARE CENTER
LLC, and SPRING CREEK REHABILITATION AND
NURSING CENTER,

                     Defendants.

 ---------------------------------------------------------------X

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

{099169}

# **Table of Contents**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS .............................................................................. 4

      The Pleadings and Procedural History........................................................ 13

ARGUMENT ............................................................................................ 14

POINT I
THE LEGAL STANDARD FOR THE MOTION ..................................................... 14

POINT II
THE TVPA CLAIMS SHOULD BE DISMISSED..................................................... 14

POINT III
THE COMPLAINT'S BREACH OF CONTRACT CLAIM
SHOULD BE DISMISSED ............................................................................ 21

      A. Plaintiff Was Paid the Proper Wage ....................................................... 21

      B. The Contract Did Not Obligate Prompt To Provide Plaintiff With 40 Hours of Work
         Per Week, Nor Did Plaintiff Desire to Work 40 Hours Per Week ........................... 24

      C. Plaintiff Conceded She Only Performed The Duties of a Registered Nurse ........... 25

POINT IV
THE DECLARATORY RELIEF SOUGHT BY PLAINTIFF
SHOULD BE DENIED ................................................................................ 27

POINT V
PROMPT SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS
COUNTERCLAIM FOR $25,000 PLUS ATTORNEYS' FEES
PURSUANT TO THE CONTRACT………………………………………………………… 29

CONCLUSION......................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Capital Commer. Group, Inc. v. Suarez*,
  CV 09-5558, 2013 U.S. Dist. LEXIS 135952 (E.D.N.Y. Aug. 30, 2013) ............................26

*Bouley v. Bouley*,
  19 A.D.3d 1049, 797 N.Y.S.2d 221 (2d Dep't 2005) .............................................................26

*Brecher v Laikin*,
  430 F.Supp. 103 (S.D.N.Y. 1977) ........................................................................................28

*Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*,
  90 F.Supp.2d 401 (S.D.N.Y. 2000) ......................................................................................26

*Fowley v. American Lawyer Media, Inc.*,
  306 A.D.2d 113, 761 N.Y.S.2d 176.......................................................................................23

*Gerstein v. 532 Broad Hollow Rd. Co.*,
  75 A.D.2d 292, 429 N.Y.S.2d 195 (1st Dep't 1980) ............................................................18

*JMD Holding Corp. v. Cong. Fin. Corp.*,
  828 N.E.2d 604 (2005)..........................................................................................................28

*Jomar Bakery Corp. v. Pergament United Sales, Inc.*,
  159 A.D.2d 491, 582 N.Y.S.2d 363 (2d Dep't 1990) .....................................................18, 19

*Kashfi v. Phibro-Salomon, Inc.*,
  628 F.Supp. 727 (S.D.N.Y.1986) .........................................................................................27

*Kenneth v. Laub & Co. v. Domansky*,
  172 A.D.2d 289, 568 N.Y.S.2d 601 (1st Dep't 1991) ..........................................................18

*Macolor v. Libiran*,
  No. 14-CV-4555 (JMF) (RLE), 2016 U.S. Dist. LEXIS 40566 (S.D.N.Y. Mar.
  25, 2016) ...............................................................................................................................20

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*,
  90 F.3d 650 (2d Cir. 1996)...............................................................................................22, 23

*Morris v. State Dep't of Taxation & Fin.*,
  82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993) ...........................................................................27

ii

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ............................................................. 15

*Murray v. Miner*,
    74 F.3d 402 (2d Cir. 1996) ................................................................. 27

*Newman v. Newman*,
    245 A.D.2d 383, 665 N.Y.S.2d 423 (2d Dep't 1997) ......................... 29

*Panwar v. Access Therapies, Inc.*,
    No. 1:12-cv-00619-TWP-TAB, 2015 U.S. Dist. LEXIS 38117 (S.D. Ind. Mar.
    25, 2015) ....................................................................................... 16, 17

*Pryor v. D'Alessio (In re D'Alessio)*,
    Case No. 8-08-72819, 2014 Bankr. LEXIS 221 (Bankr. E.D.N.Y. Jan. 17,
    2014) ................................................................................................. 26

*Rosales v. Hispanic Emple. Leasing Program, LLC*,
    06-cv-877, 2008 U.S. Dist. LEXIS 96417 (W.D. Mich., November 26, 2008) ............... 21, 22

*Sentosa Care, LLC et al v. Anilao, et al.*
    (Sup. Ct. Nassau Cty April 7, 2010) ............................................... 28, 29

*Truck Rent-A-Center, Inc. v Puritan Farms 2nd, Inc.*,
    41 N.Y.2d 420 (1977) ................................................................... 27, 28

*Wm. Passalacqua Builders v. Resnick Developers S.*,
    933 F.2d 131 (2d Cir. 1991) .............................................................. 26

**Statutes**

18 U.S.C. 1589 .......................................................................................... 14

18 U.S.C. §§1589(a), 1589(b), 1590(a) and 1594 .................................... 14

18 U.S.C. §1590(a) ................................................................................... 17

18 U.S.C. §1594 ....................................................................................... 18

Immigration Act ...................................................................................... 3, 21

Trafficking Victims Protection Act ................................................... *passim*

**Other Authorities**

20 C.F.R. § 655.731(c)(10)(i)(B) .............................................................. 17

20 CFR § 656.40 ................................................................................... 6, 21

Fed. R. Civ. P. 56 ..................................................................................................................1

16 N.Y. Jur., *Cancellation of Instruments* § 22 ........................................................18

Rule 12(b)(6) ......................................................................................................................13

Rule 26 ................................................................................................................................20

Rule 26(a)(1) ......................................................................................................................20

Defendants Prompt Nursing Employment Agency LLC d/b/a Sentosa Services ("Prompt"), Sentosacare LLC, Sentosa Nursing Recruitment Agency ("SRA"), Benjamin Landa ("Landa"), Bent Philipson ("Philipson"), Berish Rubinstein, sued herein as Berish Rubenstein a/k/a Barry Rubenstein ("Rubenstein"), Francis Luyun ("Luyun"), Golden Gate Rehabilitation & Healthcare Center LLC ("Golden Gate") and Spring Creek Rehabilitation and Nursing Center ("Spring Creek")  (collectively, at times, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 56. for summary judgment dismissing the complaint of Plaintiff Rose Ann Paguirigan ("Plaintiff" or "Paguirigan") in this action (the "Complaint"), and granting summary judgment on Prompt's counterclaim.

## PRELIMINARY STATEMENT

Each of the Plaintiff's claims lacks merit and should be dismissed.  The first three claims for violation of the Trafficking Victims Protection Act (the "TVPA") is based on pure malicious fiction that should never have been asserted in the first place because Plaintiff admitted that she was never threatened or mistreated.  Moreover, these claims should have been withdrawn after Plaintiff was deposed and unequivocally established that no such violations have taken place. Likewise, all of the claims against the individuals lack merit as the only meritorious claim in this action is Prompt's *counterclaim* for the breach *by Plaintiff* of her three-year employment contract.

Plaintiff, a nurse from the Philippines, came to the United States to work following an 8-*year* VISA application process – during which the Defendants spent time, money and resources to secure a visa on her behalf.  However, 9 *months* after arriving in the United States, Plaintiff resigned from her job without cause in breach of her three-year employment agreement.

{099169}                                          1

Plaintiff used Defendants to gain entry into this country, and after she resigned without cause or prior notice, Plaintiff engineered this putative class action, falsely claiming that Defendants made outlandish threats made against her.  Plaintiff admitted during her deposition that the threats never occurred.

Plaintiff also disputes the enforceability of an employment contract which she freely entered into, because it contained a liquidated damages clause that sought to reasonably compensate Defendants in the event of her breach.

Even though she resigned only 9 months after starting her nursing job, Plaintiff's principal claim (under the TVPA) is that she felt intimidated and coerced to continue working for the Defendants because she believed she would suffer serious financial harm if she quit.  Finally, Plaintiff also protests that the agreed upon $29.00 hourly wage that she as paid was incorrect and that she was underpaid.

The material undisputed facts in this case are that Plaintiff, as well as the other nurses, testified in this action that Defendants never threatened them at any time or in any manner, and Plaintiff was also paid the correct wage pursuant to the Contract.   Furthermore, Plaintiff was fully aware of and voluntarily agreed to the employment contract terms, including the liquidated damages provision, which amount decreased by one-third throughout the three-year contract term, and which were a reasonable estimate of Defendants' actual damages in the event of Plaintiff's breach.

Plaintiff was never forced to work and never threatened.  Plaintiff left her job precisely when she wanted to -- a mere 9 months into her three-year contract term.  The fact that Prompt exercised its contractual rights, and sued Plaintiff, *after she left her employment* does not amount to a TVPA violation.  Federal courts construing TVPA claims have made

clear that the pursuit of damages by an employer does not amount to a TVPA violation.  The undisputed facts establish that Prompt was damaged by Plaintiff's breach while Plaintiff conceded that she suffered no damages in connection with her TVPA claim.  Without any damages, the TVPA claim must fail.

Similarly, Plaintiff's breach of contract claim asserting that Plaintiff was not paid the proper prevailing wage pursuant to her contract is without merit.[1]  The claim is based on a misreading of her employment contract.  The contract refers to the prevailing wage as determined by the government for Plaintiff. This written determination by the government was part of the Visa application and was provided to Plaintiff.  Plaintiff concedes she was never misled as to what this rate was; indeed, the cover letter sealed to her contract, and part of her contract, expressly reflected the correct rate.  Plaintiff was paid the rate she agreed to and acknowledged in writing, which was more than the government determined prevailing wage.   It is also undisputed that Plaintiff never once claimed to be underpaid until she was midway through a lawsuit brought *against her* for the breach of her employment contract months after she resigned.

The interpretation of Plaintiff's employment contract is particularly well-suited for determination on summary judgment, and given the plain language of the contract, and supporting evidence, the breach of contract claim should be dismissed.

Plaintiff's declaratory judgment claim concerning the enforceability of the liquidated damages clause in her contract fares no better.  The law is well settled that liquidated damages are permitted as an estimate of injury that a party may sustain in the event of breach.  The estimate of damages by Defendants that were contained in the Contract were more than

---

[1] Plaintiff ostensibly concedes that she has no wage claim pursuant to the Immigration Act for failure to pay the prevailing wage because it is well settled that the determination under the Act of the prevailing wage is made by the government prior to employment, not when employment begins, as Plaintiff claims herein under the Contract.

reasonable, as demonstrated in Defendants' expert report, *which was unrefuted by Plaintiff*. Moreover, even if the Court were to hold that the liquidated damages amount in Plaintiff's contract is unenforceable, it is black letter law that Prompt would still be entitled to recover its *actual damages* as a result of the breach.  Here, the actual damages far exceed the liquidated damages estimate contained in the contract, as demonstrated by Defendants' unrefuted expert report.

Summary judgment is warranted against Plaintiff in connection with each of her claims in this action and in connection with Prompt's counterclaim.

## STATEMENT OF FACTS

In 2007, defendant Golden Gate, and SRA, a Philippines licensed recruitment agency, presented information to nurses in the Philippines concerning nursing employment opportunities in the United States (the "Presentation") (Paguirigan Dep. at 100) (Exh. D to the accompanying Declaration of Elliot Hahn ["Hahn Dec"]). Representatives of Golden Gate and SRA explained to the nurses that a three-year contract may be offered prior to their employment setting forth the terms and conditions of their employment including their duties and responsibilities; that Golden Gate would advance certain fees and expenses to obtain a VISA on behalf of that nurse, subject to the terms of the contract; and that the contract contained a $25,000 termination amount (which decreased by one-third each year of the contract) to be charged if the nurses prematurely terminated their employment . (Paguirigan Dep. at 22; 28; 33; 138-139) (Hahn Dec., Exh. D).

Only Luyun, and Golden Gate's representative, Philipson, were at the Presentation, (Paguirigan Dep. at 96-109) (Hahn Dec., Exh. D).  At the Presentation, Luyun and Philipson did not have any direct conversations with Plaintiff. Paguirigan Dep. 100-101 (Hahn Dec. Exhibit D).  Since the Presentation in 2007, Plaintiff has admitted that she has *never* had any contact

with defendant Philipson; she never had contact with defendant Landa; and that she was in the same room with defendant Rubenstein once or twice but could not recall any direct conversations with him.  (Paguirigan Dep. 96; 101; 105-107) (Hahn Dec., Exh. D).

After the Presentation, Plaintiff requested that Golden Gate and SRA submit an application for a VISA on her behalf.  (Paguirigan Dep. at. 98) (Hahn Dec., Exh. D.)  As the first step in applying for a VISA on behalf of Paguirigan, Golden Gate submitted to the government a request for a Prevailing Wage Determination, which was the hourly wage rate Paguirigan was required to be paid for her work when she received employment.  Golden Gate received the wage determination, which reflected that Paguirigan was entitled to an hourly wage rate of $26.87 per hour ("Prevailing Wage Determination").  Thereafter, Golden Gate and SRA provided Plaintiff with a copy of the VISA Petition which included her Prevailing Wage Determination.  (Paguirigan Dep. at 370-375) (Hahn Dec., Exh. D); Philipson Decl. at ¶ 6 (Hahn Decl. Exhibit Q).  Plaintiff reviewed the Contract and had an opportunity to have it reviewed by an attorney before signing the Contract.  Paguirigan Dep. at pp. 23; 445-446.

The processing of the VISA Application is controlled by the United States Government, and often takes between 6 and 9 years to complete.  In or about April 2015 (8 years after the VISA Application was submitted), Plaintiff received an appointment with the United States Consulate in the Philippines for her VISA Application interview.  (Paguirigan Dep. at 88-94) (Hahn Dec., Exh. D).  After receiving the interview letter but prior to the appointment, Paguirigan requested that Golden Gate enter into an employment contract, which SRA provided (the "Contract.").  Golden Gate provided the Contract to Paguirigan for execution.  This Contract included a job offer cover letter, which was fastened to the remainder of the Contract and specified that Paguirigan would receive an hourly wage rate of $29.00. (Hahn Dec., Exh. H).

Plaintiff, and the other nurses employed by Prompt, are proficient in the English language, each beginning to speak English in their early formative years.  (Paguirigan Dep. at 9) (Hahn Dec., Exh. D) (conceding she spoke English as soon as she began speaking at the age of one or two); (Valdez Dep. at 8) (Hahn Dec., Exh.G) (stating that she began to speak English in primary school); (Padernal Dep. at 6) (Hahn Dec., Exh.E) (stating that she began speaking English at around age 5); (Bane Dep. at 6-7) (Hahn Dec., Exh.F) (confirming fluency in English).  They are also proficient at using the Internet and Plaintiff possessed her own laptop computer.  (Paguirigan Dep. at 237-238; 250; 252; 306 (Hahn Dec., Exh. D); Valdez Dep. at 31 (Hahn Dec., Exh. G); Bane Dep. at 16 (Hahn Dec., Exh. F); Padernal Dep. at 78 (Hahn Dec., Exh. E).  Each completed higher education courses, and Plaintiff completed medical school in the Philippines.

At all times (when Paguirigan received and executed the Contract), the Contract, including the job offer cover letter, was sealed as a single document with an eyelet.[2] (Paguirigan Dep. at 21-25; 93-94; 445).  (Hahn Dec., Exh. D).

The Contract at Article IV, Section (1) provided:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

(emphasis added).  Pursuant to 20 CFR §656.40, only the Government may render a Prevailing

---

[2] In a brazen attempt to conceal the indisputable fact that she was fully aware and consented to the wage rate, it was revealed in discovery that Paguirigan removed the eyelet from the contract and surreptitiously produced the Contract during discovery without the cover letter attached.  Plaintiff separately presented the cover page of the contract as Paguirigan 000068 and the remainder of the contract as Paguirigan 000055-000064.  It was only during Plaintiff's deposition that she admitted that at all times the $29.00 cover page was attached to the remainder of the Contract and that she was aware and agreed to the hourly wage rate of $29.00 per hour. (Paguirigan Dep. at 89-91) (Hahn Dec., Exh. D)

Wage Determination and such determination is unique to each and every person based on a myriad of factors.  The words "as determined" refers to the previously issued Prevailing Wage Determination.  The government issued determination for Plaintiff was $26.87.  Thus, Paguirigan was fully aware that she would be paid $29.00 per hour and that the $29.00 rate was greater than the government issued Prevailing Wage Determination.

After Plaintiff arrived in the United States, the Contract was assigned by Golden Gate to Prompt.    The Contract, at Article VIII Section 8, provided that the Contract may be assigned at Golden Gate's sole discretion.[3]  Specifically, the Contract stated in pertinent part:

> Employer has the right, in its sole discretion, to assign this Agreement to another facility or nursing agency or to transfer the Employee to another nursing facility provided said facility or agency ("assignee") assumes all the obligations of the Employer for the term of the Agreement…

After Plaintiff arrived in the United States, and the Contract was assigned to Prompt, Plaintiff was notified of the assignment and acknowledged that Prompt was her employer and that her hourly wage rate was $29.00 by executing a Notice of Acknowledgment of Pay Rate and Payday (the "Wage Acknowledgement").  Plaintiff knowingly, willfully and without any coercion or duress executed the Wage Acknowledgement.  The Wage Acknowledgment lists Prompt Nursing d/b/a Sentosa Services[4] as Plaintiff's employer and $29.00 per hour as Plaintiff's pay rate.  Plaintiff was always fully aware of these details.  A copy of the Wage

---

[3]  Throughout this case, Plaintiff has incorrectly stated that there was no consideration for the assignment.  This is incorrect. It is undisputed that Prompt was assigned the Contract in consideration of Prompt assuming all liabilities and responsibilities under the Contract.  Also, it is undisputed that Prompt employed Plaintiff, provided her with medical benefits pursuant to the Contract and paid Plaintiff her weekly payroll.

[4]  Throughout this case, Plaintiff has tried to impute a nefarious motive for Prompt using the "d/b/a" of "Sentosa Services."  It is difficult to understand why Plaintiff tries to make hay of this public fact.  Sentosa Services is a registered "d/b/a" of Prompt as reflected in the assumed name certificate filed with the New York Department of State.  Hahn Dec. as Exhibit I.

Acknowledgement is attached to the Hahn Dec. as Exh. J.

On June 22, 2015, Plaintiff began working for Prompt at defendant Spring Creek's nursing home.   Plaintiff was employed as a registered nurse and performed only the duties that were listed in the Contract.  (Paguirigan Dep. at 133) (Hahn Dec., Exh. D).

On March 7, 2016, just 9 *months* after starting her employment, Plaintiff unexpectedly quit her job, without any prior notice.  Plaintiff submitted a resignation letter setting forth her reasons for terminating her employment.  The resignation letter did not raise any of the issues contained in the Complaint in this action.  Plaintiff neither claimed that Prompt had breached her employment contract in any way, nor served Prompt (or any other defendant) with a notice of default[5], as required by the Contract.  The Contract provided at Article VI, Section 3:

> The Employee can terminate this contract if the Employer and/or its designee/assignee, after being informed by written notice of any alleged breach of this Agreement, fails to cure the alleged breach after thirty (30) days of such notice as stated in Article II. 8. above.

Plaintiff's resignation letter acknowledged that she owed the $25,000.00 for early termination of her Contract (the "Termination Amount").  A copy of the resignation letter is attached to the Hahn Dec. as Exh. K.   Plaintiff was aware of the Termination Amount since her first meeting in 2007 with SRA and Golden Gate. (Paguirigan Dep. at 33) (Hahn Dec., Exh. D).  Plaintiff understood that SRA and Golden Gate incurred significant expenses in

---

[5] During her employment, Plaintiff had only one issue with her employment for which she notified Prompt and Plaintiff admitted that Prompt rectified Plaintiff's sole issue.  Specifically, Plaintiff worked 5 shifts per week and complained that certain of her shifts were scheduled back-to-back.  Prompt met with Plaintiff and the Spring Creek management, in an attempt to rectify this issue to Plaintiff's satisfaction (Paguirigan Dep. at 60-64) (Hahn Dec., Exh. D).  This issue is not the subject of Plaintiff's lawsuit; in fact, the Complaint alleges, falsely, that Plaintiff wanted to work *more* hours than she actually worked, and that Defendants prevented her from doing so.  However, this allegation, like so many others made in the Complaint, was completely refuted by Plaintiff's deposition testimony which established that she actually preferred to work less than the 35 hours that she actually worked. (Paguirigan Dep.at 159) (Hahn Dec., Exh. D).

conducting the hiring process, including arranging for VISA Applications for each nurse, and that they would incur significant additional expenses to replace her if Plaintiff failed to fulfill her Contract. (Paguirigan Dep. at 141-143) (Hahn Dec., Exh. D).

Plaintiff admits that she: (i) requested that significant funds and resources be expended on her behalf; (ii) agreed to pay the Termination Amount, (iii) benefitted from the services provided by SRA, Golden Gate and Prompt; and (iv) knew she would owe the Termination Amount if she did not complete the contract term.  (Paguirigan Dep. at 143; 167; 169; 358) (Hahn Dec., Exh. D).

Plaintiff and each of the nurses were told at the initial meeting in 2007 of the Termination Amount and it was explained at that time that significant expenses would be expended to procure a VISA and employment for Plaintiff and other nurses.  Specifically, with regard to the expenses paid on her behalf, Plaintiff acknowledged during her deposition (and at the time she executed the Contract) that $3,685.50 was paid for Plaintiff's attorneys' fees, filing fees, visa fees, ICHP visa screen fees, airfare, and "miscellaneous" expenses on her behalf.  (Paguirigan Dep. at 141-143) (Hahn Dec., Exh. D); *see also* Declaration and Undertaking dated April 22, 2015 annexed as Exh. L.  Plaintiff was also reimbursed for certain expenses and two months of her rent in the United States was paid. The Termination Amount is a realistic estimate of damages which resulted from Plaintiff's breach.

In addition to the previously listed $3,685 worth of expenses, the damages incurred as a result of Plaintiff's resignation exceeds $25,000.  For example, the 2015 annual expense to solicit nurses from the Philippines exceeded $864,000 or approximately $26,182 for each nurse. *See* Expert Report of Michael Kupka dated May 1, 2018 ("Kupka Report") at ¶22 (Hahn Decl. at P).  The damages incurred also included the cost of hiring a replacement nurse

from a staffing agency in 2015 was more than $43.00 per hour (or $14.00 more than Plaintiff's hourly rate).  Plaintiff terminated her contract after working only 9 months.  Therefore, the additional expense of hiring a nurse from an agency ($43.00-29.00) exceeds $2,000.00 per month or $54,000.00 for the 27 months remaining on Plaintiff's Contract.  Reviewing these figures shows that the Termination Amount is a reasonable estimate of expenses. The reasonableness of the Termination Amount is underscored by the fact that the Termination Amount is reduced by one-third after each year of employment.

The reasonableness of the Termination Amount is also demonstrated by the Kupka Report, which is annexed to the Hahn Dec. as Exhibit P.  The expert report sets forth in great detail that the Termination Amount of $25,000 (which decreased each year by one-third) was a reasonable estimate of damages at the time of the Contract.  Moreover, the actual amount of Defendants' damages, although difficult to precisely ascertain (and thus ripe for a liquidated damages estimate for precisely that reason) was significantly higher than the Termination Amount.  The Kupka Report was unrefuted by Plaintiff, and Plaintiff has not designated her own expert on this or any other issue.

Upon terminating her employment with Prompt, Plaintiff procured a more lucrative position with North Central Bronx Hospital, part of the New York City Health and Hospitals Corporation.  At her new position, Plaintiff was paid $36.00 per hour, received four weeks of paid vacation, overtime pay for holidays worked, "differential" pay for shifts after a certain time, and the right to participate in a pension plan.  (Paguirigan Dep. at 254-261) (Hahn Dec. Ex. D).

 It is clear that the nurses used their employment at Prompt as a stepping stone to obtain a VISA and to obtain experience so that they could move to a better paying nursing

position at an American hospital or move geographically closer to relatives in the States. *See* e.g. Valdez Dep. at 71[Exh. G to Hahn Dec.]; Bane Dep. at 32-33[Exh. F to Hahn Dec.]; Padernal Dep. at 58; 93-94 [Exh. E to Hahn Dec.E].

Moreover, unbeknownst to Defendants, some of the nurses executed the Contract, *knowing that they never intended to fulfil their employment commitment.* (Padernal Dep. at p. 58) (Hahn Dec., Exh. E) ("At the beginning I was planning to finish like two years of my contract but then I ended up completing the one year only"); (Bane Dep. at p. 32-33) (Hahn Dec., Exh. F) (testifying that he used SRA and Prompt as a "short term stepping stone" to get to his "ultimate goal" of coming to America). Mr. Bane ultimately obtained employment in a New York hospital for $112,000 per year. But for Defendants' efforts and Bane's employment at Prompt, Bane would never have obtained his current high paying six-figure nursing job. Similarly, nurse Padernal stated outright that the reason she wished to be employed by Defendants was because it would be a "steppingstone" for her career. (Padernal Dep. at 94) (Hahn Dec., Exh. E).

In 2016, Prompt commenced state court lawsuits against Plaintiff and two other nurses, Jericson Valdez ("Valdez") and April Sullivan Francisco ("Francisco"), for damages in connection with the breach of their employment contracts. These lawsuits were the first time that any action had been brought by Prompt (or any other defendants) since the 2007 lawsuits.[6]

Contrary to the allegations in the Complaint, Plaintiff and other nurses testified that Defendants never threatened the Plaintiff, or any other nurse, in any way. (Paguirigan Dep. at

---

[6] Throughout this lawsuit, Plaintiff has inaccurately depicted the 2007 lawsuit as 27 lawsuits. In fact, in 2007, one consolidated action went forward (before it was settled) because various nurses and other professionals staged a walkout of a pediatric unit leaving disabled and ill children without care. The complaint also mischaracterizes a single complaint by Avalon Gardens Rehabilitation and Health Care Center to the Department of Education in 2007. The fact of the matter is that nursing facilities and its professionals are all "mandatory reporters" and are required to report malfeasance to the appropriate authorities. Plaintiff, as a registered nurse, is also a mandatory reporter and admitted that any failure in patient care must be reported. (Paguirigan Dep. at 72) (Hahn Dec., Exh. D).

26-33; 404) (Hahn Dec., Exh. D); (Valdez Dep. [Exh. to Hahn Dec. G] at 83; 104-105); (Bane

Dep. [Exh. F to Hahn Dec.]. at 61-62; 99); (Padernal Dep. [Exh E to Hahn Dec.] at 73-74).

Plaintiff and the other nurses were never threatened with any lawsuits, and only had

knowledge of the 2007 incident (which far pre-dated their employment with Prompt) through

news reports in the Philippines in 2007 well before they began working for Prompt.  Each

nurse decided on their own volition to seek employment with the Defendants,

notwithstanding this 2007 incident.  (Paguirigan Dep. at 226-228) (Hahn Dec., Exh. D);

(Valdez Dep. at 31-32; 48-49) (Hahn Dec., Exh. G); (Bane Dep. at 69-71) (Hahn Dec., Exh.

F); (Padernal Dep. at 84) (Hahn Dec., Exh. E).  For her part, Plaintiff was not familiar with

any of the nurses involved in the lawsuits and could not even recognize their names.

(Paguirigan Dep. at 322-324) (Hahn Dec., Exh. D).  Plaintiff never heard about the incident

with the 27 nurses other than in news reports in 2007 (Paguirigan Dep. at 228) (Hahn Dec.,

Exh. D).  The 2007 lawsuit had no bearing on whether or not she would be able to leave her

position.   Nurse Bane affirmatively testified that had he been "bothered by that in the first

place, [he] would have not signed the contract in the first place."  Bane Dep. 94 (Hahn Dec.,

Exh. F).  Similarly, nurse Padernal had the following exchange with her own attorney at her

deposition on page 94:

> Q [Mr. Howley].  Okay.  If you knew that someone
> associated with Sentosa had brought cases against other nurses,
> then why did you agree to work for Sentosa?
>
> A [Ms. Padernal].  First of all, as I have mentioned, I never
> landed a nursing job in the Philippines.  It's only Sentosa is hiring
> nurses without any experience.

The testimony offered by Plaintiff and the other nurses unequivocally establishes that

the 2007 incident with the 27 nurses has absolutely no relevance to the instant action, and is

included in the Complaint merely as an attempt to smear Defendants in this action without any justification.

Although the Complaint alleges that Defendants breached the Contract by preventing Plaintiff and other nursed from working 40 hours per week, the testimony in this case revealed that the opposite was true: Plaintiff desired to work less hours than the 35 weekly hours that she regularly worked.  Paguirigan Dep. at 156-160. (Hahn Dec., Exh. D)  The other putative class members deposed in this case testified similarly: not one of them desired to work more than the amount of hours that they actually worked. Valdez Dep. 76-77(Hahn Dec., Exh. G); Bane Dep. at 67-68(Hahn Dec., Exh. F); Padernal Dep. at 43-44(Hahn Dec., Exh. E).

This claim is also belied by the Contract, which does not require the employer to provide 40 hours of work each week.  Rather, the Contract leaves it to the Employer's discretion to set the amount of hours. *See* Article IV, Section 3 of Contract (Exh. H).

The claim regarding the amount of weekly hours offered to Plaintiff is yet another baseless contrivance offered by the Complaint which does not comport with the evidence.

**The Pleadings and Procedural History**

Plaintiff commenced the instant action on March 7, 2017.  The First through Third Claims for Relief allege violations of the TVPA, the Fourth Claim seeks recovery for breach of contract and the Fifth Claim seeks a declaratory judgment that the liquidated damages provision of the Contract is unenforceable as a matter of law.  Complaint (Exhibit A to the Hahn Dec.).

Defendants moved to dismiss portions of the breach of contract claim and the entirety of the other claims in this action, pursuant to Rule 12(b)(6).  By Order dated December 20, 2017 (ECF Dok. 37), this Court denied Defendants' motion.

On January 16, 2018, Defendants filed their Answer with Counterclaim.  The Counterclaim is asserted by Prompt and seeks damages against Plaintiff for breaching the Contract, and further seeks the recovery of Prompt's legal fees, as permitted by the Contract. Exh. B to the Hahn Dec.  Plaintiff filed her Answer to the Counterclaim on February 6, 2018. Exhibit C to the Hahn Dec.

Plaintiff moved for class certification on December 9, 2017.  The motion was fully briefed on April 9, 2018 and is presently *sub judice*.

## ARGUMENT

## I.

## THE LEGAL STANDARD FOR THE MOTION

Summary judgment should be granted where "there is no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the movant must "'demonstrate the absence of a genuine issue of material fact. . . . The burden is then on the non-moving party to set forth specific facts raising a genuine issue of fact for trial.'" *United States ex rel. Romanov.NY. Presbyterian,* 426 F. Supp. 2d 174, 177 (S.D.N.Y. 2006) *(quoting Celotex Corp.* v. *Catrett,* 477 U.S. 317, 323, 324 (1986)).

## POINT II

## THE TVPA CLAIMS SHOULD BE DISMISSED

Plaintiff's TVPA claims are anchored on alleged violations of 18 U.S.C. §§1589(a), 1589(b), 1590(a) and 1594.  18 U.S.C. 1589 provides as follows:

> **(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
> **(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;
(3) by means of the abuse or threatened abuse of law or legal process; or
(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

Accordingly, claims of forced labor and involuntary servitude ultimately require evidence that Defendants used physical force or restraint, unlawful threats or legal coercion against Plaintiff to *obtain* her services and *hold* her in involuntary servitude.   Plaintiff admitted that no such threats or coercion forced her to provide service to Prompt.  Prompt did not obtain any of Plaintiff's services unlawfully.

Section 1589 of the TVPA also contains an express scienter requirement.  Specifically, in order to properly plead a violation of the TVPA, "[t]here must be evidence from which the jury could find 'that the employer *intended* to cause the victim to believe that she would suffer serious harm--from the vantage point of the victim--if she did not continue to work.'[citation omitted]. 'The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her' if she left her employment." *Muchira v. Al-Rawaf*, 850 F.3d 605, 618, (4th Cir. 2017) [italicized emphasis in original]; December 20, 2017 decision at p. 9.  Scienter is defined as intentional conduct *directed towards the victim.  Id.*

As set forth above, Plaintiff and each of the putative class members whose depositions were taken in this case, expressly contradict the claims in the Complaint that they were ever threatened or coerced in any manner.  (Paguirigan Dep. at 26-33; 404) (Hahn Dec., Exh. D); (Valdez Dep. at 83; 104-105) (Hahn Dec., Exh. G); (Bane Dep. at 61-62; 99) (Hahn Dec., Exh. F); (Padernal Dep. at 73-74) (Hahn Dec., Exh. E).  Thus, Plaintiff is left to argue that the Termination Amount in the Contract itself constitutes a "threat of serious harm" within the meaning of § 1589, a proposition wholly refuted by nurse Padernal, who testified that she entered into the Contract *with the intent* of not satisfying the three-year commitment and always intending to pay the Termination Amount.  (Padernal Dep at 53-54) (Hahn Dec., Exh. E).

Plaintiff's own testimony on this point also undercuts her TVPA claims.  At her deposition, Plaintiff testified that she fully understood the implications of the Termination Amount at the time that she executed the Contract, and that the Termination Amount was never even mentioned after she arrived in the United States and commenced her employment. Paguirigan Tr. at 33; 166-167 (Hahn Dec., Exh. D).  The Complaint's claim that the Termination Amount--which Plaintiff knew about and recognized prior to her employment and which was never discussed during her employment--constitutes a "threat of serious harm," is absurd.   It would be patently unreasonable for Plaintiff to have felt threatened about the Termination Amount when she accepted these terms without duress while executing the Contract, and then never heard another word about it while employed by Prompt.

Moreover, filing a lawsuit to pursue contractual remedies *after* an employee breaches her employment agreement is the right of any employer and, thus, cannot constitute "serious harm" under the TVPA. *See Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 U.S. Dist. LEXIS 38117, at *5 (S.D. Ind. Mar. 25, 2015).  In *Panwar*, the court found that the

fact that the Plaintiffs knew about a liquidated damages provision prior to entering into an

employment agreement belied any claim of a "forced labor scheme". *Id.* at *10.  The court also

distinguished between "use of process" and "abuse of process" and noted:

> It is not an abuse of legal process to enforce valid contractual
> rights against individuals who no longer wish to be bound by the
> terms of an agreement they voluntarily signed. By Plaintiffs' logic,
> any pursuit of damages for breach of contract would constitute an
> abuse of process, which would be an absurd outcome. Thus, the
> Court concludes that neither the compliance with immigration laws
> nor the enforcement of contract rights constituted an 'abuse of law
> or legal process' for purposes of TVPA liability.

> *Id.* at *15.

Here, Plaintiff was never forced to work or told that she could not leave her employment.

To the contrary, she understood that she could leave at any time and also understood that

breaching her employment contract would likely result in liability to her employer.  This was not

a threat--it was a contract term.  The inclusion of a liquidated damages provision in an

employment contract is not a TVPA violation.  The TVPA does not guarantee that a lawful U.S.

resident can never be subject to legal action or bound by common contractual clauses such as

liquidated provisions.  Indeed, with respect to holders of H-1B visas, the Immigration

Regulations expressly provide that "'[t]he employer is permitted to receive bona fide liquidated

damages from the H-1B nonimmigrant who ceases employment with the employer prior to the

agreed date.' 20 C.F.R. 655.731(c)(10)(i)(B). The distinction between what constitutes

permissible liquidated damages and a prohibited penalty is made on the basis of applicable state

law." *Panwar*, *supra*, at *10. As set forth below in Point IV, the liquidated damages provision in

the Contract is permissible pursuant to New York state law.  There is no basis to differentiate

between Visa classifications and find that a holder of an EB-3 visa (such as Plaintiff) may not be

subject to liquidated damages, while a H-1B visa holder is expressly permitted to be subject to

liquidated damages.  Moreover, there is no basis to provide an immigrant with greater rights than a United States citizen.

There was similarly no violation of 18 U.S.C. §1590(a).  This provision fixes liability if a defendant recruits, harbors, transports or obtains services of another in violation of the TVPA. Here, no violation of the TVPA occurred, as set forth above.  Accordingly, there are no grounds for liability under this section of the statute.

18 U.S.C. §1594 extends liability to whoever conspires with another to violate the TVPA. Here, because no violation of the TVPA occurred, as set forth above, the claims under this section fail as a matter of law.

Essentially, Plaintiff is claiming that Defendants obtained Plaintiff's services through duress by including the liquidated damages provision.  Of course, there is no evidence to support such a claim that the liquidated damages provision constitutes economic duress.  It is well settled that a party cannot be guilty of economic duress for threatening to do that which it is legally entitled to do.  16 N.Y. Jur., *Cancellation of Instruments* § 22 (*citing Berzin v. W.P. Casey & Co, Inc.,* 293 A.D.2d 320 (1st Dep't 2002) (employer's threat to terminate original employment agreement unless employee signed revised agreement did not constitute economic duress given employer's express right to terminate agreement)); s*ee also Gerstein v. 532 Broad Hollow Rd. Co.*, 75 A.D.2d 292, 297, 429 N.Y.S.2d 195 (1st Dep't 1980).  Similarly, mere hard bargaining tactics do not amount to duress.  *Kenneth v. Laub & Co. v. Domansky*, 172 A.D.2d 289, 568 N.Y.S.2d 601 (1st Dep't 1991).

Case law makes clear that the availability of a litigation option -- or, indeed, <u>any</u> option -- conclusively rebuts a claim of duress.  In *Jomar Bakery Corp. v. Pergament United Sales, Inc.,* 159 A.D.2d 491, 582 N.Y.S.2d 363 (2d Dep't 1990), the defendant wrongfully refused to give

consent for the plaintiff to assign a license and the plaintiff did <u>not</u> sue to force the defendant to give the requisite consent.  Instead, the plaintiff capitulated to the defendant's demands and issued a release, and then later sued to void the release on grounds of economic duress.  The court held there was no duress:

> We find that Jomar was not precluded from exercising its free will. We are persuaded by the adequacy of the remedies available to Jomar.  Jomar could have commenced an action against Pergament based on Pergament's alleged threats to refuse to consent to any assignment of Jomar's license and to withhold Jomar's security deposit.  Jomar elected to forego remedies available to it, and, instead, released its rights under the license.  Thus, it cannot now argue economic duress.

552 N.Y.S.2d at 363.

In our case, the actions taken by Defendants to enforce their contractual rights do not constitute economic duress or some form of involuntary servitude.  Like the plaintiff in *Jomar*, Plaintiff was not precluded from seeking legal relief in connection with the terms of her contract if she truly believed to have been the "victim" of an overly onerous employment agreement.  The fact of the matter is that Plaintiff left her employment as soon as she desired to do so, and never once complained to be a victim of human trafficking (or supposedly being paid less than that to which she now claims to be entitled).

Plaintiff cannot assert a claim for economic duress under these circumstances.  Dressing up such a claim in the garb of salacious Human Trafficking claims does not make her claim any more viable.

The TVPA claims also should be dismissed because Plaintiff cannot establish any damages in connection with the claim.  The Complaint alleges that "Defendants knowingly provided and obtained the labor and services of plaintiff and other members of the class by means of serious harm and threats of serious harm to plaintiff and other members of the class,

including without limitation psychological, financial, or reputational harm…" Complaint ¶ 86.
Plaintiff has not established that she suffered harm of *any* sort, including emotional harm.

Plaintiff confirmed at her deposition that she never sought any psychological treatment in
connection with any emotional harm suffered in connection with her employment (Paguirigan
Dep. at p. 126-127) (Hahn Dec., Exh. D), and that the only anxieties that she described were that
she was nervous about failing in her patient care[7] or being blamed for misconduct without basis
(*Id*. at 31-33), which she admits did not occur (*Id*. at 31).  Plaintiff certainly has not provided
evidence of any emotional damages in this case.

 After the close of discovery, on May 9, 2018, Plaintiff served an Amended Rule 26(a)(1)
disclosure statement (the "Rule 26 Disclosure), annexed to the accompanying Hahn Dec. as
Exhibit O.  In the Rule 26 Disclosure, Plaintiff did not identify *any* damages sustained by
Plaintiff other than the $12,219.50 sought in connection with her breach of contract claim.
Without incurring damages of any sort, there can be no recovery under the TVPA.

Federal courts have indicated that a TVPA plaintiff seeking damages must support that
claim by documentary or other forms of evidence.  Even in TVPA cases where there has been a
default judgment against the defendant, the court will examine the record to support a damages
award.  *See Macolor v. Libiran*, No. 14-CV-4555 (JMF) (RLE), 2016 U.S. Dist. LEXIS 40566,
at *17-18 (S.D.N.Y. Mar. 25, 2016) (examining the record and rejecting plaintiff's request for
punitive damages). It follows, therefore, that where, as here, there has been no evidence of any
independent damages sustained by virtue of the TVPA claims, the claims are unsustainable.

Accordingly, the TVPA claims should be dismissed in their entirety.

---

[7] All nurses are held to a standard of care and all should be concerned about the care being provided to elderly and
ill patients.

## III.

## THE COMPLAINT'S BREACH OF CONTRACT CLAIM
## <u>SHOULD BE DISMISSED</u>

Although not succinctly pleaded in the Complaint, it appears that Plaintiff's breach of

contract claim is comprised of three components.  She claims the contract was breached because

she was: (i) not paid the proper wage rate; (ii) not provided with 40 hours of work per week; and

(iii) employed as a "nurse manager" instead of a "registered nurse."  Complaint ¶¶22-44; 108-

114. (Exhibit A to Hahn Dec.)  None of these claims has merit and each of them should be

dismissed.

### A.  **Plaintiff Was Paid the Proper Wage**

Plaintiff concedes that her wage claim is not brought pursuant to the Immigration Act,

and that it is based solely on her interpretation of the Contract.  *See* ECF Docket No. 58 at pp.3-

4) ("…defendants' compliance with the immigration laws is irrelevant…").  Plaintiff's

interpretation is wrong and belied by the documentary evidence and her own testimony.

In coming to her conclusion that the contract was breached, Plaintiff miscomprehends the

VISA Application process and the requirement for the Prevailing Wage Determination.  First, 20

CFR § 656.40, requires each employee to have a <u>government</u> determined Prevailing Wage

Determination:

> Application process. The <u>employer</u> must request a <u>PWD</u> from the
> NPC, on a form or in a manner prescribed by OFLC. Prior to
> January 1, 2010, the SWA having jurisdiction over the <u>area of
> intended employment</u> shall continue to receive and process
> <u>prevailing wage determination</u> requests in accordance with the
> regulatory provisions and <u>Department</u> guidance in effect prior to
> January 1, 2009. On or after January 1, 2010, the NPC shall
> receive and process <u>prevailing wage determination</u> requests in
> accordance with these regulations and with <u>Department</u> guidance.
> <u>The NPC will provide the employer with an appropriate prevailing
> wage rate. The NPC shall determine the wage in accordance with</u>

<u>sec. 212(t) of the INA</u>.

(emphasis added).

It is undisputed that Plaintiff received a Prevailing Wage Determination which was submitted to the United States Government as part of the VISA Application. Declaration of Bent Philipson, Exhibit Q to Hahn Decl., at ¶6.  Plaintiff claims that the prevailing wage due to her would be the prevailing wage which existed at the time that her employment began.  As a matter of law, this is incorrect.  *See Rosales v. Hispanic Emple. Leasing Program, LLC*, 06-cv-877, 2008 U.S. Dist. LEXIS 96417 at *5-6 (W.D. Mich., November 26, 2008) (prevailing wage rate is measured from the time the government issues a wage determination, not actual start of employment date).

Plaintiff's interpretation also is not in conformity with the terms of the Contract which provides:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as <u>determined</u> by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

(emphasis added).  The words "As of the Commencement Date" refer to when Plaintiff would receive the $29.00 per hour, because for 4 weeks prior to the Commencement Date, Plaintiff was entitled to only $12 per hour.  (Contract at Article IV, Section 2).  The reference to "as determined" refers to the *already determined* Prevailing Wage Determination, which was submitted with Plaintiff's VISA Application prior to the Contract.   The law regarding the interpretation of contracts is clear:

> When parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. That rule imparts

> stability to commercial transactions by safeguarding against
> fraudulent claims, perjury, death of witnesses . . . infirmity . . . of
> memory . . . [and] the fear that the jury will improperly evaluate
> the extrinsic evidence…

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 660 (2d Cir. 1996) (quoting *W.W.W.*

*Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).

Here, Plaintiff does not even offer any testimony that Defendants' plain reading of the

Contract is incorrect.  On the contrary, Plaintiff consistently testified during her deposition that

she understood she was to receive $29.00 per hour.  In fact, after executing the Contract, and the

Contract was assigned to Prompt, Paguirigan executed the Wage Acknowledgment which

provided for the same $29.00 rate.  Moreover, and most significantly, the cover letter to the

Contract, which was attached at all times to the rest of the Contract, specified a wage rate of

$29.00 per hour.   The Court should rule as a matter of law that Plaintiff was paid the proper rate.

Furthermore, Plaintiff's wage claim is undercut by the Contract which required her to

serve notice of a breach and give her employer the opportunity to cure the breach.  Contract,

Article VI, Sections 3-5. It is undisputed that she did not give notice of any breach during her

employment (Paguirigan Dep. at 136-137) (Hahn Dec., Exh. D).

Finally, the wage component of the breach of contract claim should be dismissed because

Plaintiff cannot satisfy the damages element of the claim.  *See Fowley v. American Lawyer*

*Media, Inc.*, 306 A.D.2d 113, 761 N.Y.S.2d 176, 177 (dismissal of breach of contract claim

where there were no damages).

A simple accounting proves that Plaintiff was overpaid.  Plaintiff claims to have been

entitled to receive an hourly rate of $30.99, but was instead paid $29.00 per hour, an alleged

underpayment of $1.99 per hour worked.  Plaintiff worked approximately 1048.73 hours during

her post-training employment (Exhibit 4 to the Kupka Report) (Hahn Dec., Exh. P), which means

that the total alleged underpayment was $2,086.97.  However, this does not reflect that Plaintiff

received an advance during her first four weeks of employment, during which she was entitled to

be paid an hourly rate of $12.00 (Contract at Article IV, Section 2), but received the $29.00

hourly rate, for a total advance of $2,380, which is in excess of the alleged $2,086.77

underpayment.  It is also undisputed that Defendants paid $3,455 in airfare and other expenses

for Plaintiff (Paguirigan Dep. at 141-143); (*see also* Declaration and Undertaking, annexed to the

Hahn Decl. as Exh. L), for which Plaintiff is liable, which more than exceeds the alleged

underpayment. Accordingly, because Plaintiff suffered no damages the wage component of the

breach of contract claim fails as a matter of law.

### B.   The Contract Did Not Obligate Prompt To Provide Plaintiff With 40 Hours of Work Per Week, Nor Did Plaintiff Desire to Work 40 Hours Per Week

As set forth above, the Contract leaves it to the employer's discretion to set the amount of

hours that Plaintiff would work.  Specifically, Article IV, Section 3 provides:

> Employee agrees to work on a full-time basis for and on behalf of
> Employer or Employer's designee/assignee under the general
> direction of Employer or Employer's designee/assignee, *pursuant
> to a work schedule established at the sole discretion of Employer*.

Therefore, the Complaint's allegations that the Contract was breached because Plaintiff

was not provided with 40 hours of work per week is completely refuted by the terms of the

Contract.  There was no 40-hour requirement.

Further, Plaintiff testified that she had no interest in working more than 35 hours of work

each week.  Paguirigan Dep. at 156-160 (Hahn Dec., Exh. D).  The other putative class members

deposed in this case gave the same testimony on this issue.  Valdez Dep. 76-77 (Hahn Dec., Exh.

G); Bane Dep. at 67-68(Hahn Dec., Exh. F); Padernal Dep. at 43-44(Hahn Dec., Exh. E).  This is

yet another example in this case of testimony that flies completely in the face of the allegations

of the Complaint.  It begs the question as to how counsel for Plaintiff certified the accuracy of

the serious allegations asserted in this action.

**C.  <u>Plaintiff Conceded She Only Performed The Duties of a Registered Nurse</u>**

The Complaint alleges that Plaintiff performed services as a "Nurse Manager" rather than

as a registered nurse and that she therefore should have been entitled to a higher wage.  The

claim is utter nonsense.  Plaintiff conceded during her deposition that she performed only the

duties described in her Contract which match the description as a nurse, not as manager.

(Paguirigan Dep. 68-7) (Hahn Dec., Exh. D).  Plaintiff's entire allegations in this regard rests

upon her "employment identification badge" which stated that her position as "Nurse Manager."

The title does not establish that Plaintiff performed any managerial services; on the contrary, the

"Manager" title only addressed that as a registered nurse she supervised the certified nursing

assistants who assist all registered nurses.  In fact, New York Department of Health regulations,

which govern skilled nursing facilities (i.e. nursing homes) do not list any position of "Nurse

Manger."

The Job Classification Guide known as the O*Net OnLine Summary Report, prepared

with information from the Department of Labor, delineates the distinctions between Registered

Nurses and other managerial-type nursing positions. Hahn Dec. at Exh. N. To the extent Plaintiff

claims that she was a supervisor entitled to a greater prevailing wage, Plaintiff must establish that

her duties complied with the requirements of O*Net OnLine, which establishes the statutory

designation for each position.  Plaintiff testified at length that she did not provide *any*

supervisory services and did not meet the requirements of a Medical and Health Services

Manager.  (Paguirigan Dep. 52; 68-71) (Hahn Dec., Exh. D).  Plaintiff was supervised by a

nursing supervisor, director of nursing services and a licensed nursing home administrator. She

was not a manager by any definition that matters.

Moreover, any dispute with Plaintiff's Prevailing Wage Determination must be made with the government, which issues such determinations. Plaintiff received the Prevailing Wage Determination in 2007 and never objected to it or filed an appeal with the government. The claim that Plaintiff was employed as a "Nurse Manager" in breach of her Contract should be dismissed.

At a minimum, even if the breach of contract claim survives (which it should not), the claim must be dismissed as to all defendants other than Prompt. Not a scintilla of evidence has been proffered by Plaintiff to support veil piercing with respect to the contracting party, Prompt. Accordingly, at a minimum, the breach of contract claim must be dismissed as to all parties other than Prompt.

It is well settled that law that only a party to a contract may be sued for its breach. *See Advanced Capital Commer. Group, Inc. v. Suarez*, CV 09-5558 (DRH) (GRB), 2013 U.S. Dist. LEXIS 135952 at *10 (E.D.N.Y. Aug. 30, 2013); *see also Bouley v. Bouley*, 19 A.D.3d 1049, 1050, 797 N.Y.S.2d 221, 222 (2d Dep't 2005) (*citing Blank v. Noumair*, 239 A.D.2d 534, 658 N.Y.S.2d 88 (2d Dep't 1997)). Here, it is beyond dispute that only Prompt is party to the Contract with Plaintiff.

Plaintiff cannot establish a claim for veil piercing which includes a showing that the stockholders exercised complete domination of the corporation and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. *See Wm. Passalacqua Builders v. Resnick Developers S.,* 933 F.2d 131, 138 (2d Cir. 1991); *Pryor v. D'Alessio (In re D'Alessio)*, Case No. 8-08-72819, 2014 Bankr. LEXIS 221, at *20-21 (Bankr. E.D.N.Y. Jan. 17, 2014); *see also Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*, 90 F.Supp.2d 401, 414-415 (S.D.N.Y. 2000).

The Second Circuit has explained that veil piercing is a narrow exception to the doctrine of limited liability for corporate entities, and that courts should permit veil-piercing only under "extraordinary circumstances." *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir. 1996).

Here, no evidence has been submitted, establishing that Prompt was so controlled and dominated by any of the other Defendants to such an extent that it "had no existence of its own." *Kashfi v. Phibro-Salomon, Inc.*, 628 F.Supp. 727, 733 (S.D.N.Y.1986). On the contrary, each of the corporate defendants is a separate entity and maintains corporate formalities.

Plaintiff has also failed to submit any evidence as to the second prong of the veil-piercing analysis. Under the second prong, a plaintiff must allege facts sufficient to establish that defendants "misused the corporate form for [their] personal ends so as to commit a wrong or injustice against" her. *Morris v. State Dep't of Taxation & Fin*., 82 N.Y.2d 135, 143, 603 N.Y.S.2d 807, 811 (1993). In other words, a plaintiff must establish a relationship between the alleged wrong against her and Defendants' alleged abuse of the corporate form. Plaintiff would need to show that Defendants were misusing the corporate form for the express purpose of harming her. There has been absolutely no evidence submitted to that effect.

Accordingly, because none of the Defendants, other than Prompt, is a party to the Contract, and there is no basis to pierce Prompt's corporate veil, dismissal of the claim for breach of contract as to the other seven Defendants is required as a matter of law.

## IV.

## THE DECLARATORY RELIEF SOUGHT BY PLAINTIFF SHOULD BE DENIED

Plaintiff's declaratory judgment claim seeks a judgment declaring the Termination Amount unenforceable as a matter of law. Plaintiff is not entitled to the requested declaration

because the Termination Amount is enforceable.[8]  New York courts favor freedom of contract and generally enforce liquidated damages clauses.  *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 610 (2005).  Under New York law, "a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement."  *Truck Rent-A-Center, Inc. v Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977).  Although not the case here, a liquidated damages clause is enforceable even if the actual loss may be much less than the sum agreed upon[9].  *Id.*

Here, the Termination Amount is $25,000 and is allocated at $8,333 per year for the three-year contract term.  As set forth in great detail in Defendants' expert report, $25,000 was a reasonable estimate at the time of the contract of Defendants' estimated damages.  Indeed, the Total Risk Exposure/Probable Loss of Golden Gate, the original employer under the Contract, was estimated to be between $85,401 and $140,296 at the time that it contracted with Plaintiff.  Even the assignee Prompt's damages were more than $25,000.  Prompt incurred $26,182 in direct recruitment costs, and damages of $35,951 as a result of Plaintiff's breach. Kupka Report at pp. 3-4. Given these realities, an estimate of liquidated damages of $25,000 or $8,333 per year was more than reasonable as an estimate.

The Complaint misstates the Nassau County Supreme Court holding in *Sentosa Care, LLC et al v. Anilao, et al.* (Sup. Ct. Nassau Cty April 7, 2010), a copy of which is attached to the

---

[8] It should be noted that even if Plaintiff were to obtain the declaratory relief she seeks, she would be liable to Prompt for even *more* than the Termination Amount since Defendants' actual damages well exceed the Termination Amount.  It is well settled that when a liquidated damages provision is struck down, the party seeking to enforce the provision can still recover its actual damages.  *See Brecher v Laikin*, 430 F.Supp. 103, 106 (S.D.N.Y. 1977) ("[i]f the clause is rejected as being a penalty, the recovery is limited to actual damages proven." [citations omitted]); *see also* 3 Farnsworth, Contracts 12.18, at 304 [3d ed] (where a liquidated damages provision is an unenforceable penalty, "the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of that agreement, just as if the provision had not been included"); As set forth in the accompanying Expert Report of Michael Kupka, the damages incurred by Defendants for Plaintiff's breach was in the range of $86,000 to $140,000.

[9] In our case, the actual amount is, in fact, *more* than the Termination Amount.

Hahn Dec. as Exhibit M, and its legal effect.  First, in *Anilao*, the Court was faced with a contract that had employment terms that were different than the Contract in this case.  Prompt was not the employer in the *Anilao* case. Second, the *Anilao* court denied the employers <u>and</u> the employees' summary judgment motions and determined that questions of fact existed.  The *Anilao* court did <u>not</u> determine that the liquated damages clause was a penalty.  After discussing at length in *dicta* the general rules concerning liquidated damages, the *Anilao* court denied the employer's motion for summary judgment to enforce the liquidated damages and denied the employees' cross-motions to dismiss.  The *Anilao* court set the damages issue for trial and stated that:

> …Plaintiffs' damages flowing from any proven breach by defendant Nurses will be easily ascertained at trial.

Order at 6 (Exh. M).

Furthermore, the *Anilao* decision does not have res judicata effect for two reasons.  First, the Contract in this case, and the relevant contracts in *Anilao*, are not identical, nor are the parties identical.  Second, the *Anilao* case was discontinued by agreement of the parties.  As a matter of law, once the *Anilao* case was discontinued, any prior Orders are a nullity.  *See Newman v. Newman*, 245 A.D.2d 383, 665 N.Y.S.2d 423 (2d Dep't 1997) ("When an action is discontinued, it is as if it had never been; everything done in the action is annulled and all prior orders in the case are nullified.").  Thus, the notion that the *Anilao* case bars enforcement of the Termination Amount is wrong as a matter of fact and law.

As a result, the Court should grant summary judgment in Defendants' favor denying the relief requested in the Declaratory Judgment claim.

## V.

### PROMPT SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR $25,000 PLUS ATTORNEYS' FEES <u>PURSUANT TO THE CONTRACT</u>

There is no genuine dispute that Plaintiff left her employment after only 9 months without any prior notice.  As set forth above, the Termination Amount is an enforceable contractual provision.  The Contract also provides for Prompt to recover its attorneys' fees in connection with the enforcement of liquidated damages provision.  Article VII, Section 4. Accordingly, the Court should award summary judgment to Prompt on its counterclaim and hold a hearing to determine the precise amount of Prompt's damages and attorneys' fees.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declarations, the Court should grant Defendants' motion in its entirety and award Defendants such other and further relief that is just and proper.

Dated: Brooklyn, New York
         August 31, 2018

**HAHN EISENBERGER PLLC**

By:___/s/ Elliot Hahn_____
         Seth Eisenberger (SE-6769)
         Elliot Hahn (EH-6087)
Hahn Eisenberger PLLC
969 East 27th Street
Brooklyn, New York 11210
347-410-5800
mail@hahneisenberger.com

                    &

**ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK, P.C.**

By:     Sheldon Eisenberger (SE-2021)
         Alan M. Pollack (AMP-3759)
         Tarique Collins (TC-4744)
875 Third Avenue, 9th Floor
New York, NY 10022
212-603-6300

*Attorneys for Defendants*

{099169}                                    30