UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,                                     :

                               Plaintiff,                            :          1:17 Civ. 1302 (NG) (JO)

                -vs-                                          :

PROMPT NURSING EMPLOYMENT AGENCY     :
LLC d/b/a SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING            :
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a  :
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH    :
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,         :

                     Defendants.                         :
------------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


THE HOWLEY LAW FIRM P.C.
John Howley
Leandro B. Lachica
350 Fifth Avenue, 59th Floor
New York, New York 10118
(212) 601-2728

*Attorneys for Plaintiff*

**Table of Contents**

Statement of Undisputed Facts…………………………………………………………..…..1

    A.  Golden Gate Submitted a Visa Application as the Proposed Employer…………………..1

    B.  The Contract Required Payment of a "Base Salary"
        at the "Prevailing Wage" for the "Geographic Area"………………………………….2

    C.  The Contract Termination Fee and Confession of Judgment
        Were Designed "to Secure Employee's Performance"…………………………….…..3

    D.  Defendants Acknowledged the Costs for Visa Sponsorship,
        Transportation to the United States, and Miscellaneous Fees…………………….…..3

    E.  Defendants Pursued Abusive Legal Actions Against Filipino Nurses……………..…..4

Argument…………………………………………………………………………..…..5

Point I
The Contract Termination Fee is an Unenforceable Penalty…………………………………..6

    A.  The Employer's Actual Damages Were Readily Ascertainable…………………………7

        1.  The Employer's recruiting costs were not difficult to determine……………………8

        2.  The Employer's visa and travel costs were not difficult to determine………………8

        3.  The Employer's temporary housing costs were not difficult to determine………..…..9

        4.  The Employer's training and orientation costs were agreed in advance…………….9

    B.  The Contract Termination Fee Was Intended
        "to Secure Employee's Performance"………………………………………..…..9

    C.  Defendants' Proposed Expert Report on "Actual Damages" is Inadmissible…………..10

        1.  Kupka Has No Evidentiary Basis for His Opinion
            that the Employer Incurred "Direct Recruitment Costs"………………………..…..12

            a.  Kupka's factual assumptions are contrary to defendants' admissions…....…..12

            b.  Kupka improperly relied on a summary provided by defendants'
               attorneys……………………………………………………………..…..13

       c.  Kupka has no basis for his assumption that Golden Gate
          and Prompt Nursing had similar cost structures……………………………..15

    2.  Kupka Has No Evidentiary Basis for His Opinion that
       Golden Gate Would Incur "Increased Operating Costs"……………………...…..17

    3.  Kupka's "lost profits" analysis is irrelevant because the contract
       does not contemplate a recovery for lost profits and he uses the
       wrong profit margin……………………………………………………………...…..19

Point II
Plaintiff is Entitled to Summary Judgment on Her Breach of Contract Claim…………………..21

  A.  The Contract's Plain Language Requires Payment of a Base Salary at
     the Prevailing Wage for the Geographic Area as of the Commencement Date……...…..21

  B.  Parol Evidence Does Not Support Defendants' Proposed Interpretation……………….24

  C.  Plaintiff and All Other Class Members Are Entitled to Compensatory Damages…....…..25

Point III
The Undisputed Facts Establish Defendants' Violations
of the Trafficking Victims Protection Act…………………………………………………...…..25

  A.  Defendants' Enforcement of the Contract Termination Fee and Other Baseless
     Legal Actions Were Abuses of Legal Process and Threats of Serious Harm…………..….26

  B.  Defendants Acted with an Intent to Compel Plaintiff and
     All Other Class Members to Continue Working…………………………………………..30

  C.  Plaintiff and Other Class Members Have Proved Their Right
     to Compensatory and Punitive Damages…………………………………………………..30

  D.  The Individual and Corporate Defendants Are Jointly and
     Severally Liable for TVPA Violations……………………………………………………..31

Point IV
The Undisputed Facts Justify Piercing the Corporate Veil
and Holding the Individual Defendants Liable for Breach of Contract…………………...…..32

Conclusion…………………………………………………………………………...…..34

# Table of Authorities

## <u>Cases</u>

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002)…………………..……11

*Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904 (S.D.N.Y. 1985),
*aff'd*, 801 F.2d 38 (2d Cir. 1986), *cert. denied*, 479 U.S. 1088 (1987)…………………..……14-15

*Borghese Trademarks Inc. v. Borghese*, 10 Civ. 5552 (JPO),
2013 WL 143807 (S.D.N.Y. Jan. 14, 2013)………………………………………………..……19-20

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556 (S.D.N.Y. 2003)..…..6-7, 21

*Brooks v. Outboard Motor Corp.*, 234 F.3d 89 (2d Cir. 2000)…………………………………..19

*Carmichael v. City of New York*, 34 F. Supp. 3d 252 (E.D.N.Y. 2014)…………………..…..6, 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………..……6

*Cibbarelli v. Bombardier, Inc.,* 01 Civ. 6959 (NG),
2004 WL 3090594 (E.D.N.Y. Sept. 3, 2004)………………………………………5-6, 11-12, 19

*CIT Group/Business Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*,
815 F. Supp. 2d 673 (S.D.N.Y. 2011)………………………………………………………..14-15

*Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir. 1993)………………..…21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)…………………..…..11-12

*Groome v. Matsushita Elec. Corp. of Am.,* 92 Civ. 3073 (NG),
2000 WL 341134 (E.D.N.Y. Mar. 30, 2000)…………………………………………..6, 11-13, 17

*Hillside Metro Associates, LLC v. JPMorgan Chase Bank, Nat. Ass'n*,
10 Civ. 1772 (JG), 2012 WL 1617157 (E.D.N.Y. May 09, 2012)………………………..…..21

*Javier v. Beck*, 13 Civ. 2926 (WHP), 2014 WL 3058456
(S.D.N.Y. July 3, 2014)……………………………………………………..…..26, 28-29, 32

*Kenford Co. v. Erie*, 67 N.Y.2d 257 502 N.Y.S.2d 131 (1986)…………………………..…..19

*Kenford Co. v. Erie*, 73 N.Y.2d 312, 540 N.Y.S.2d 1 (1989)…………………………….19-20

*LG Capital Funding, LLC v. Coroware, Inc.*, 16 Civ. 2266 (AMD),
2017 WL 3973921 (E.D.N.Y. Sept. 8, 2017)……………………………………………..6

*Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017)………………………………………..29

*Nunag-Tanedo v. East Baton Rouge Parish School Bd.*,
790 F. Supp. 2d 1134 (C.D. Cal. 2011)……………………………………………...…..28

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997)………………………………………...…..11

*Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 169 (S.D.N.Y. 1990)……………………..9-10

*Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 98 Civ. 8272 (RPP),
2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)……………………………………...…..15

*SentosaCare LLC v. Anilao*, Index No. 6079/06
(N.Y. Sup. Ct. Nassau Cty. May 20, 2010)……………………………………………..4-5, 7

*Shred-It USA, Inc. v. Bartscher*, 02 Civ. 4082 (JO),
2005 WL 2367613 (E.D.N.Y. Sept. 27, 2005)……………………………...…..10, 19-21, 24

*Supply & Building Co. v. Estee Lauder Int'l Inc.*, 95 Civ. 8136 (RCC),
2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001)…………………………………….…..13-15, 18-19

*Union Capital LLC v. Vape Holdings Inc.*, 16 Civ. 1343 (RJS),
2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017)……………………………………...…..6

*United States v Bradley*, 390 F.3d 145 (1st Cir. 2004)……………………………………..26

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011)………………………….…..26, 28-29

*United States v. Kaufman*, 546 F.3d 1242 (10th Cir. 2008)………………………………..26

*United States v. Kozminski*, 487 U.S. 931 (1988)………………………………….…..26, 29

*United States v. Rivera*, 799 F.3d 180 (2d Cir 2015)………………………………...…..28

*U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34 (2d Cir. 2004)……….…..6

*Matter of Vinluan v. Doyle*, 60 A.D.3d 237 (2d Dep't 2009)……………………………….4

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
933 F.2d 131 (2d Cir. 1991)……………………………………………………...…..32, 34

*W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157 565 N.Y.S.2d 440 (1990)……………..…21, 24

**Statutes, Regulations, and Rules**

8 U.S.C. § 1182(a)(5)(A)(i)…………………………………………………………….23

8 U.S.C. 1182(a)(14)…………………………………………………………………….23

8 U.S.C. § 1188(a)(1)(B)………………………………………………………………..23

8 U.S.C. § 1188(c)(3)(B)(iii)………………………………………………………...…..23

18 U.S.C. § 1589(a)…………………………………………………………..…..25-26, 31

18 U.S.C. § 1589(a)(2)…………………………………………………………………..26

18 U.S.C. § 1589(a)(4)…………………………………………………………………..26

18 U.S.C. § 1589(b)……………………………………………………………………..31

18 U.S.C. § 1589(c)…………………………………………………………………..26-27

18 U.S.C. § 1589(c)(2)…………………………………………………………………..27

18 U.S.C. § 1590(a)……………………………………………………………………..31

18 U.S.C. § 1594(a)………………………………………………………….…...26, 31

18 U.S.C. § 1594(b)……………………………………………………………………..31

18 U.S.C. § 1595…………………………………………………………………..25-26

18 U.S.C. § 1595(a)……………………………………………………………………..34

20 C.F.R. § 656.40……………………………………………………………....2, 22-23

Fed. R. Civ. P. 56(c)……………………………………………………………...…..5-6

Fed. R. Civ. P. 56(e)……………………………………………………………………..11

Fed. R. Evid. 702………………………………………………………………………..11

N.Y. Labor L. § 220(5)(a)………………………………………………………………..23

**Statement of Undisputed Facts**

In 2006, plaintiff Rose Ann Paguirigan was recruited in the Philippines to work for a nursing home in New York owned by defendants.  The process began at an event organized by defendant Sentosa Nursing Recruitment Agency ("Sentosa Agency").  Defendants Francris Luyun and Bent Philipson spoke at the event.  Paguirigan Dep. at 96-109 (Hahn Decl., Exh. D).

Luyun was introduced as the owner of Sentosa Agency.  Luyun Dep. at 10 (Howley Decl., Exh. 1).  Philipson was introduced as a representative of Sentosa Care LLC ("Sentosa Care").  Philipson Dep. at 13 (Hahn Decl., Exh. T).  Defendant Sentosa Care is a consulting company Philipson owns with defendant Benjamin Landa that provides services to nursing homes owned by Landa, Philipson, and Philipson's wife.  *Id.* at 6-7, 13.  Philipson told the nurses that "we operate nursing homes," and that the nurses would be hired directly by the nursing homes.  *Id.* at 12, 41; Luyun Dep. at 18.

**A.  Golden Gate Submitted a Visa Application as the Proposed Employer**

In 2007, defendant Golden Gate Rehabilitation & Health Care Center LLC submitted a visa application on plaintiff's behalf.  Philipson Decl. ¶ 5.  The application included a prevailing wage determination of $26.87 per hour as of that time.  *Id.*

It took eight years for plaintiff to be notified of a visa interview with the U.S. Consulate in the Philippines.  *Id.* ¶ 8.  At the time of the interview, the Consulate required confirmation that a job was still available.  *Id.* ¶ 9.  On April 15, 2015, before the scheduled interview, Landa signed a letter to the Consul stating that Golden Gate was offering plaintiff a position at $29.00 per hour.  Hahn Decl., Exh. H.  One week later, on April 22, 2015, plaintiff signed a three-year employment contract with Golden Gate as the Employer.  *Id.*

**B. The Contract Required Payment of a "Base Salary"
at the "Prevailing Wage" for the "Geographic Area"**

Section IV(l) of the contract contains the following provision regarding wages:

"As of the Commencement Date, Employee will be paid a base salary in
accordance with the prevailing wage for the geographic area in which the
employee is assigned to work, as determined by the National Prevailing Wage and
Helpdesk Center (NPWC) of the United States Department of Labor."

"Commencement Date" is defined as "the date when Employee first starts to provide direct
nursing care to residents/patients after completing the orientation and training."  Contract § III.

The NPWC determines the prevailing wage *for an individual employee* in response to a
prospective employer's application for a prevailing wage determination, which may include a
wage survey submitted by the employer.  *See* 20 C.F.R. § 656.40.  The NPWC independently
determines the prevailing wage *for a geographic area*, which it publishes for public use.  *See*
Howley Decl., Exhs. A-H.  The contract requires use of "the prevailing wage *for the geographic
area* in which the employee is assigned to work."  Contract § IV(1) (emphasis added).

The NPWC calculates the prevailing wage for a "geographic area" on both an hourly and
annual salary basis.  Howley Decl., Exhs A-H.  The contract requires payment of "*a base salary*
in accordance with the prevailing wage for the geographic area in which the employee is
assigned to work."  Contract § IV(1) (emphasis added).

Physically affixed to the front of the employment contract at the time of plaintiff's
signing was Landa's letter to the Consul.  Hahn Decl., Exh. H.  While plaintiff's signature
appears on each of the 10 numbered pages of the contract, plaintiff's signature does not appear on
Landa's letter to the Consul.  *Id*.

2

### C. The Contract Termination Fee and Confession of Judgment Were Designed "to Secure Employee's Performance"

The contract required plaintiff to pay a contract termination fee – the contract calls it "Liquidated Damages" – of up to $25,000 if she stopped working before the end of the three-year contract term.  Contract § VII(4).[1]  The stated purpose of the contract termination fee is to compensate the Employer for expenses incurred "in recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area."  *Id*.  The same section of the contract required the employee to execute a confession of judgment for $25,000, which the employee agreed could be filed in court if she failed to complete the employment term.  *Id*.  The stated purpose of the confession of judgment is "to secure Employee's performance of the Employment Term."  *Id*.

### D. Defendants Acknowledged the Costs for Visa Sponsorship, Transportation to the United States, and Miscellaneous Fees

Plaintiff was required to sign an acknowledgment of the costs related to her recruitment. Hahn Decl., Exh. L.  The acknowledgment states that Sentosa Care paid a total of $3,685 for attorneys' fees, filing fees, visa fees, airfare, and miscellaneous fees in connection with plaintiff's hiring and travel to the United States.  *Id.*  For the first two months after she arrived in the U.S., plaintiff lived rent-free in a two bedroom/one bathroom apartment with three other nurses. Paguirigan Dep. at 149.  A lease for the apartment states that the rent was $1,500.00 per month, which amounts to $375.00 per month for each nurse.  Howley Decl., Exh. 10.

---

[1] The contract provides:  "The afore-cited liquidated damages of Twenty Five Thousand Dollars ($25,000.00) in case of pre-termination of employment/breach of contract within the three (3) year period shall be computed as follows:  Within Year 1 - the liquidated damages is $25,000.00.  Within Year 2- the liquidated damages is $16,666.67.  Within Year 3 - the liquidated damages is $8,333.34."  *Id.*

### E.  Defendants Pursued Abusive Legal Actions Against Filipino Nurses

In April 2006, 10 nurses, recruited by Sentosa Agency in the Philippines and employed by Sentosa Care in New York, resigned their employment.  *See Matter of Vinluan v. Doyle*, 60 A.D.3d 237, 240 (2d Dep't 2009).  All the nurses had signed employment contracts requiring them to pay a $25,000 contract termination fee if they stopped working before the end of a three-year term.  *Id.*  Defendants filed a complaint with the New York State Education Department alleging that the nurses had abandoned their patients by simultaneously resigning without adequate notice.  *Id.* at 242.  The Education Department conducted an investigation and in September 2006 concluded that none of the nurses had committed professional misconduct.  *Id.*

After the nurses resigned, defendants Landa and Philipson met with the District Attorney for Suffolk County, New York.  Howley Decl., Exh. 11.  In March 2007, the Suffolk County District Attorney obtained an indictment against the nurses and their attorney on charges of conspiracy to endanger the welfare of a child and endangering the welfare of a physically-disabled person.  *Vinluan*, 60 A.D.3d at 242.  The nurses and their attorney sought a writ of prohibition to halt the criminal proceeding.  *Id.* at 243.  The New York State Supreme Court, Appellate Division, Second Department, granted the writ, holding that the prosecution would violate the nurses' Thirteenth Amendment rights and their attorney's First Amendment right.  *Id.* at 249-50.

Between 2006 and 2008, defendants Sentosa Care, Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate and other nursing homes owned by the defendants brought a series of civil lawsuits against 38 Filipino nurses to enforce the $25,000 contract termination fee.  *See, e.g., SentosaCare LLC v. Anilao*, Index No. 6079/06 (N.Y. Sup. Ct. Nassau

Cty. May 20, 2010) (Hahn Decl., Exh. M).[2]  The court found that "the liquidated damages

provision at issue is unenforceable as [the Employer's] damages flowing from any proven breach

by [the] Nurses will be easily ascertained at trial." *Id.* at 6.

This pattern of abusive legal actions has continued.  After plaintiff arrived in the United

States, defendant Golden Gate verbally assigned her contract to defendant Prompt Nursing.

Philipson Decl. ¶ 12; Philipson Dep. at 19.  On June 22, 2015, plaintiff began working at

defendant Spring Creek.  Paguirigan Dep. at 133.  On March 7, 2016, plaintiff quit her job.

Hahn Decl., Exh. K.  Defendant Prompt Nursing sued plaintiff and two other Filipino nurses,

Jericson Valdez and April Sullivan Francisco, to enforce the $25,000 contract termination fees

and for $250,000 in damages against each nurse for alleged tortious interference with contract

and prospective business relations.  Howley Decl., Exhs. 12-14.  In the lawsuit against plaintiff,

Prompt Nursing refused to respond to discovery requests seeking the identities of the nurses

plaintiff allegedly tortiously induced to breach their contracts or business relations.  *Id.,* Exh. 15.

In the lawsuit against Valdez, Prompt Nursing ignored court orders directing it to produce that

information.  *Id.*, Exh. 16.  After this action was commenced, Prompt Nursing voluntarily

discontinued the lawsuits against plaintiff and Valdez.  Howley Decl., Exh. 17.

## <u>Argument</u>

"Summary judgment is appropriate where 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue of any material fact and the moving party is entitled to judgment as a matter of

law.'"  *Cibbarelli v. Bombardier, Inc.*, 01 Civ. 6959 (NG), 2004 WL 3090594, at *3 (E.D.N.Y.

---

[2] Defendants commenced at least five lawsuits against Filipino nurses in NYS Supreme Court, Nassau County, between 2006 and 2008.  *Brookhaven v. Manugas*, Index No. 19156/2006; *SentosaCare v. Anilao*, Index No. 06079/2006; *Avalon Gardens v. Caluya*, Index No. 16057/2006; *Avalon Gardens v. Almendrala*, Index No. 21330/2006; *Avalon Gardens v. Ignacio*, Index No. 13282/2008.

Sept. 3, 2004) (quoting Fed. R. Civ. P. 56(c)); *see also Carmichael v. City of New York*, 34 F. Supp. 3d 252, 259-60 (E.D.N.Y. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)); *Groome v. Matsushita Elec. Corp. of Am.*, 92 Civ. 3073 (NG), 2000 WL 341134, at *2 (E.D.N.Y. Mar. 30, 2000) (quoting *Celotex,* 477 U.S. at 322).  For the reasons set forth below, summary judgment is appropriate in plaintiff's favor on all claims alleged in the complaint.

**Point I**

**The Contract Termination Fee is an Unenforceable Penalty**

Under New York law, courts will enforce liquidated damages provisions when:  (1) actual damages are difficult to determine; and (2) the amount of liquidated damages is not clearly disproportionate to the potential loss.  *See, e.g., U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70-71 (2d Cir. 2004).  If the clause in question does not satisfy one or both of these factors, then it is an impermissible penalty and will not be enforced.  *Id*. at 70-71.

Whether the provision constitutes liquidated damages or a penalty is a question of law that requires consideration of the nature of the contract and the attendant circumstances, including the sophistication of the parties and whether they were represented by counsel.  *Id*. at 71; *see also Union Capital LLC v. Vape Holdings Inc.,* 16 Civ. 1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017); *LG Capital Funding, LLC v. Coroware, Inc.,* 16 Civ. 2266 (AMD), 2017 WL 3973921, at *3 (E.D.N.Y. Sept. 8, 2017).  The point is to prevent the imposition of penalties whose purpose is to "secure performance" through the threat of disproportionate damages.  *LG Capital Funding,* 2017 WL 3973921, at *3.  To that end, New York courts construe purported liquidated damages provisions strictly.  *See, e.g., U.S. Fidelity & Guar. Co.*, 369 F.3d at 71.  "[A]ny doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages clause should be resolved in favor of

a construction which holds that the provision is a penalty." *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) (citations omitted).

In this case, the Employer's damages were not difficult to determine in the event of a breach, the "liquidated damages" amount is disproportionate to the Employer's damages and the Employee's compensation, and the contract states on its face that the purpose of the termination fee and confession of judgment is "to secure Employee's performance." Accordingly, plaintiff and all class members are entitled to summary judgment declaring that the contract termination fee is unenforceable, permanently enjoining defendants from threatening or attempting to enforce it, and dismissing with prejudice defendants' counterclaim to enforce it against plaintiff.

### A. The Employer's Actual Damages Were Readily Ascertainable

The contract states that the contract termination fee is intended to compensate the Employer for expenses incurred "in recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area." Contract § VII(4). Each of these costs can be determined without difficulty. Indeed, defendants' proposed expert witness, Michael Kupka, CPA, describes how the exact amount of damages can be determined from the Employer's accounting records. Kupka Report, at 9 (Hahn Decl., Exh. P). For this reason alone, plaintiff is entitled to summary judgment declaring that the contract termination fee is unenforceable on the same grounds as the New York State court found it unenforceable in *SentosaCare LLC v. Anilao*, Index No. 6079/2016, Order at 6 (N.Y. Sup. Ct. Nassau Cty. May 20, 2010) ("the liquidated damages provision at issue is unenforceable as [the Employer's] damages flowing from any proven breach by [the] Nurses will be easily ascertained at trial") (Hahn Decl., Exh. M).

7

### 1. The Employer's recruiting costs were not difficult to determine

Plaintiff signed the contract with Golden Gate, a nursing home, as the Employer. Defendants have not produced any evidence that Golden Gate incurred any recruiting costs. This absence of evidence is consistent with Philipson's testimony that Golden Gate never paid any costs of recruiting and bringing nurses to the United States. Philipson Dep. at 43. The contract was assigned to defendant Prompt Nursing after plaintiff arrived in the United States. *Id.* at 16. At that point, all recruiting efforts had been completed by Philipson and Luyun. Rubenstein, the owner of Prompt Nursing, confirmed this fact when he testified that Prompt Nursing does not recruit nurses. Rubenstein Dep. at 12-13 (Hahn Decl., Exh. R). It is, therefore, undisputed that neither Golden Gate nor Prompt Nursing incurred or ever intended to incur any recruiting costs for plaintiff or any other Filipino nurse. Moreover, even if recruiting costs had been incurred by the Employer, defendants' expert opines that they can be calculated based on the Employer's accounting records. *See* Kupka Report, at 9.

### 2. The Employer's visa and travel costs were not difficult to determine

Plaintiff was required to execute an acknowledgement that $3685.50 in costs were incurred on her behalf for lawyer's fees, filing fees, visa fees, ICHP visa screening fees, miscellaneous expenses, and airfare. Hahn Decl., Exh. L. None of these costs was incurred by plaintiff's Employer. The Declaration and Undertaking states that all costs were paid by Sentosa Care. Defendants have not produced any records suggesting that either Golden Gate or Prompt Nursing reimbursed Sentosa Care for these costs. This is not surprising given Philipson's testimony that nursing homes did not pay any of these costs and that the contracts were never assigned to Prompt Nursing until after the nurses arrived in the United States, at which point all of these costs would have been paid. Accordingly, there is no evidence that the Employer – *i.e.*,

the entity entitled to recover "liquidated damages" – ever incurred or intended to incur any visa or travel costs. Moreover, even if the Employer had incurred such costs, the amounts are set forth in the Declaration and Undertaking.

### 3. The Employer's temporary housing costs were not difficult to determine

The cost of temporary housing was known with precision. Plaintiff shared a two-bedroom apartment with three other nurses. She was allowed to live there rent-free for two months. The lease between Rubenstein and the landlord provided for a rent payment of $1,500.00 per month, making the per-nurse cost $375.00 per month. Assuming Prompt Nursing incurred this cost, the total cost for providing plaintiff with two months of housing was $750.00.

### 4. The Employer's training and orientation costs were agreed in advance

Defendants have no evidence that the Employer incurred any costs for training or orientation. Plaintiff testified that she received no training and only a brief orientation while she was providing services to patients. Paguirigan Dep. at 326. Even if training and orientation had been provided, the Employer was permitted to recoup training and orientation costs by paying a lower hourly wage (only $12 per hour), so there would be no need for "liquidated damages" to recoup training and orientation costs. *See* Contract § IV(2).

### B. The Contract Termination Fee Was Intended "to Secure Employee's Performance"

The stated purpose of the contract termination fee and confession of judgment is "to secure Employee's performance of the Employment Term." Agreement § VII(4). This admission alone renders it unenforceable as a matter of law. Where, as here, the contract termination fee "is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced." *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169

(S.D.N.Y. 1990); *see also Shred-It USA, Inc. v. Bartscher*, 02 Civ. 4082 (JO), 2005 WL 2367613, at *10 (E.D.N.Y. Sept. 27, 2005).

The contract termination fee is also disproportionate to the Employer's actual costs and the Employee's compensation. Even assuming (contrary to the defendants' admissions) that plaintiff's Employer, either Golden Gate or Prompt Nursing, actually incurred all costs identified in the Declaration and Undertaking, plus $750.00 for two months of temporary housing, the total costs amount to $4,435.50 – less than one-fifth the contract termination fee.

The disproportionate nature of the contract termination fee is even more striking when compared to plaintiff's compensation. Plaintiff earned less than $700.00 per week after taxes. Howley Decl., Exh. 18. Even if plaintiff spent nothing at all on food, shelter, commuting to work, and other necessities, she would have to work more than 35 weeks – almost nine months – to pay the contract termination fee. If she wanted to eat, sleep in an apartment, and buy basic necessities, she would not have enough left over after a full year to pay off the contract termination fee. Given these undisputed facts, it is obvious that the contract termination fee was designed for its stated purpose "to secure Employee's performance of the Employment Term." Agreement § VII(4). Accordingly, it is an unenforceable penalty under New York law. *See, e.g., Rattigan,* 739 F. Supp. at 169; *Shred-It*, 2005 WL 2367613, at 10.

## C. Defendants' Proposed Expert Report on "Actual Damages" is Inadmissible

Defendants argue that their proposed expert report demonstrates that the contract termination fee was a reasonable estimate of the Employer's damages in the event of a breach. Before reaching this argument, the Court must determine whether the proposed expert testimony would be admissible in evidence at trial.

10

"Rule 56(e) requires that affidavits supporting and opposing summary judgment should 'set forth such facts as would be admissible in evidence.'" *Cibbarelli v. Bombardier, Inc.*, 01 Civ. 6959 (NG), 2004 WL 3090594, at *3 (E.D.N.Y. Sept. 3, 2004); *see also Groome v. Matsushita Elec. Corp. of Am.*, 92 Civ. 3073 (NG), 2000 WL 341134, at *3 (E.D.N.Y. Mar. 30, 2000). "Therefore, 'it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment,' and the trial court need only consider admissible evidence in ruling on a summary judgment motion." *Cibbarelli*, 2004 WL 3090594, at *3 (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

Admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) *the testimony is based upon sufficient facts or data*, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702 (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

"'[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'" *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 265-66 (E.D.N.Y. 2014) (excluding expert testimony and granting summary judgment because of "the unreliability of the data upon which [the expert witness] bases his analysis") (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *Cibbarelli*, 2004 WL 3090594, at *3-4 (excluding expert testimony and granting summary judgment "because it is

11

based on unfounded speculation and is unreliable under *Daubert* principles.") (citing *Daubert,* 509 U.S. at 597); *Groome*, 2000 WL 341134, at *3 (excluding expert testimony and granting summary judgment because the expert's "opinions assume facts for which there is no evidentiary basis") (citing *Daubert*, 509 U.S. at 597).

### 1. Kupka Has No Evidentiary Basis for His Opinion that the Employer Incurred "Direct Recruitment Costs"

Kupka assumes that "Golden Gate incurred certain up-front recruitment costs associated with the hiring of their employees, mainly related to the (i) identification of potential nurses in the Philippines, (ii) evaluation of their skills and talents, (iii) costs incurred by sponsoring their U.S. Visa status, (iv) travel to the United States, (v) provision of initial housing, and (vi) provision of training."  Kupka Report at 3.  Kupka also assumes that Prompt Nursing "incurred . . . direct recruitment costs."  *Id.* at 4; Kupka Dep. at 15-17, 21-25 (Howley Decl., Exh. 19).

#### a.  *Kupka's factual assumptions are contrary to defendants' admissions*

The undisputed evidence establishes that neither Golden Gate nor Prompt Nursing ever incurred or intended to incur any "recruitment costs."  Philipson testified that Golden Gate and the other nursing homes he owns with Landa never paid any recruitment costs:

> "Q:  Other than paying the hourly rate to Prompt [for the nurse's services], does the nursing home pay anything towards the cost of recruiting and bringing the nurse over?
>
> A:  No."

Philipson Dep. at 43.  Rubenstein testified that Prompt Nursing does not recruit nurses:

> "Q:  Does it [Prompt Nursing] do any recruiting?
>
> A:  What is – I'm sorry.  Recruiting meaning?
>
> Q:  Going out and finding nurses so you can staff . . . .
>
> A:  No."

12

Rubenstein Dep. at 12.  Kupka's assumptions are also contrary the Declaration and Undertaking defendants required plaintiff to sign stating that all visa sponsorship and transportation costs were paid by Sentosa Care.  (Hahn Decl., Exh. L).

Kupka admits that he has not examined the accounting records of either Golden Gate or Prompt Nursing, and that he has not seen any evidence that either entity ever incurred or reimbursed others for any "recruitment costs."  Kupka Dep. at 49-50.  Where, as here, Kupka's assumptions are contrary to his own clients' testimony and documents, his "expert opinion" is inadmissible.  *See, e.g. Supply & Building Co. v. Estee Lauder Int'l Inc.*, 95 Civ. 8136 (RCC), 2001 WL 1602976, at *1 (S.D.N.Y. Dec. 14, 2001) (excluding expert testimony because expert's assumption that company restarted its business in June 1991 was inconsistent with client's admission that operations did not restart until January 1992); *Groome*, 2000 WL 341134, at *3.

### b.  *Kupka improperly relied on a summary provided by defendants' attorneys*

Kupka assumed that Prompt Nursing actually incurred the following "direct recruitment costs" in 2015:  $388,510 for office expenses; $105,225 for auto and travel expenses; $97,352 for licenses and permits; $88,000 for rent; $79,070 for professional fees; $28,103 for insurance; $16,460 for telephone charges; $14,413 for depreciation and amortization; $13,180 for interest and bank charges; $13,169 for light, heat and power; $12,605 for maintenance; $12,295 for payroll; and $8,256 for housekeeping.  Kupka Dep. at 50-88.  Kupka then divided the sum of these costs by the number of nurses recruited by defendants in 2015 to arrive at the average recruitment cost per nurse.  Kupka Report at 11.

The numbers were provided to Kupka by defendants' attorneys in a one-page document Kupka calls a "Profit and Loss Statement" for Prompt Nursing.  Kupka Report, Attachment 3; Kupka Dep. at 15-20, 50.  Kupka does not know where the numbers came from, how the costs

13

were allocated to "recruitment costs," who decided how much of each cost to allocate to "recruitment costs," the basis for the allocation to "recruitment costs," what percentage of costs were allocated to "recruitment costs," or "the specifics of what is included" in the numbers given to him by defendants' attorneys.  Kupka Dep. at 48-52.  He does not know who created the document, when it was created, why it was created, whether it was created in the ordinary course of business, or whether it was created specifically for this lawsuit.  *Id.*  Kupka does not even know if this one page document includes all of Prompt Nursing's costs or only those costs allocated to "recruitment."  *Id.* at 50.  Kupka assumed that the one-page summary lists only recruitment costs because that is what defendants' attorneys told him.  *Id.* at 50-52, 62.[3]

Simply repeating assertions by trial counsel in an expert report does not magically transform trial counsel's assertions into admissible evidence.  To the contrary, Kupka's reliance on a one-page summary provided by defendants' attorneys renders his opinions unreliable and inadmissible.  *See, e.g., Supply & Bldg.*, 2001 WL 1602976, at *4 (excluding expert testimony because "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable") (citing *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985) (excluding expert testimony because expert "based his opinion on the conclusory statements of management, and not on his independent evaluation of the facts"), *aff'd*, 801 F.2d 38 (2d Cir. 1986), *cert. denied*, 479 U.S. 1088 (1987)); *CIT Group/Business Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677-78 (S.D.N.Y. 2011) ("expert opinion regarding lost profits . . . is inadmissible because [the expert] 'based his opinion on the conclusory statements of [plaintiff's] management, and not on

---

[3] While Kupka's report identifies the one-page summary as a "Profit and Loss of Prompt Nursing showing recruitment costs for the year ended December 31, 2015," Kupka admitted in his deposition that it is not a Profit and Loss Statement because it does not provide any information on revenues, profits, or losses.  Kupka Dep. at 49.

his independent evaluation of the facts'") (quoting *Argus*, 612 F. Supp. at 926); *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 98 Civ. 8272 (RPP), 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) (excluding expert testimony and noting that "any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply") (citing *Supply & Building*, 2001 WL 1602976, at *4; *Argus,* 612 F. Supp. at 926)).

For example, in *Supply & Building*, the proposed expert presented an analysis of lost profits "based on orders Supply & Building placed with Estee Lauder during the post-war years." *Supply & Building,* 2001 WL 1602976, at *1. The court found his analysis unreliable and inadmissible because "he actually relied on a summary of orders prepared by Sami Bakir, the son of Supply & Building's owner and a general manager of the company, not the orders themselves." *Id*.

Kupka's opinions are even less reliable than the proposed expert opinions that were found to be inadmissible in *Supply & Building, Argus, CIT Group,* and *Rowe Entertainment.* Not only did Kupka fail to review the accounting records of either Golden Gate or Prompt Nursing, but he relied on a one-page "profit and loss statement" without knowing who prepared it, when it was prepared, why it was prepared, how the allocations to "recruitment costs" were calculated, or even what was included in the definition of "recruitment costs." In *Supply & Building*, the expert at least knew who prepared the summary and what it was based upon. Here, Kupka has no idea and did not bother to ask.

### c. *Kupka has no basis for his assumption that Golden Gate and Prompt Nursing had similar cost structures*

Kupka opines that it was reasonable for Golden Gate to estimate that it would have $25,000.00 in potential damages in the event of a breach because Golden Gate would have had

"direct recruitment costs" similar to his calculation of Prompt Nursing's "direct recruitment costs" if Golden Gate had actually incurred any costs related to recruiting nurses in the Philippines.  In Kupka's opinion, his calculation of Prompt Nursing's recruiting costs may be used "as a proxy for the true costs of acquiring nurses from the Philippines."  Kupka Dep. at 21.

Even if Prompt Nursing recruited nurses in the Philippines (Rubenstein testified it did not), and even if Kupka had relied on something more than a one-page summary provided by defendants' attorneys, there is no basis for Kupka's assumption that Golden Gate, a nursing home, had the same cost structure as Prompt Nursing, a staffing agency.

For example, based on the one-page summary provided by defendants' attorneys, Kupka assumes that Prompt Nursing spent $97,352.00 in 2015 for "licenses and permits" related to recruiting Filipino nurses.  Kupka Dep. at 57.  He does not know (and did not ask) what licenses and permits Prompt Nursing had related to the recruitment of nurses in the Philippines.  *Id.* at 58.  He does not know (and did not ask) whether Golden Gate had any "recruitment-related" licenses or permits, or whether Golden Gate as a direct employer was required to have the same licenses and permits as a staffing agency such as Prompt Nursing was required to maintain.  *Id.* at 59.

Similarly, based on the one-page summary provided by defendants' attorneys, Kupka assumed that Prompt Nursing spent $388,510.00 for office expenses (*id.* at 52-54), $88,000.00 for rent (*id.* at 59-61), $13,169.00 for light, heat, and power (*id.* at 78-82), $12,605.00 for maintenance (*id.* at 83-85), and $8,256.00 for housekeeping (*id.* at 86-88).  The expenses related to operating an office total $510,540.00 or 60% of the total costs Kupka assumed for Prompt Nursing's "direct recruitment costs."

Kupka does not know (and did not ask) whether the $388,510.00 he assumed Prompt Nursing paid for "office expenses" included any payroll expenses.  *Id.* at 52-54.  He does not

know (and did not ask) whether the $88,000.00 he assumed Prompt Nursing paid for rent included expenses in the United States or the Philippines.  *Id*. at 60.  He does not know (and did not ask) whether Golden Gate owns its property or has any rent expenses.  *Id*.  He does not know (and did not ask) whether the $20,861 he assumed Prompt Nursing paid for maintenance and housekeeping was paid to an outside contractor, or whether Golden Gate has a staff at its nursing home that takes care of maintenance and housekeeping.  *Id*. at 83-88.

Given the complete absence of any reason to believe that Golden Gate, a nursing home, had the same cost structure as Prompt Nursing, a staffing agency, defendants have "failed to meet [their] burden to present facts from which a reasonable jury could determine that the factual premise underlying [their expert's] opinion is true."  *Groome*, 2000 WL 341134, at *3.  Accordingly, Kupka's expert report and testimony must be excluded as unreliable.

### 2. Kupka Has No Evidentiary Basis for His Opinion that Golden Gate Would Incur "Increased Operating Costs"

Kupka opines that the contract termination fee is reasonable because Golden Gate would have suffered between $81,946 and $114,114 in "increased operating costs" as a result of plaintiff leaving before the end of her contract term.  Kupka arrives at these numbers by assuming that Golden Gate would have paid $52.20 per hour for a permanent replacement from a third-party staffing agency.  Kupka Report at 3; Kupka Dep. at 32, 36.

Kupka did not ask anyone at Golden Gate whether they would have used a staffing agency to find a permanent replacement for plaintiff.  Kupka Dep. at 11.  Instead, he relied exclusively on "facts presented to [him] by the counsel" for the defendants and "articles [he] read, just to familiarize [himself] with the overall state of the industry."  *Id*. at 30-31.  When asked to identify the industry research he relied on, Kupka testified that it was just "general

information that [he] obtained with no specific documents that [he] could list as part of the research." *Id*. at 31-32.

Kupka obtained the rate of $52.20 per hour from the defendants' attorneys, who gave him a redacted invoice for one nurse provided by a staffing agency to Sentosa Care in 2015. Kupka Dep. at 32; Staffing Invoice (Howley Decl., Exh. 20). Kupka knows nothing about the "agency nurse" listed on the invoice. He does not know (and did not ask) how many years of experience the "agency nurse" had, where she worked, how long she worked, whether she worked on a temporary or permanent basis, whether she was a staff nurse or supervising nurse, what shift she worked, whether her rate included a shift differential for an overnight shift, or whether Golden Gate ever used this or any other agency to fill vacancies. Kupka Dep. at 37-40.

Kupka does not know (and did not ask) what happened when plaintiff actually stopped working at Spring Creek. *Id*. at 33-36. He does not know (and did not ask) who took over plaintiff's responsibilities at Spring Creek, how long it took to find her replacement, or whether she was replaced with another sponsored nurse, a nurse from an agency, or another nurse from Prompt Nursing. *Id*. at 34-36. He simply relied on statements by defendants' attorneys that she would have been replaced with a more expensive nurse from a third-party staffing agency. *Id*.

This is precisely the type of speculative analysis that courts have found inadmissible. For example, in *Supply & Building*, the proposed damages expert "assumed that Supply & Building would sell an entire Estee Lauder order within two months of receipt. However, [the expert admitted] that he never actually reviewed Supply & Building's pre- or post-war records in making this assumption. Instead, he based this assumption on the assurances of Omar Bakir, a principal of Supply & Building." *Supply & Bldg.*, 2001 WL 1602976, at *1 (citations omitted). The court held that reliance on the client's representations was insufficient to support the

expert's opinion. *Id.*; *see also Cibbarelli*, 2004 WL 3090594, at *4 (citing *Brooks v. Outboard Motor Corp.*, 234 F.3d 89, 91-92 (2d Cir. 2000)).  Here, Kupka is even further removed from reliable evidence because he never asked the client.  He relied exclusively on information provided by trial counsel.

### 3. Kupka's "lost profits" analysis is irrelevant because the contract does not contemplate a recovery for lost profits and he uses the wrong profit margin

Defendants argue that it was reasonable for Golden Gate to include a $25,000 termination fee in plaintiff's contract because Prompt Nursing had lost profits of more than $25,000 when plaintiff stopped working before the end of her contract term.  This argument improperly assumes both that lost profits are recoverable for breach of the contract and that the proper measure is Prompt Nursing's profit margin.

Lost profits are recoverable only upon a showing "that such a measure of damages was within the parties' contemplation at the time they entered into the Agreement."  *Shred-It*, 2005 WL 2367613, at *12 (rejecting claim for lost profits because plaintiff "has done nothing to show that the parties contemplated lost profit damages at the time they entered into the Agreement") (citing *Kenford Co. v. Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986) ("*Kenford I*" ); *Kenford Co. v. Erie*, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 3-4 (1989) ("*Kenford II*" )).

"'[C]ourts should take a 'common sense' approach to determining whether damages were within the reasonable contemplation of the parties, by considering the nature, purpose and particular circumstances of the contract known by the parties, as well as the risks that defendant foresaw or should have foreseen at the time of contract.'"  *Borghese Trademarks Inc. v. Borghese*, 10 Civ. 5552 (JPO), 2013 WL 143807, at *18 (S.D.N.Y. Jan. 14, 2013) (quoting *Shred–It*, 2005 WL 2367613, at *11 (citing *Kenford II*, 73 N.Y.2d at 319, 540 N.Y.S.2d at 3-4)).

In this case, there was no reason for plaintiff or any other Filipino nurse to believe that "lost profits" were included in a "liquidated damages" clause that expressly stated it was designed to compensate the Employer only for the costs of "recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area." Agreement § VII(4). Simply put, there is nothing to suggest that lost profits were a risk that the nurses "'foresaw or should have foreseen at the time of contract.'" *Borghese,* 2013 WL 142807, at *18 (quoting *Shred–It,* 2005 WL 2367613, at *11 (citing *Kenford II,* 73 N.Y.2d at 319, 540 N.Y.S.2d at 3-4)).

There also was no reason for plaintiff or any other Filipino nurse to believe that their Employer, a nursing home, would suffer any meaningful lost profits if they stopped working. The contract required payment of the prevailing wage for a nurse in the same geographic area. The replacement nurse would presumably be paid the same prevailing wage in the same geographic area. Kupka, however, did not base his "lost profits" calculation on the nursing home's profit margin. Instead, he based his "lost profits" calculation on Prompt Nursing's gross profit margin. Kupka Report at 4; Kupka Dep. at 89. While Prompt Nursing paid plaintiff only $29.00 per hour, the nursing home paid Prompt Nursing $47.00 per hour for plaintiff's services. Kupka Report at 12; Kupka Dep. at 90. Kupka, therefore, calculates that Prompt Nursing lost profits of $18.00 per hour for all the hours remaining on plaintiff's contract. There is no reason to believe that plaintiff or any other Filipino nurse contemplated that they would be liable for lost profits based on a 62% mark-up of their hourly rate when they were promised that they would be paid the prevailing wage for the geographic area.

**Point II**

**Plaintiff is Entitled to Summary Judgment
on Her Breach of Contract Claim**

Section IV(1) of the contract requires payment of a base salary at the prevailing wage for

a nurse in the same geographic area as of the Commencement Date:

> "As of the Commencement Date, Employee will be paid a base salary in
> accordance with the prevailing wage for the geographic area in which the
> employee is assigned to work, as determined by the National Prevailing Wage
> Helpdesk Center (NPWC) of the United States Department of Labor."

The "Commencement Date" is "the date when Employee first starts to provide direct nursing

care to residents/patients after completing the orientation and training." Contract § III. Plaintiff

contends that the defendants breached the contract by paying an hourly wage that was less than

the prevailing wage on the date she and other class members began providing direct nursing care.

The starting point for the Court's analysis is the plain meaning of the contract language.

*See, e.g., W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990);

*Hillside Metro Associates, LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 10 Civ. 1772 (JG), 2012

WL 1617157, at *3 (E.D.N.Y. May 09, 2012). Under New York law, "[i]f a contract is

unambiguous, courts are required to give effect to the contract as written and may not consider

extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank,

N.A.,* 996 F.2d 568, 573 (2d Cir. 1993) (citations omitted). Whether a contract is ambiguous is a

question of law for the Court to decide. *Id*.**;** *see also Shred-It*, 2005 WL 2367613, at *9; *Bristol

Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 562 (S.D.N.Y. 2003).

**A.  The Contract's Plain Language Requires Payment of a Base Salary at
the Prevailing Wage for the Geographic Area as of the Commencement Date**

The contract unambiguously requires payment of the prevailing wage "for the geographic

area" in which plaintiff was assigned to work. This is significant because the NPWC has two

21

different procedures for calculating the prevailing wage.  In one procedure, a prospective employer files an application for a prevailing wage determination *for an individual employee*. *See* 20 C.F.R. § 656.40.  In a separate procedure, the NPWC periodically determines the prevailing wage *for a geographic area*, which it publishes on the internet and elsewhere.  *See* Howley Decl., Exhs. 2-9.  The contract unambiguously requires payment of "the prevailing wage *for the geographic area* in which the employee is assigned to work."  Contract § IV(1) (emphasis added).

The contract also unambiguously requires payment of a "base salary" at the prevailing wage.  This is significant because the NPWC calculates the prevailing wage for a "geographic area' on both an hourly and annual salary basis.  *See* Howley Decl., Exhs. 2-9.  The contract unambiguously requires payment of "*a base salary* in accordance with the prevailing wage for the geographic area in which the employee is assigned to work."  Contract § IV(1) (emphasis added).

Defendants argue that the contract allowed payment of an hourly wage in the "Prevailing Wage Determination, which was submitted with Plaintiff's VISA Application" eight years before the Commencement Date.  Def. Mem. at 22.  This argument cannot be reconciled with the contract language requiring payment of the prevailing wage "[a]s of the Commencement Date."  Contract § IV(1).  Defendants ask this Court to read the contract as if it contained the following clarifying language:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage Helpdesk Center (NPWC) of the United States Department of Labor *as of the date of the Employee's Prevailing Wage Determination eight years earlier.*

22

If that is what defendants intended when they drafted their standard contract, they could have simply provided, "As of the Commencement Date, Employee will be paid the prevailing wage set forth in the Employee's Prevailing Wage Determination." That is not the language in the contract. Moreover, adopting the defendants' interpretation would render meaningless the contract language referring to "the prevailing wage for the geographic area in which the employee is assigned to work." There would be no reason to reference the prevailing wage "for the geographic area" if the contract intended to use a prevailing wage determination that was submitted with the nurse's visa application eight years before the Commencement Date.

Defendants' proposed interpretation is also commercially unreasonable. Prevailing wages are, by their nature, only prevailing for a period of time. A wage that is prevailing today may not be the prevailing wage three, six, or eight years from now. Recognizing this commercial reality, the U.S. Department of Labor is required to establish a "validity period" of between 90 days and 1 year for its prevailing wage calculations. 20 C.F.R. § 656.40(b)(4)(c). The U.S. Department of Labor is prohibited from establishing a prevailing wage for a period of more than 12 months. *Id.* The New York Labor Law also requires that prevailing wages be re-calculated every 12 months. *See* N.Y. Labor L. § 220(5)(a).

The prevailing wage requirement is designed to protect foreign workers from abuse and, equally important, to ensure that American workers are not paid lower wages or displaced by foreign workers who, because of economic conditions in their home countries, may be willing to work for less than the prevailing wage. *See, e.g.*, 8 U.S.C. § 1182(a)(5)(A)(i); 8 U.S.C. § 1182(a)(14); 8 U.S.C. § 1188(a)(1)(B); 8 U.S.C. § 1188(c)(3)(B)(iii). Allowing employers to pay less than the prevailing wage today because they started the visa application process three, six, or eight years ago would undermine that policy. On the other hand, plaintiff's interpretation

is consistent with both the commercial reality that prevailing wages change over time and the
policy of protecting both foreign and domestic workers from wage abuse.

### B. Parol Evidence Does Not Support Defendants' Proposed Interpretation

Defendants argue that their interpretation of the prevailing wage requirement is supported
by Landa's cover letter to the U.S. Consul stating that plaintiff was offered a position at $29.00
per hour.  The letter is dated April 15, 2015, seven days before plaintiff signed the contract.  The
letter is not part of the contract that is paginated from 1 to 10, it is not referenced in the contract
and, unlike each page of the 10-page contract, it is not signed by plaintiff.  *Id.*

Such parol evidence cannot be used to create an ambiguity where none otherwise exists.
*See, e.g., W.W.W. Assocs.*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443.  Moreover, the contract
contains an integration clause stating that the written contract signed by plaintiff on each page
"supersedes all previous employment contracts and constitutes the entire agreement between the
parties."  Contract § VIII(7).  The contract also contains a provision requiring that any
amendments "shall be in writing and executed in multiple copies."  *Id*. § VIII(3).  Under these
circumstances, defendants cannot rely on a letter that pre-dates the contract and was not executed
by plaintiff to alter the plain meaning of the contract language.  *See, e.g., W.W.W. Associates*, 77
N.Y.2d at 163, 565 N.Y.S.2d at 443; *Shred-It USA,* 2005 WL 2367613, at *9.

Defendants' interpretation of the prevailing wage requirement is also inconsistent with
statements made by Luyun and the Sentosa Agency staff to nurses in Manila.  Luyun told
plaintiff that $29.00 was the prevailing wage.  Paguirigan Dep. at 438.  Sentosa Agency staff told
class members that the rate was subject to change.  Jericson Valdez, for example, wanted to
know the rate he would be paid, but the Sentosa Agency staff "just told us depending on the
prevailing wage in that area" where he would be assigned.  Valdez Dep. at 51 (Hahn Decl., Exh.

G).  Margaret Padernal understood that the prevailing wage was $21.00 when she first met

Philipson and $29.50 by the time she signed the contract.  Padernal Dep. at 26-27 (Hahn Decl.,

Exh. E).  When asked what wage Padernal thought she would be paid under the contract, she

replied, "We were told that we would be given a prevailing rate or wage.  So at that time I really

have no idea what the rate was."  *Id.* at 29-30.  Sentosa staff in Manila told Padernal that "the

reason why she – the contract did not specify the rate is because just tell the immigration officer

immigration officer that we will be given prevailing wage.  As she further explained that we

might be assigned to an upstate in New York that would have a different rate compared to the

city."  *Id.* at 30, 56-57; 63.  This parol evidence is completely consistent with the plain language

of the contract, which requires payment of the prevailing wage for the geographic area when and

where the nurse begins to work with patients, not the wage that was determined six to eight years

earlier when the visa application process started.

### C.  Plaintiff and All Other Class Members Are Entitled to Compensatory Damages

Plaintiff and all other class members are entitled to breach of contract damages equal to

the difference between the base salary at the prevailing wage in effect as of their Commencement

Date and the compensation they were actually paid.  In plaintiff's case, this amounts to

$12,319.50.  *See* Howley Decl., Exh. 21.  For all class members, the prevailing wage

underpayment exceeds $4.2 million.  *See id*.

### Point III

### The Undisputed Facts Establish Defendants' Violations of the Trafficking Victims Protection Act

The Trafficking Victims Protection Act provides a private right of action for damages

against those who "knowingly provide[] or obtain[] the labor or services of a person . . . by

means of . . . abuse or threatened abuse of law or legal process . . . or . . . by means of any

scheme, plan, or pattern intended to cause the person to believe that, if the person did not

perform such labor or services, that person . . . would suffer serious harm . . . ."  18 U.S.C. §

1589(a); *see also* 18 U.S.C. § 1595.

The threats do not have to be directed at the plaintiff herself.  Threats directed at "another

person" are sufficient if they are intended to induce the plaintiff to continue providing labor or

services.  18 U.S.C. § 1589(a)(2); *see also* 18 U.S.C. § 1589(a)(4).  In addition, defendants may

be held liable for "attempts" to provide or obtain plaintiff's labor or services in violation of the

statute, even if their attempts do not succeed.  18 U.S.C. § 1594(a).

Congress enacted 18 U.S.C. § 1589 to address the U.S. Supreme Court's decision in

*United States v. Kozminski*, 487 U.S. 931 (1988).  *See, e.g.*, *United States v Bradley*, 390 F.3d

145, 150 (1st Cir. 2004).  "In *Kozminski* the Supreme Court had interpreted the pre-existing ban

on 'involuntary servitude' in section 1584 to prohibit only conduct involving the use or

threatened use of physical or legal coercion." *Id.* (citing *Kozminski*, 487 U.S. at 949-52).  In

Section 1589, Congress made clear that the term "'serious harm' was intended to encompass not

only physical violence, but also more subtle psychological methods of coercion." *Id.*; *see also*

*United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008).  Congress, therefore, defined

"'harm' broadly in order to 'reach cases in which persons are held in a condition of servitude

through nonviolent coercion.'" *Javier v. Beck*, 13 Civ. 2926 (WHP), 2014 WL 3058456, at *6

(S.D.N.Y. July 3, 2014) (quoting *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)).

**A. Defendants' Enforcement of the Contract Termination Fee and
Other Baseless Legal Actions Were Abuses of Legal Process
and Threats of Serious Harm**

Congress defined "abuse of law or legal process" to include "the use or threatened use of

a law or legal process, whether administrative, civil, or criminal, in any manner or for any

26

purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c).  The term "serious harm" includes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid that harm."  18 U.S.C. § 1589(c)(2).

Defendants argue that it is not an abuse of law or legal process to include a "*bona fide* liquidated damages" clause in an employment contract or to enforce "valid contractual rights." Def. Mem. at 17-18.  As demonstrated above in Point I, the contract termination fee was not a "*bona fide* liquidated damages clause."  As demonstrated here, defendants did not merely attempt to enforce "valid contractual rights."

Defendants engaged in a multi-year campaign of baseless legal actions against Filipino nurses, including by filing lawsuits to enforce an unenforceable contract penalty, filing professional disciplinary complaints that were found to be without merit, and convincing a District Attorney to pursue criminal charges that were found to violate the First and Thirteenth Amendments to the United States Constitution.

Defendants continued to pursue abusive legal actions against Filipino nurses as recently as 2016, when they brought three separate lawsuits against plaintiff, Jericson Valdez, and April Francisco to enforce the contract termination fee that had already been found unenforceable.  In

27

those lawsuits, defendants also sought $250,000 in damages against each nurse for alleged "tortious interference" with contracts and prospective business relations.[4]

The question before the Court is _not_ whether defendants may enforce "valid contractual rights." The question is whether a multi-year campaign of baseless legal actions against dozens of Filipino nurses constitutes an abuse of legal process and a threat of serious harm. The answer, as a matter of law, is that it does.

The $25,000 contract termination fee exceeded 50% of plaintiff's annual compensation before taxes. This falls squarely within the definition of a threat of "serious harm" in the TVPA. _See, e.g., Javier_, 2014 WL 3058456, at *6 (threat to enforce $15,000 penalty against physical therapist constituted a threat of "serious harm"); _Nunag-Tanedo v. East Baton Rouge Parish School Bd._, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011) (threat to enforce $10,000 penalty against school teachers constituted a threat of "serious harm"); _Dann_, 652 F.3d at 1171 (threat to enforce $7,500 penalty against housekeeper constituted a threat of "serious harm").

When considering whether threats are sufficiently serious to violate the TVPA, the Court must "consider the particular vulnerabilities of a person in the victim's position." _United States v. Rivera_, 799 F.3d 180, 186 (2d Cir 2015). In this case, the victims are recent arrivals from a developing country, who have not been paid the prevailing wages they were promised in their contracts, who have been told that they will owe their employer more than nine months of after-tax income as a penalty if they try to work anywhere else, and who know that their employer has a history of filing civil lawsuits, professional disciplinary complaints, and criminal charges against dozens of other Filipino nurses who tried to find other employment.

---

[4] After plaintiff and Mr. Valdez retained a lawyer to defend against the claims and pursue discovery, defendants dismissed both actions. Howley Decl., Exh. 17. When defendants responded to the complaint in this action – where they are subject to potential Rule 11 sanctions – they did not allege any tortious interference counterclaims.

Plaintiff and other nurses who recently arrived from the Philippines would reasonably fear that a group of nursing home operators that filed lawsuits and professional disciplinary complaints against dozens of Filipino nurses, convinced a District Attorney to file criminal charges against Filipino nurses, and even convinced a District Attorney to file criminal charges against the lawyer who defended the Filipino nurses, would not hesitate to take similar actions against her, which could result in the loss of her professional license, a criminal record, and the loss of her immigration status in this country.  The fact that some class members planned to "buy out" their contract after two years by paying the $8,333.34 penalty proves only that an $8,333.34 penalty after two years is less a threat of serious harm than a $25,000 penalty in year one or a $16,66.67 penalty in year two.

Defendants next argue that plaintiff was not "forced to work," was not directly "threatened with physical force or restraint," and that "she could leave at any time."  Def. Mem. at 15-17.  It is certainly true that some of the cases decided under the TVPA have involved the types of heinous conduct that would state a claim for involuntary servitude under the Supreme Court's decision in *Kozminski*.  It is equally true that Congress enacted the TVPA because the *Kozminski* standard based on slavery in the 18th and 19th centuries was too restrictive to address the realities of global labor markets in the 21st century.  *See, e.g., Dann*, 652 F.3d at 1170; *Javier*, 2014 WL 3058456, at *6.

The *Muchira* case that defendants cite is easily distinguished.  *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017).  The Fourth Circuit emphasized that the plaintiff in that case never faced "any adverse consequences if she tried to leave."  *Id.* at 613; *see also id.* at 619-20.  In other words, the *Muchira* case presented none of the facts that are undisputed in this lawsuit.

**B.  Defendants Acted with an Intent to Compel Plaintiff
and All Other Class Members to Continue Working**

Defendants admit in the contract that the intent behind the $25,000 confession of

judgment was "to secure Employee's performance of the Employment Term."  Contract §

VII(4).  This is an admission that defendants knowingly used the threat of enforcement of a

$25,000 confession of judgment to secure the labor and services of plaintiff and other class

members.  Defendants' intent may also be inferred from the fact that they continued to include

the $25,000 contract termination fee and confession of judgment in their contracts – and

continued to bring lawsuits to enforce both the fee and the confessions of judgment – after they

knew from the *Anilao* decision that the contract termination fee was unenforceable.  *Anilao*,

Order at 6 (Hahn Decl., Exh. M).  Defendants also sued plaintiff and two other nurses for an

additional $250,000 in alleged "tortious interference" damages when they had no good faith

basis to believe that plaintiff or the other two nurses had interfered with anything.

**C.  Plaintiff and Other Class Members Have Proved
Their Right to Compensatory and Punitive Damages**

Plaintiff and other class members suffered damages equal to the difference between the

compensation they were actually paid and the base salary at the prevailing wage as of their

Commencement Date.  Unlike their breach of contract claim, plaintiff and other class members

are also entitled under the TVPA to consequential damages, emotional distress damages, and

punitive damages extending back 10 years.  In plaintiff's case, the emotional distress damages

include compensation for the "very traumatic and difficult experience," the "verbal[] and

emotional[] abuse[]," and the "mental anguish, depression, and psychological stress" she

described in her resignation letter and deposition testimony.  The consequential damages include

the difference between the compensation class members were paid and the compensation they

would have been paid from another employer if they had not been compelled to stay with the

defendants.  Accordingly, plaintiff requests an inquest or trial to determine the amount of each

class member's damages caused by defendants' TVPA violations.

### D. The Individual and Corporate Defendants Are Jointly and Severally Liable for TVPA Violations

The TVPA extends liability to anyone who:  "knowingly benefits, financially or by

receiving anything of value" from participation in a venture that involves providing or obtaining

labor by the means described in 18 U.S.C. § 1589(a)," *see* 18 U.S.C. § 1589(b); "knowingly

recruits, harbors, transports, provides, or obtains by any means, any person for labor or services

in violation of this chapter," *see* 18 U.S.C. § 1590(a); or attempts or conspires with another to

violate, *inter alia*, Sections 1589 and 1590, *see* 18 U.S.C. § 1594(a)-(b).

In this case, each defendant was part of a venture with the purpose of recruiting nurses

from the Philippines to work at nursing homes owned by Landa, Philipson, and Philipson's wife

under contracts requiring that the nurses work off, or pay off, a $25,000 debt before they could

end their employment.  Each defendant was aware of the contract terms, engaged in conduct to

pursue the objectives of the venture, and benefitted financially from the venture.  Each defendant

knowingly recruited plaintiff and other Filipino nurses (including Philipson, Sentosa Care,

Luyun, and Sentosa Agency), provided the labor and services of plaintiff and other Filipino

nurses to defendants' nursing homes (including Rubenstein, Prompt Nursing, Luyun, and

Sentiosa Agency), and/or obtained the labor and services of plaintiff and other Filipino nurses

(including Golden Gate, Spring Creek, and other nursing homes owned by Landa and Philipson)

as a result of the venture's conduct in violation of the TVPA.  Accordingly, each defendant is

jointly and severally liable for the damages caused by the venture.

31

**Point IV**

**The Undisputed Facts Justify Piercing the Corporate Veil**
**and Holding the Individual Defendants Liable for Breach of Contract**

The corporate veil will be pierced when non-signatories to a contract "'exercised

complete domination of the corporation in respect of the transaction attacked'" and "'such

domination was used to commit a fraud or wrong against the plaintiff which resulted in

plaintiff's injury.'"  *Javier*, 2014 WL 3058456, at *9 (citations omitted); *see also Wm.*

*Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138-39 (2d Cir.

1991).  In this case, the wrongs against the plaintiff include failing to pay her the appropriate

prevailing wage, using an unenforceable contract termination penalty to secure her continued

labor and services, and commencing baseless legal actions against plaintiff and other class

members.  Prompt Nursing was vehicle used to commit each of these wrongs.  The beneficiaries

were Rubenstein, Landa, Philipson and nursing homes owned by Landa, Philipson, and

Philipson's wife (the "Sentosa Nursing Homes").

The individual defendants used Prompt Nursing to carry out their scheme without regard

to corporate formalities.  When Philipson travels to the Philippines to recruit nurses, he

introduces himself as a representative of Sentosa Care even though all the nurses will end up

working for Prompt Nursing.  Luyun introduces himself as Sentosa Agency, when he is actually

an employee of Prompt Nursing.  The nurses who work under contract at the Sentosa Nursing

Homes are paid by an entity called Sentosa Services, which is actually an assumed name used by

Prompt Nursing.  Hahn Decl., Exh. 1.  The purpose and effect of the defendants' conduct is to

cause Filipino nurses to believe that Sentosa Care, Sentosa Agency, the Sentosa Nursing Homes,

and Sentosa Services are part of a single, integrated enterprise.  When it comes time to take

responsibility for wrongs committed against the nurses, however, defendants want to argue that Prompt Nursing is an entirely separate entity.

Prompt Nursing d/b/a Sentosa Services does not have any clients other than the Sentosa Nursing Homes owned by Landa, Philipson, and Philipson's wife, including defendants Golden Gate and Spring Creek.  Philipson Dep. at 22-23.  Spring Creek and Golden Gate do not have any written agreements with Prompt Nursing for the supply of nurses.  *Id.* at 23-24.  All dealings between Philipson, Landa, and Prompt Nursing are handled informally.  *Id.*

Philipson has been to the Philippines "many" times to recruit nurses.  *Id*. at 9-10.  After introducing himself as a representative of Sentosa Care, he tells the nurses that "we operate nursing homes."  *Id*. at 12-13.  Philipson does not know who pays for his recruiting trips to the Philippines.  *Id*. at 13-14.  He believes that the nursing homes sometimes pay for the trips, but Prompt Nursing may have paid for them.  *Id*. at 14.  In his mind, who pays does not matter because they are all acting for his benefit.

The decision whether or not to assign contracts to Prompt Nursing is made by Landa or Philipson, even though they claim not to have any interest in Prompt Nursing.  Landa and Philipson have decided to assign all contracts with Filipino nurses to Prompt Nursing after the nurses arrive in the United States.  *Id*. at 17.  Philipson does not recall any conversations with Rubenstein about whether or not to assign particular contracts to Prompt Nursing.  *Id*. at 38.  Over the past ten years, Landa and Philipson have caused their nursing homes to assign more than $34 million worth of contracts to Prompt Nursing without anything in writing.[5]  *Id*. at 16-17, 31, 34-35.  Prompt never pays anything to the nursing homes in return for the assignments. *Id.* at 18-19, 26, 31, 45.  Philipson does not know and does not have records showing which

---

[5] $50,000.00 annual compensation x 3 year contract terms x 230 contracts = $34.5 million.

specific contracts were assigned to Prompt Nursing.  *Id*. at 15, 25-26, 30, 35, 38.  The only way Philipson would know whether a particular nurse's contract was assigned to Prompt Nursing is by checking the payroll records to determine whether the nursing home or Prompt Nursing paid the nurse's compensation.  Philipson Dep. at 30, 32-33.

Under these facts – where Prompt Nursing is nothing more than a shell used by the individual defendants to advance the interests of themselves and the nursing homes they own without regard to corporate formalities – it is appropriate to pierce the corporate veil and hold the individual defendants liable for breach of contract.  *See, e.g., Wm. Passalacqua Builders,* 933 F.2d at 138-39 (citations omitted).

<u>**Conclusion**</u>

For all the foregoing reasons, plaintiff requests entry of judgment: (a) declaring that the contract termination fee and confessions of judgment are unenforceable under 18 U.S.C. 1589(a) and New York common law; permanently enjoining defendants from threatening or attempting to enforce the contract termination fee or confessions of judgment; awarding plaintiff and all other class members compensatory damages jointly and severally against defendants Prompt Nursing, Rubenstein, Philipson, and Landa for breach of contract in amounts to be determined at trial or inquest; awarding plaintiff and all other class members compensatory, consequential, and punitive damages jointly and severally against each defendant for violations of the TVPA in amounts to be determined at trial or inquest; awarding plaintiff reasonable attorneys' fees and the costs of this action as authorized by 18 U.S.C. § 1595(a); and granting such other relief as the

Court deems just.

Dated: New York, New York
      October 26, 2018

                                      Respectfully submitted,

                                        THE HOWLEY LAW FIRM P.C.

                                        By: _____
                                            John Howley
                                          Leandro B. Lachica
                                      *Attorneys for Plaintiffs*
                                        350 Fifth Avenue, 59th Floor
                                        New York, New York 10118
                                        (212) 601-2728