UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,

                             Plaintiff,                  17 Civ. 1302 (NG) (JO)

     -v-

PROMPT NURSING EMPLOYMENT AGENCY
LLC d/b/a SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a:
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,

                          Defendants.

-----------------------------------------------------------------X

# DEFENDANTS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S "CROSS-MOTION" FOR SUMMARY JUDGMENT

{100497}

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

POINT I
THE COURT SHOULD DENY PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT ............................................................................ 1

A. The Court Should Deny Plaintiff's Motion to Exclude the Expert's Report ........................... 1

B. Golden Gate's Actual and Estimated Cost to Replace
Plaintiff Exceeded $25,000 ........................................................................ 1

C. Kupka's Assumptions Are Based on Undisputed Facts ....................................... 4

D. Kupka's Report is Designed to Assist The Court As Permitted by FRE 702 ................... 5

POINT II.
THE COURT SHOULD GRANT DEFENDANTS SUMMARY JUDGMENT DISMISSING
THE DECLARATORY JUDGMENT CLAIM AND GRANT JUDGMENT AGAINST
PLAINTIFF ON THE BREACH OF CONTRACT COUNTERCLAIM ...................................... 6

A.   Defendant Has Established That
The Liquidated Damages Provision Is
Enforceable ............................................................................................ 7

B.   Plaintiff Has Not Met Its Burden Of Proof
To Establish That the Liquidated Damages Clause
Is Unenforceable ................................................................................... 9

POINT III.
THE COMPLAINT'S BREACH OF CONTRACT CLAIM
SHOULD BE DISMISSED ........................................................................... 10

POINT IV
THE TVPA CLAIMS SHOULD BE DISMISSED ................................................. 17

CONCLUSION ........................................................................................ 20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*10 L & L Wings, Inc. v. Marco-Destin Inc.*,
   756 F. Supp.2d 359 (S.D. N.Y. 2010) ..................................................................19

*7 3H Enterprises, Inc. v. Murray*,
   165 F.3d 15 (2d Cir. 1998) .................................................................................19

*Matter of Andy Floors, Inc. [Tyler Constr. Corp.]*,
   202 A.D.2d 938, 609 N.Y.S.2d 692 (3d Dept. 1994) ........................................22

*Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*,
   214 A.D.2d 359, 625 N.Y.S.2d 152 (1''Dep't 1995) .........................................28

*BDO Seidman v. Hirshberg*,
   93 N.Y.2d 382, 690 N.Y.S.2d 854 (1999) ....................................................15, 19

*Borghese Trademarks Inc. v. Borghese*,
   10 Civ. 5552 (JPO), 2013 WL 143807 (S.D.N.Y., Jan. 14, 2013) .......................5

*Burns v. Burns*,
   163 A.D.3d 210, 81 N.Y.S.3d 846 (4th Dep't 2018) .....................................21, 22

*Matter of Carla Leather, Inc.*,
   44 BR 457 (Bankr S.D.N.Y. 1984), *aff'd sub nom. In re Carla Leather, Inc.*, 50 BR
   764 (S.D.N.Y 1985)............................................................................................27

*Cashel v. Cashel*,
   2009 NY Slip Op 6659 (2d Dep't 2009)..............................................................28

*CIT Group Business Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*,
   815 F.Supp.2d 673 (S.D.N.Y. 2011) (cited of Pl. Memo) .....................................9

*Cohen v. Cerier*,
   243 A.D.2d 670, 663 N.Y.S.2d 643 (2d Dep't 1997).........................................34

*Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*,
   286 A.D.2d 118 (1st Dep't. 2001) .......................................................................27

*Columbus Park Corp. v. Department of Housing Preservation and Development*,
   80 N.Y.2d 19, 586 N.Y.S.2d 554 (1992) ............................................................32

*Conzo v. City of New York*,
   438 F.Supp.2d 432 *(S.D.N.Y. 2006)*..................................................................30

*Della Rocco v. City of Schenectady*,
   278 A.D.2d 628, 717 N.Y.S.2d 704 (3d Dep't 2000)..........................................28

*DeTata v. Tress,*
 4 A.D.2d 748, 164 N.Y.S.2d 762 (2d Dep't 1957) ..............................................................28

*Dolman v. United States Trust Co. of N. Y.,*
 2 N.Y.2d 110 (1956) ......................................................................................................22, 29

*Eastman Kodak Co. v. STWB Inc.,*
 232 F.Supp.2d 74 (S.D.N.Y.2002) .....................................................................................30

*Engineer Co. v. Herring-Hall-Marvin Safe Co.,*
 154 A.D. 123,138.................................................................................................................25

*Fowler v. American Lawyer Media, Inc.,*
 306 A.D.2d 113, 761 N.Y.S.2d 176.....................................................................................35

*Galli v. Metz,*
 973 F.2d 145 (2d Cir. 1992) ................................................................................................30

*GFI Brokers, LLC v. Santana,*
 06-Civ.3988, 2008 WL 3166972 (S.D.N.Y. Aug. 6, 2008)...................................................1

*Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc.,*
 26 A.D.2d 481, 275 N.Y.S.2d 587 *(1st Dept 1966) (emphasis added)* .................................25

*Herrera v. Katz Communications, Inc.,*
 532 F.Supp.2d 644 (S.D.N.Y 2008) .....................................................................................30

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.,*
 No. 12-CV-5354 KAM RLM, 2014 WL 1311979 (E.D.N.Y. Mar. 28, 2014).....................33

*JMD Holding Corp. v. Cong. Fin. Corp.,*
 4 N.Y.3d 373, 795 N.Y.S.2d 502 (2005) ........................................................................15, 18

*Leasing Service Corp. v. Justice,*
 673 F.2d 70 (2d Cir. 1982) ..................................................................................................19

*Luncheonette v. Dehaan,*
 No. 01 CIV. 5603 (LMM), 2002 WL 15642 (S.D.N.Y. Jan. 4, 2002)..................................32

*Macolor v. Libiran,*
 No. 14-CV-4555 (JMF) (RLE), 2016 U.S. Dist. LEXIS 40566 (S.D.N.Y. Mar. 25,
 2016)....................................................................................................................................41

*Malin v. Ward,*
 16 A.D.2d 850, 227 N.Y.S.2d 515 (3rd Dep't 1962)............................................................25

*Mathew v. Slocum–Dickson Medical Group, PLLC,*
 160 A.D.3d 1500, 75 N.Y.S.3d 738 (4th Dep't 2018)...........................................15, 17, 20

*Mayo v. Royal Ins. Co. of America,*
 242 A.D.2d 944, 662 N.Y.S.2d 654 (4th Dep't 1997).......................................21, 22, 25, 28

*NLRB v. Local 32B-32J Serv. Employees Int'l Union,*
   353 F.3d 197 (2d Cir. 2003) ............................................................................................... 30

*P.J. Carlin Constr. Co. v. City of New York,*
   59 A.D.2d 847, 399 N.Y.S.2d 13 (1st Dep't 1977) ........................................................... 18

*Panwar v. Access Therapies, Inc.,*
   No. 1:12-cv-00619-TWP-TAB, 2015 U.S. Dist. LEXIS 38117 (S.D. Ind. Mar. 25,
   2015)............................................................................................................................. 37, 38, 39

*PAR Assoc., Inc. v. Uniforce Services, Inc.,*
   37 F.Supp.2d 192 (E.D.N.Y. 1999) ................................................................................ 1, 18

*Piccoli A/S v. Calvin Klein Jeanswear Co.,*
   19 F. Supp. 2d 157 (S.D.N.Y. 1998) ................................................................................. 32

*Rattigan v. Commodore Int'l Ltd,*
   739 F.Supp. 167 (S.D.N.Y, 1999) ............................................................................ 1, 12, 18

*Rodas v. Manitaras,*
   159 A.D.2d 341, 522 N.Y.S.2d 618..................................................................................... 34

*Rodgers v. City of New York,*
   222 A.D. 546, 226 N.Y.S. 485 (1st Dep't 1928) ............................................................... 25

*Ronnen v. Ajax Elec. Motor Corp.,*
   88 N.Y.2d 582, 648 N.Y.S.2d 422 (1996)........................................................................... 22

*Rosales v. Hispanic Emple. Leasing Program, LLC,*
   06-cv-877, 2008 U.S. Dist. LEXIS 96417 (W.D. Mich., November 26, 2008)............................*passim*

*Sbarra v. Totolis,*
   191 A.D.2d 867, 594 N.Y.S.2d 868 (3rd Dep't 1993)........................................................ 25

*Shred-It USA, Inc. v. Bartscher,*
   02 Civ. 4082 (JO), 2005 WL 2367613 (E.D.N.Y., Sept. 27, 2005)....................................... 5

*Sotheby's Fin. Services, Inc. v Baran,*
   00 CIV.7897 BSJ, 2003 WL 21756126 (S.D.N.Y. July 29, 2003), affd, 107 Fed Appx
   235 (2d Cir 2004)............................................................................................................. 27

*Standard Funding Corp. v. Lewitt,*
   89 N.Y.2d 546, 656 N.Y.S.2d 188 (1997) .......................................................................... 28

*Venizelos S.A. v. Chase Manhattan Bank,*
   425 F.2d 461 (2d Cir.1970) ................................................................................................ 30

*Von Hoffman v. City of Quincy,*
   71 U.S. (4 Wall.) 535, 18 L.Ed. 403 (1866) ...................................................................... 22

*Walsh v. Schlecht,*
   429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977)........................................................... 30

*XCO Intl. Inc. v. Pacific Scientific Co.*,
   369 F.3d 998 (7th Cir.2004) ........................................................................... 15

**Statutes**

8 U.S.C. §1182(a)(5)(A) ................................................................................ 29

8 U.S.C. §1182(a)(5)(A)(i) ............................................................................ 34

8 U.S.C. §1182(a)(14) .................................................................................. 35

8 U.S.C. §1188(a)(1) .................................................................................... 29

8 U.S.C. §1188(a)(1)(B) and (c)(3)(B)(iii) .................................................. 35

FICA .............................................................................................................. 12

Immigration Act ............................................................................................. 21

Immigration Law ........................................................................................... 31

New York Labor Law 220(5)(a) .................................................................... 34

New York Social Services Law section 413 .................................................. 38

NY Public Health Law section 2803-d ......................................................... 38

NY Public Health Law section 2803-d (4) .................................................... 38

**Other Authorities**

20 C.F.R. 655.731(c)(10)(i)(B) ..................................................................... 37

20 C.F.R. 656.40 ........................................................................................... 33

20 C.F.R. § 656.21 ........................................................................................ 29

20 C.F.R.§ 656.40(b)(4)(c) ........................................................................... 34

20 CFR 656.40 .............................................................................................. 34

20 CFR § 656.40 ........................................................................................... 32

69 FR 77326-01, 2004 WL 2973380(F.R ..................................................... 32

Fed. R. Civ. P. 34(b)(2)(E)(i) ........................................................................ 23

Federal R. Evid. 803(6) ................................................................................... 7

FRE 702 ........................................................................................................... 8

FRE 702(a) ....................................................................................................... 8

Defendants[1] respectfully submit this memorandum of law in further support of their motion, pursuant to Fed. R. Civ. P. 56. for summary judgment dismissing the complaint of Plaintiff Rose Ann Paguirigan ("plaintiff" or "Paguirigan") in this action (the "Complaint"), and granting summary judgment on Prompt's counterclaim, and in opposition to plaintiff's cross-motion for summary judgment.

## I.     THE COURT SHOULD DENY PLAINTIFF'S CROSS-MOTION

### A.     The Court Should Deny Plaintiff's Motion to Exclude the Expert's Report

Plaintiff does not dispute Mr. Kupka's expert qualifications.  As detailed in Mr. Kupka's curriculum vitae, Mr. Kupka is a certified public accountant practicing for over 17 years and has been recognized by federal and state courts as a financial expert.  Plaintiff does not offer any expert testimony or analysis which is contrary to Mr. Kupkas's report (the "Kupka Report").

As explained herein, and in defendants' moving papers, the liquidated damages clause must be premised on a *reasonable estimation* of Golden Gate's damages at the time that Golden Gate entered into the Contract with plaintiff (i.e. April 16, 2015).  Therefore, the Kupka Report and the accompanying Philipson and Rubinstein declarations (which provide the admissible and undisputed evidence) must only establish that the liquidated damages amount set forth in the Contract was a *reasonable estimation* of Golden Gate's damages at the time that Golden Gate entered into the Contract with plaintiff.[2]

### B.  Golden Gate's Actual and Estimated Cost to Replace Plaintiff Exceeded $25,000

Plaintiff does not offer any *evidence* which disputes that defendants' cost to replace

---

[1] The capitalized terms used in defendants' moving papers will be used herein and their designations are incorporated by reference.

[2] Furthermore, the Court may search the record before it and consider all documents before it and grant a defendant summary judgment.  The record before this Court includes the submissions herewith which is also submitted in opposition to plaintiff's motion for summary judgment. *See Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 2013 WL 417352 (E.D.N.Y. January 29, 2013) (Gershon, J.)

plaintiff when she voluntarily terminated her employment exceeded $25,000. Plaintiff does not

offer any *evidence* concerning the replacement cost for a registered nurse from a staffing agency

without notice or delay. The *evidence* establishes that in 2015 Golden Gate paid its outside

staffing agency $52.20 per hour for a registered nurse. *See* Philipson Reply Decl.¶ 16 and Ex.20

to the Declaration of plaintiff's counsel John Howley (Howley Decl.) When plaintiff voluntarily

terminated her employment without notice, defendants were required to fill her position. Given

the waiting time for nurses to obtain Visas into the United States (plaintiff waited more than 8

years), there is no dispute that defendants could not replace plaintiff with another nurse that was

under contract from the Philippines. Moreover, each of the nurses that had obtained Visas and

were employed by defendants already had a registered nurse position at a nursing home and were

not available to assume plaintiff's job. Therefore, when plaintiff voluntarily terminated her

employment without notice or cause, defendants lost an employee and could not replace her

without hiring a new employee from a staffing agency.[3]

At the time that Golden Gate entered into the Contract, Golden Gate could not project the

actual cost of replacing plaintiff with another registered nurse for 2015-2018 (i.e. the "Contract

Term"). As explained in the March 7, 2018 Philipson Decl. submitted with defendants' moving

papers (the "March 7, 2018 Philipson Decl."), and the Philipson Reply Declaration submitted

herewith ("Philipson Reply Decl."), Philipson estimated that the cost to replace plaintiff would

be at least $43, or $14 per hour more than plaintiff's hourly rate. Thus, when plaintiff's Contract

was executed, Golden Gate's reasonable estimation of its damages was approximately $25,480

per year or $2,123 per month. This is computed as $14 per hour in additional costs multiplied by

35 hours per week and then multiplied by 52 weeks per year. In reality, the cost of a new

---

[3] Nursing Homes are mandated to have registered nurses caring for their patients at all times. Accordingly, plaintiff
needed to be replaced immediately when she terminated her employment without notice and without cause.

employee from an outside staffing agency in 2015 was $52.20 per hour and the damages much greater than estimated. Philipson Reply Decl. ¶¶16-18; Exhibit 20 to the Howley Decl.

Plaintiff does not offer any evidence disputing Golden Gate's reasonable estimation of its additional costs. Instead, plaintiff refers to these additional costs and damages as "lost profits" and claims that such damages were not contemplated by the parties (Pl. Memo. at 19-20.) Plaintiff's argument is incorrect for two reasons. First, plaintiff's entire case is based on the inclusion of the liquidated damages clause in the Contract. Clearly defendants' damages were contemplated at the time of the Contract where the Contract clearly provides for liquidated damages. Second, plaintiff's argument concerning the hourly fee paid to Prompt for plaintiff's services is mere hyperbole and is not supported by any testimony or expert analysis. Finally, plaintiff admits that defendants were damaged by plaintiff's termination of the Contract inasmuch as plaintiff concedes that actual expenses were paid in connection with plaintiff's recruitment process; *the only question is the amount of the defendants' damages.* (Plaintiff's Memo. at p.10). The simple fact that plaintiff is litigating the amount of damages and that the damages are not "easily ascertainable" supports the notion that the liquidated damages provision should be enforced.

Plaintiff repeatedly alleges that defendants recruited nurses in the Philippines and admits that defendants paid for plaintiff's travel, lodging in the United States and a myriad of other expenses. Plaintiff admits that plaintiff was provided employment as required by the Contract and that plaintiff voluntarily breached the Contract. (Paguirigan Tr. at pp.29; 44). The sole issue is the *amount* of defendants' damages.

In order to support plaintiff's claim, plaintiff misstates the record and omits material facts. Defendant SRA is a Philippines' registered recruitment agency that operates in the

Philippines to recruit nurses for Defendant Golden Gate. (Philipson Tr. [Exhibit T to defendants' moving papers] at p. 10)   SRA maintains an office in the Philippines, employs persons in the Philippines and incurs other business expenses in its recruitment of the nurses (the "SRA Recruitment Expenses"). (Luyun Dep. [Exhibit 1 to Howley Decl.]) at pp. 9-13).   Defendant Golden Gate is responsible to pay SRA for the SRA Recruitment Expenses incurred in recruiting nurses for Golden Gate.  Philipson Reply Decl. at ¶13.  Likewise, Golden Gate is responsible to reimburse defendant Sentosacare LLC for any travel and licensing expenses incurred by Sentosacare LLC ("Sentosacare Recruitment Expenses") for plaintiff and other nurses recruited for Golden Gate.[4] *Id.*

After plaintiff arrived in the United States, plaintiff's Contract with Golden Gate was assigned to Prompt.  Defendants' Rule 56.1 Statement at ¶33.   As consideration for assignment of the Contract from Golden Gate to Prompt, Prompt agreed to assume all of Golden Gate's recruitment expenses and obligations to (i) SRA for SRA Recruitment Expenses; (ii) Sentosacare LLC for any Sentosacare Expenses; and (iii) plaintiff for any obligations pursuant to the terms of the Contract.  Rubinstein Reply Decl. at ¶3.

Prompt fulfilled all of its obligations by remitting payment for all SRA Recruitment Expenses and Sentosacare Expenses. Rubinstein Reply Decl. at ¶¶3-5. Prompt also employed plaintiff pursuant to the terms of the Contract, remitted all payroll to plaintiff and provided all benefits as required by the Contract. *Id.* Thus, Golden Gate's anticipated expenses and Prompt's actual expenses are identical.

C.        **Kupka's Assumptions Are Based on Undisputed Facts**

As explained above, and in the accompanying declarations, in consideration for the

---

[4] *See* list of expenses set forth on the acknowledgment executed by plaintiff and attached to the Moving Hahn Declaration ("Hahn Decl.") as Exhibit L.

assignment of the Contract, Prompt agreed to reimburse or pay all of Golden Gate's recruitment expenses. Prompt's payment of all of these expenses are set forth in Prompt's recruitment expenses attached to the Rubinstein Reply Decl.[5]

Plaintiff (Pl. Memo at 12) misconstrues both Philipson's and Rubinstein's testimony. First, Philipson testified truthfully that Golden Gate did not pay any of the recruitment expenses. This statement is true because Prompt had agreed to pay and reimburse Golden Gate for all of those expenses as consideration for the assignment of the Contract. (Rubinstein Reply Decl. ¶¶3-5). It is undisputed that Prompt paid those expenses. Moreover, plaintiff omits that Philipson testified that although the structure of payment of recruitment expenses had changed, Prompt did pay and reimburse the nursing home facility on occasions. Philipson Dep. (Exhibit T to the moving Hahn Decl.) at Page 15.

Second, Rubinstein testified truthfully that Prompt did not perform any recruiting. All recruiting was performed by Golden Gate or SRA. Rubinstein Dep. Tr. p. 12; Philipson Dep. Tr. pp. 10-11. Prompt incurred the recruitment-related expenses after it assumed the Contract and agreed to pay all of the SRA Recruitment Expenses or the Sentosacare Expenses. Rubinstein Reply Decl. ¶¶3-5 and Philipson Reply Decl. at ¶15. Furthermore, plaintiff *never questioned* Rubinstein concerning Prompt's agreement to pay and reimburse the SRA Recruitment Expenses or the Sentosacare Expenses.

## D.     Kupka's Report is Designed to Assist The Court As Permitted by FRE 702

FRE 702(a) provides that an expert's testimony is admissible where the testimony will assist the trier of fact. The factual basis for the Kupka Report is set forth in the documents and testimony of Philipson and Rubinstein. Plaintiff has not offered any evidence refuting these

---

[5] As set forth in the Rubinstein Reply Decl. this document is a Prompt business record admissible pursuant to Federal R. Evid. 803(6).

facts. The Kupka Report relies on the undisputed facts concerning the costs incurred in recruiting the nurses. Given the fact that defendants incurred expenses in recruiting the nurses, the Kupka Report allocated an equal share of the 2015 expenses to each nurse that arrived in the United States in 2015. The Kupka Report specifically provides for a division of these expenses by each such nurse.[6]

Plaintiff argues without any factual or expert support that Golden Gate and Prompt did not have the same expenses. Once again, this conjecture is not supported by any facts or expert testimony. Given that Prompt assumed all of Golden Gate's expenses, it is axiomatic that Prompt's and Golden Gate's expenses are not only "similar" but identical.

Plaintiff does not cite to Prompt's Rubinstein's deposition because plaintiff never sought to question Prompt concerning defendants' recruiting expenses.[7] Prompt's Rubinstein could have answered all of these questions as explained in his accompanying declaration.

## II. THE COURT SHOULD DISMISSING THE DECLARATORY JUDGMENT CLAIM AND GRANT JUDGMENT AGAINST PLAINTIFF

There is no dispute that plaintiff breached the Contract and defendants were damaged. Plaintiff's opposition does not deny that plaintiff terminated her employment without prior notice

---

[6] The cases cited by plaintiff (Pl. Memo. at 13-15) are inapposite because this case does not require an audit of Prompt's books and records to establish that $25,000 is a reasonable approximation of defendants' damages. The Kupka Report sufficiently establishes the reasonableness of defendant's estimate of damages because the undisputed evidence shows that, in fact, defendants incurred substantially more damages than the liquidated damages estimate. By contrast, the expert in the *Supply & Bldg. Co. v. Estee Lauder Int'l Inc.* case (cited at pp. 13-14 of Pl. Memo) was opining on the loss of future sales based on unsound data and assumptions. 2001 WL 1602976 *at 13. That unsound process led the court to preclude the expert's testimony. Here, defendants must only show that their estimates of damages were reasonable at the time of the contract and the raw data referenced in the Kupka Report unmistakably supports that conclusion. Similarly, in *CIT Group Business Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F.Supp.2d 673 (S.D.N.Y. 2011) (cited at page 14 of Pl. Memo), the court precluded expert testimony concerning a lost profits projection which relied on "conclusory statements" of management. *Id.* at 677. Here, the Kupka Report does not speculatively make a projection of lost profits based on unsound evidence; the opinion is based on unrefuted documentary evidence which establishes the costs associated with defendants' businesses. The Kupka Report reliably demonstrates that there was a reasonable basis for the estimate made by the parties as to the employer's damages in the event of a breach.

[7] Plaintiff only questioned Prompt's Rubinstein on December 21, 2017 for slightly more than two hours. Months after the deposition, on February 6, 2018, plaintiff requested the documents concerning Prompt's recruitment expenses. After receiving the financial documents produced by Prompt, plaintiff never sought to continue Prompt's deposition and submit questions concerning Prompt's recruitment expenses.

and without cause. Plaintiff's Counter-Statement ¶59.  Therefore, the Court should enter

judgment on liability against plaintiff finding that plaintiff breached the Contract.

The sole question raised by plaintiff concerning plaintiff's breach of contract is the

*amount of damages due defendants* as a result of plaintiff's premature termination of the

Contract.  Plaintiff concedes that defendants' damages are at least $4,435.50 ($3,685.50 plus

$750) for plaintiff's airfare and other direct expenses. (Pl. Memo 8-9).  In addition, plaintiff does

not dispute that the Contract provides for defendants' attorney's fees in enforcing the liquidated

damages provision.  (Contract, Article VII, Section 4).

### A.  <u>Defendant Has Established That The Liquidated Damages Provision Is Enforceable</u>

Under New York law, a liquidated damages provision is presumed enforceable.[8]  In

reviewing a liquidated damages clause, the New York Court of Appeals has "cautioned generally

against interfering with parties' agreements." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d

373, 795 N.Y.S.2d 502 (2005).  To establish the enforceability of a liquidated damages clause,

defendants must only meet "its initial burden of establishing that the liquidated damages clauses

are enforceable because they represent a reasonable measure of the anticipated probable harm."

*Mathew v. Slocum–Dickson Medical Group, PLLC*, 160 A.D.3d 1500, 75 N.Y.S.3d 738 (4th

Dep't 2018) (internal quotations omitted). Defendants have met their initial burden initial burden

of establishing that the liquidated damages clauses are enforceable because they represent a

"reasonable measure of the anticipated probable harm." *Mathew v. Slocum–Dickson Medical

Group, PLLC*, 160 A.D.3d 1500, 75 N.Y.S.3d 738 (4th Dep't 2018) [quotations omitted]

(upholding liquidated damages of 50% of a party's income).  When Golden Gate entered into the

---

[8] "The rule (against penalty clauses) hangs on, but is chastened by an emerging presumption against
interpreting liquidated damages clauses as penalty clauses." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373,
795 N.Y.S.2d 502 (2005) quoting *XCO Intl. Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1002–1003 (7th Cir.2004).

Contract, Golden Gate was aware that if plaintiff breached the Contract then Golden Gate would be required to replace plaintiff with another registered nurse. [9] At that time, Golden Gate estimated that the hourly replacement cost would be at least $43 per hour or $14 more per hour than plaintiff's $29 hourly wage. *See* above at Point I(a)(i). This estimated amount totaled more than the liquidated damages of over $25,000. *Id.*

Golden Gate's actual damages could not be easily ascertained at the time that Golden Gate entered into the Contract. First, at the time that Golden Gate entered into the Contract, Golden Gate could not know (i) when or if plaintiff would breach her Contract (it could have occurred in 2015-2018); (ii) the replacement cost for a nurse when plaintiff breached her Contract; (iii) the availability of a replacement nurse or if Golden Gate would be required to have nurses work multiple shifts and Golden Gate would be required to pay overtime (time and one-half for regular days or double or triple time for holidays); and (iv) the length of time that Golden Gate for which would be required to retain a replacement nurse.

In light of the indisputable facts that at the time of Contract, Golden Gate could not foretell the future and any of the aforementioned expenses concerning the replacement costs and damages when plaintiff would breach the Contract, Golden Gate's damages were not easily ascertainable. Thus, the liquidated damages in the Contract are enforceable. *Mathew v. Slocum–Dickson Medical Group, PLLC*, 160 A.D.3d 1500, 75 N.Y.S.3d 738 (4th Dep't 2018)

Second, Golden Gate's damages was also not ascertainable at the time of the entry of the Contract. At the time of the Contract, Golden Gate was obligated to pay the recruiting expenses for plaintiff which included SRA's office and expenses in the Philippines. The total expenses that Golden Gate and the other nursing homes incurred in 2015 from recruiting expenses was

---

[9] Pursuant to the Department of Health regulations, Golden Gate (a skilled nursing facility) is required to maintain a certain amount of nurses on staff at all times. There is no question once plaintiff bleached her Contract, Golden Gate was required as a matter of law to replace plaintiff with a registered nurse.

$864,373 (the "Recruiting Expenses.") (Rubinstein Reply Dec., Exhibit A).  Golden Gate could

not know what the total 2015 Recruiting Expenses would be when the Contract was signed in

April 2015.  Likewise, Golden Gate could not know what the total number of nurses successfully

recruited in 2015 would be when the Contract was signed in April 2015.  This information could

only be computed after December 31, 2015.  Therefore, at the time of the Contract, Golden Gate

could not ascertain its damages or the pro rata Recruiting Expenses attributable to plaintiff.

### B. Plaintiff Has Not Met Its Burden Of Proof To Establish That the Liquidated Damages Clause Is Unenforceable

Plaintiff bears the burden to establish that the liquidated damages provision is

unenforceable.  See *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 201

(E.D.N.Y. 1999); *Rattigan v. Commodore Int'l Ltd.,* 739 F.Supp. 167, 170 (S.D.N.Y.1990); *P.J.

Carlin Constr. Co. v. City of New York,* 59 A.D.2d 847, 399 N.Y.S.2d 13, 14 (1st Dep't 1977).

Plaintiff has not met this burden.  Plaintiff must demonstrate either that damages flowing from a

prospective early termination were readily **ascertainable** at the time [the parties] entered into

their [contract], or that the early termination fee is conspicuously disproportionate to these

foreseeable losses." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 795 N.Y.S.2d 502

(2005).  Plaintiff has not established either of these prongs.

Plaintiff weakly contends that the damages were easily ascertainable.   Plaintiff ignores

all of defendants' other damages beyond the admitted $4,435.50, all of which could not be easily

ascertained at the time of the Contract[10] but were complicated, difficult to determine and could

only be determined *after* the breach occurred.  Damages are considered not easily ascertainable

when (i) there is an inability to project with any degree of certainty what the **damages** would be.

---

[10] In determining whether a liquidated damage clause should be upheld because of a difficulty in ascertaining damages, the focus is upon the time of the making of the contract, not the time of the breach. *10 L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359 (S.D. N.Y. 2010).

(*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 396, 690 N.Y.S.2d 854 (1999)); (ii) they would

fluctuate over time (*Leasing Service Corp. v. Justice*, 673 F.2d 70, 74 (2d Cir. 1982)); or (iii)  the

actual loss would depend on a multitude of factors (*7 3H Enterprises, Inc. v. Murray*, 165 F.3d

15 (2d Cir. 1998)).

Plaintiff does not offer *any evidence* proving that defendants' damages were

disproportioned to the actual damages.  Plaintiff fails to offer any documentary evidence or

expert testimony (i) concerning the replacement nursing; or (ii) disputing defendants' damages

and loss of its Recruiting Expenses.  The law is well settled that plaintiff bears the burden of

proof to establish the liquidated damages clause unenforceable and that defendants did not incur

any actual damages.  As the Court stated in *Mathew v. Slocum–Dickson Medical Group, PLLC*,

160 A.D.3d 1500, 75 N.Y.S.3d 738 (4th Dep't 2018):

> We reject plaintiffs' further contention that the liquidated damages clauses are
> invalid because defendant failed to submit any evidence of specific revenue loss
> for defendant's cardiology department resulting from plaintiffs' breach of the
> employment agreements. "Once [defendant's] burden of proving the validity of
> the liquidated damages clause was met, it was not necessary for [defendant] to
> prove any actual damages"

*Id.* at 1503 (quoting *Martin L. Ryan, P.C.*, 95 A.D.2d at 881, 463 N.Y.S.2d 883 (3rd Dep't 1983).

### III. THE COMPLAINT'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED

As we pointed out in defendants' moving papers, plaintiff's breach of contract claim was

unartfully drafted and seemed to be comprised of three components.   It appears that plaintiff has

abandoned her claims that the contract was breached because plaintiff was: (i) not provided with

40 hours of work per week;[11] and (ii) employed as a "nurse manager" instead of as a "registered

---

[11] In plaintiff's response to Defendants' Statement of Undisputed Facts pursuant to Rule 56.1 at ¶31, plaintiff denies that "full time" consists of 35 hours per week, but fails to support this denial with any citation to any statute, regulation or caselaw.  Conversely, defendants attached as Exhibit U a printout from the Bureau of Labor Statistics website which provides (at p.5) that "Full time is 35 or more hours per week".  Moreover, as we pointed out in defendants' moving papers, plaintiff testified that she did not want to work more than 35 hours per week (and complained about the 35 hours as well), never requested more work hours and never sought to work at other medical

nurse." Complaint ¶¶22-44 (Exhibit A to the moving Hahn Decl.). *See* Plaintiff's Counter-Statement at ¶¶47-48; 54-55  Plaintiff's opposition only addresses a single claim: that plaintiff was not paid the proper wage rate because she was not paid the "prevailing wage" which was in effect at the time that plaintiff commenced her employment in the United States.

Although plaintiff may not like the law. the law has been well settled and is crystal clear -- the prevailing wage used in the immigration process and the wage to be paid to plaintiff is the Prevailing Wage Determination issued by the Government *prior* to the submission of the Visa and included in the Visa application. *See Rosales v. Hispanic Emple. Leasing Program, LLC,* 06-cv-877, 2008 U.S. Dist. LEXIS 96417 at *5-6 (W.D. Mich., November 26, 2008) (prevailing wage rate is measured from the time the government issues a wage determination, not actual start of employment date).   Plaintiff does not address the *Rosales* case.[12]

Plaintiff claims that her breach of contract claim is independent from the Immigration Act.  Plaintiff is wrong because as a matter of law, the rule interpreted by the *Rosales* case is part of the Contract "as though it were expressed or referred to therein." *Mayo v. Royal Ins. Co. of America,* 242 A.D.2d 944, 662 N.Y.S.2d 654 (4th Dep't 1997) (citations and quotations omitted."). In *Burns v. Burns,* 163 A.D.3d 210, 81 N.Y.S.3d 846 (4th Dep't 2018), New York's Appellate Division recently explained:

> [I]t is basic that, unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein,

Id. at 213-14.

The Contract is clear that there are three time periods provided in the Contract.  The first

---

facilities when she was not working for defendants (even though it was permitted by the Contract).

[12] Plaintiff previously conceded that her wage claim does not violate the Immigration Act. *See* ECF Docket No. 58 at pp.3-4).

is from the Contract signing until plaintiff is able to work (the "First Period"). The second time

period is defined in the Contract as "Start of Employment" for a period of four weeks (the

"Second Period"). The Contract provides that plaintiff will be compensated $12 per hour during

the Second Period. After the Second Period, the Contract designates a third and final period

which is from the end of the Second Period, for a three-year period when plaintiff was to receive

$29.00 per hour. The Contract provides for the Third Period:

> As of the Commencement Date, Employee will be paid a base
> salary in accordance with the prevailing wage for the geographic
> area in which the employee is assigned to work, as determined by
> the National Prevailing Wage and Helpdesk Center (NPWC) of the
> United States Department of Labor. [emphasis added].

The words "[a]s of the Commencement Date" refer to the Third Period when plaintiff

would receive the $29.00 per hour, because for 4 weeks prior to the Commencement Date (i.e.

the Second Period), plaintiff was entitled to only $12 per hour. (Contract at Article IV, Section

2). The reference to "as determined" refers to the previously determined Prevailing Wage

Determination, which was submitted with Plaintiff's VISA Application. *See* March 7, 2018

Philipson Dec. at ¶10 (Ex. Q to the Moving Hahn Dec.); Philipson Reply Dec. ¶¶9-10.

As a matter of law, the first page is part of the Contract. It is undisputed that: (i) at all

times the first page was attached to the remainder of the Contract (Paguirigan Dep., Page 89,

Line 21-Page 93 Line 7); (ii) the first page and the last page of the Contract which defendant

signed on April 15, 2015 were attached at the time that *defendant and plaintiff* executed the

Contract (Plaintiff's Counter-Statement ¶¶13;18;[13] (Paguirigan Dep. Pages 92-93)); (iii) the first

page specified that plaintiff was to receive $29 per hour. (Paguirigan Dep. Pages 91, Line 24-

---

[13] Plaintiff misleads the Court by claiming that the first page "letter is dated April 15, 2015, seven days before plaintiff signed the contract and infers that the first page was not attached to the Contract. Pl. Memo 24. The undisputed facts are that defendant Landa executed the first page and last page of the Contract on April 15, 2015 and that plaintiff signed the same copy of the Contract with the first page attached on April 22, 2015.

Page 94, Line 9), and plaintiff submitted the first page and contract to the United States Embassy (Paguirigan Dep, Page 94, Lines 18-21); (iv) plaintiff understood that she was to receive $29 per hour (Plaintiff's Counter-Statement ¶20) and when the Contract was assigned to Prompt, plaintiff executed the Wage Acknowledgment which specified that her base salary[14] was $29 per hour. (Exhibit J to the moving Hahn Dec).

The first page that was attached to the remainder of the Contract *is part of the Contract* and not parol evidence. It is well established that "letters and other instruments may be construed as a part of a contract where they are referred to therein or *annexed thereto.*" *Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc.*, 26 A.D.2d 481, 275 N.Y.S.2d 587 (*1st* Dept 1966) (emphasis added); see also Mayo, supra.

Plaintiff does not even offer any *testimony* that Defendants' plain reading of the Contract is incorrect. On the contrary, Plaintiff testified that she understood she was to receive $29.00 per hour. (Paguirigan Dep. Page 21, Lines 9-13; Page 445, Lines 12-19). Also, plaintiff executed the Wage Acknowledgment which provided for the same $29.00 rate. (Exhibit J to the Moving Hahn Dec.) Plaintiff's conduct constitutes ratification and plaintiff is prohibited from disavowing the Contract at this time. *See Sotheby's Fin. Services, Inc. v Baran*, 00 CIV.7897 BSJ, 2003 WL 21756126, at *6 (S.D.N.Y. July 29, 2003), affd, 107 Fed Appx 235 (2d Cir 2004) ("a party who re-affirms his contractual obligations in a subsequent written agreement is precluded from asserting defenses to those obligations under that agreement.").

Furthermore, plaintiff's receipt of the benefits of the Contract and failure to repudiate the agreement, amount to the subsequent ratification of the Contract. *See Cologne Life*

---

[14] Plaintiff claims for the first time that she was entitled to a set salary of $55,890 and not the hourly salary set forth in the Prevailing Wage Determination. There is no basis to this claim and it is not supported by any caselaw or statute. Plaintiff testified that she was to be paid for the hours that she worked at the hourly rate of $29. (Paguirigan pages 93-94). At no time did Plaintiff testify that she was to be paid for hours that she did not work or that she was entitled to an annual salary even though she breached the Contract and quit her employment after 9 months.

{100509}                                                  13

*Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.,* 286 A.D.2d 118, 126 (1st Dep't. 2001); *Cashel v. Cashel,* 2009 NY Slip Op 6659, 2 (2d Dep't 2009) (ratification occurs when the party retains the benefit with knowledge of the material facts). It is undisputed that plaintiff accepted all of defendants' costly efforts pursuant to the Contract in obtaining her Visa, paying for her travel and lodging, and employing her in the United States, and cannot now dispute the Contract.[15]

Plaintiff's counsel's interpretation of the Contract is not supported by evidence or testimony. As explained in *Rasales,* the Prevailing Wage that defendants were required to pay plaintiff refers to the Prevailing Wage Determination in effect and determined at the time the plaintiff's Visa Application was submitted. *Rosales,* is incorporated into the terms of the Contract because "it is basic that, unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein...and the contract will be construed in the light of such law." *Mayo v. Royal Ins. Co. of America,* 242 A.D.2d 944, 662 N.Y.S.2d 654 (4th Dep't 1997), (quoting *Dolman v. United States Trust Co. of N. Y.,* 2 N.Y.2d 110 (1956).

Additionally, plaintiff's interpretation would render meaningless the protection given to United States citizens by 8 U.S.C. §1182(a)(5)(A)[16]. The *Rosales* Court recognized the time-lag in the lengthy immigration process and expressly held that an employer is not required to re-determine the prevailing wage on the date that the employee commences work,

---

[15] Furthermore, Plaintiff's was required to serve notice of a breach and give her employer the opportunity to cure the breach. Contract, Article VI, Sections 3-5. It is undisputed that she did not give notice of any breach during her employment (Paguirigan Dep. at 136-137) (Moving Hahn Dec., Exh. D).

[16] Contrary to plaintiff's statements (Pl. Memo. p.23) the requirement to pay the Prevailing Wage is solely designed to prevent foreign worker from taking available jobs offered at the Prevailing Wage to United States citizens. *See* 8 U.S.C. §1182(a)(5)(A); 8 U.S.C. §1188(a)(1)(B); *Rosales, supra.* There is no caselaw, statute or regulation supporting plaintiff's claim that the Prevailing Wage requirements provide any protection to plaintiff or other immigrants.

and may instead rely on the prior prevailing wage determination.   It would further be

contrary to the protections afforded to American workers by federal regulations requiring

publication of available jobs and their rates (see 20 C.F.R. § 656.21).  In *NLRB v. Local 32B-

*32J Serv. Employees Int'l Union,* 353 F.3d 197, 202 (2d Cir. 2003), the Second Circuit stated:

> The law is well settled that "ambiguously worded contracts should not be
> interpreted to render them illegal and unenforceable where the wording lends
> itself to a logically acceptable construction that renders them legal and
> enforceable.

Plaintiff's interpretation would render superfluous (i) the first page of the Contract -- the

Job Offer which specified $29 per hour; (ii) the Contract language which specifies the Prevailing

Wage "*as determined*" by the Government; and (iii) the requirement to submit the Prevailing

Wage Determination as part of the Visa application.  First, according to plaintiff's counsel,

plaintiff was *never* to receive the $29 per hour set forth in the first page of the Contract --

plaintiff was to receive $12 per hour during the Second Period and $30.99 during the Third

Period.  This would render the first page meaningless.  Second, plaintiff's counsel's

interpretation ignores the Contract's reference to the Prevailing Wage "*as determined*" by the

NWPC (Ex. H to the Moving Hahn Dec., Article IV, Section 1).  Plaintiff ignores the past tense

of "as determined" and argues that the Contract could have been written in a different fashion.

Plaintiff does not provide any reason why the simple meaning of "as determined" does not refer

to the Prevailing Wage Determination which was "determined" by the Government and was part

and parcel of plaintiff's Visa application.  According to plaintiff's interpretation, the Contract

should *not* have stated the past tense of "as determined;"  but should have stated "will determine"

in the future tense because (according to plaintiff) the Prevailing Wage is unknown at the time of

the execution of the Contract but the NWPC will or may determine on its *website* a new

Prevailing Wage as of the Commencement Date *which may be several months (or more) after*

*the execution of the Contract.* Thus, according to plaintiff, the use of the past tense "as determined" is rendered meaningless. Third, plaintiff's counsel's interpretation would render the Government's Prevailing Wage Determination of no value and the law requiring the Government's Prevailing Wage Determination to be submitted with plaintiff's Visa application meaningless.[17]

Plaintiff's citations to Immigration Statutes is incorrect. First, in an effort to ignore the existence of the *Rosales* case or the reality that Prevailing Wage Determination is determined by the Government, plaintiff wrongly claims that there are two different procedures for calculating the Prevailing Wage. (Pl. Memo. 22) This argument is fictional and is not supported by any caselaw, statute or regulation. In fact, 20 CFR § 656.40 expressly requires each employee to have a government determined Prevailing Wage Determination:

> Application process. The employer must request a PWD [Prevailing Wage Determination] from the NPC, on a form or in a manner prescribed by OFLC

Second, plaintiff attempts to read the words "for the geographic area" in Article IV, Section 1 of the Contract, as if they have some special meaning supporting the change of the Prevailing Wage Determination. (Pl. Memo 21-22) Once again, there is no caselaw or statute that supports this argument. The "geographic area" is the criterion used by the Government in issuing the Prevailing Wage Determination and is repeatedly referred to in 20 C.F.R. 656.40 as the "area of intended employment." The inclusion of "in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the [Government]," merely refers to the manner in which the Government previously made the

---

[17] As set forth above, the Prevailing Wage Determination is issued to protect the United States citizen's from losing jobs to foreigners. It is only after the employment is offered to United States citizens at the Prevailing Wage Determination amount, and a United States citizen did not take the available job, was plaintiff able to apply for her Visa. *See E.J.'s Luncheonette v. Dehaan*, No. 01 CIV. 5603 (LMM), 2002 WL 15642, at *1 (S.D.N.Y. Jan. 4, 2002) (setting forth policy reasons behind the immigration labor laws); *see also* 69 FR 77326-01, 2004 WL 2973380(F.R.); Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System (same).

determination, and is not rendered meaningless by the plain reading of the Contract.

Without citing to a single supporting case, plaintiff advocates (at p.23 of the Opposition Memo) that it is "commercially unreasonable" for the Prevailing Wage Determination to govern her wage rate in light of the time lag between the date of the determination and her actual start of employment. This argument was disregarded in *Rosales* and plaintiff does not provide any support for this argument. [18]

At a minimum, for the reasons set forth in defendants' moving papers, the claims against all parties other than the contracting party (Prompt as assignee) because no evidence has been submitted to support the piercing of the corporate veil.

## IV. THE TVPA CLAIMS SHOULD BE DISMISSED

Plaintiff's papers are light on any facts or evidence and heavy on unsupported hyperbole. This has been a pattern throughout this case and is continued it is current motion papers. As the Court may recall, plaintiff alleged in the Complaint that the individual defendants threatened plaintiff with enforcement of its contract rights. In the Court's Decision denying defendants' motion to dismiss, the Court specifically relied on the allegation in the Complaint, stating "[p]laintiff specifically alleges that defendants Philipson and Luyun said they would sue her if she tried to leave her job…." (Order ECF Doc. 37 at p. 9) *Plaintiff's own testimony established that defendants' never threatened plaintiff, never spoke to any of the defendants about the liquidated damages clause in her contract, and had no meaningful contact with any of Landa,*

---

[18] Even worse, plaintiff resorts to mischaracterizing the federal regulations to try to buttress her argument, as explained below. These attempts should be rejected. For example, plaintiff cites to 20 CFR 656.40 and New York Labor Law 220(5)(a) for the proposition that the prevailing wage is only valid for 90 days to 1 year. By its very terms, the "validity period" for a prevailing wage determination referred to in 20 C.F.R.§ 656.40(b)(4)(c) refers to the time within which the employer "must file their applications or begin the recruitment period required by §§ 656.17(e) or 656.21." Those two sections refer to the publishing requirements and other recruitment activities required under the immigration regulations, not the time within which the employee must begin working. Plaintiff's attempt to pull the wool over the Court's eyes concerning the applicability of the immigration laws should be rejected. The relevant case law, statute and regulations all support defendants' interpretation of the Contract's wage terms.

*Philipson and Rubinstein during her employment.*  Plaintiff's-Counter Statement at ¶¶26, 50, 51, 52 and 53.  Fortunately, on this motion for summary judgment, the Court is not compelled to accept as true the false allegations in the Complaint.  Rather, plaintiff must present *evidence in admissible form* supporting each of the elements of each claim.  Such evidence is noticeably absent from plaintiff's motion papers.

During plaintiff's deposition, plaintiff readily admitted that she owed Prompt $25,000 when she left her employment (Paguirigan Dep. Page 358, Lines 6-16) and was aware of these damages prior to executing the Contract. (Paguirigan Dep. Page 167, Lines 15-20; Page 169, Lines 9-21).  Even in her current motion papers, plaintiff concedes that she is liable to defendants for *at least* $4,435.50.  (Pl. Memo 8-9).  Prompt's lawsuit *after* plaintiff breached the Contract is the right of any employer and, thus, cannot constitute serious harm under the TVPA.  *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 U.S. Dist. LEXIS 38117, at *5 (S.D. Ind. Mar. 25, 2015).[19]  The liquidated damages clause is enforceable and 20 C.F.R. 655.731(c)(10)(i)(B), expressly permits the inclusion of a liquidated damages clause.

Plaintiff also incorrectly claims that defendants filed a professional disciplinary complaint that was found "to be without merit."  There was never any such specific finding.[20]  In any event, as a matter of law, the nursing home's licensed administrator is a "mandatory reporter" required to report any improper behavior by a nurse and other medical professional. (Paguirigan Page 73, Line 16-Page 74 Line 14); *See* NY Public Health Law section 2803-d; New York Social Services Law section 413.  Plaintiff does not provide any evidence that defendants acted unlawfully by filing the confidential incident report in 2006.  Therefore, plaintiff has not

---

[19] Plaintiff opposition does not address *Panwar* nor does plaintiff provide any contrary case law.

[20] In response to the incident report the state licensing board chose not to take any action.  Contrary to plaintiff's claim, the licensing board *never* made a determination that the incident report was without merit.

fulfilled her burden of proof to establish a right to summary judgment nor her burden in opposing defendants' summary judgment motion. *See Celotex, supra*. Likewise, plaintiff refers to criminal action taken by the District Attorney against the nurses for endangering the welfare of disabled children, but there is no *evidence* that defendants participated in the independent action taken by the District Attorney or that defendants acted unlawfully in any way.[21] Mere, hyperbole and allegations are insufficient to defeat defendants' motion for summary judgment. *See Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 301 (S.D.N.Y. 2017)

Plaintiff does not allege that defendants filed any lawsuits against any employees for approximately 9 years (from 2008 until 2016). As explained in *Panwar*, even if defendants had sought to enforce their contractual rights during this 8-year period there would be no TVPA violation. In 2016, *after plaintiff terminated her employment*, Prompt commenced an action to enforce its contractual rights against plaintiff and two other nurses who simultaneously breached their Contract. Plaintiff and Jericson Valdez were represented by plaintiff's counsel, John Howley. Mr. Howley removed the Valdez case to the Eastern District of New York (Central Islip Courthouse) and moved to change venue for the Paguirigan case to Richmond County. When settlement talks failed, Mr. Howley advised Prompt's counsel that Paguirigan had commenced the within action which raised the same defenses that he was asserting in the other two suits. Instead of litigating the same issues in three courthouses (i.e. this Court; Supreme Court of the State of New York, Richmond County; and Eastern District of New York, Central Islip Courthouse), counsel agreed to discontinue the other actions without prejudice and for the parties

---

[21] According to plaintiff's argument no "mandatory reporter" can ever report suspected unlawful action by an immigrant nurse unless the "mandatory reporter" is certain beyond a reasonable doubt that the immigrant nurse committed the unlawful act and will be convicted. Clearly, there is no merit to plaintiff's argument.

to assert claims in this action.[22]

Finally, plaintiff does not provide any evidence that Prompt's claims for tortious interference in the 2016 actions (*after* plaintiff resigned) were without merit.  On the contrary, (i) the Contract prohibits plaintiff from interfering with other employees. (Contract Article VII, Section 1(i); (ii) plaintiff and other nurses essentially threatened Prompt that they would cause other employees to leave Prompt (Rubinstein Tr [Exhibit P to Hahn Dec.] at Page 94, Line 20- Page 100, Line 4); (iii) defendants were advised by another nurse that plaintiff was interfering with other nurses (*Id.*); and (iv) Padernal (after initially denying it) admitted that plaintiff and other nurses communicated in a group where they discussed leaving Prompt. (Padernal Tr.[Ex. E to Hahn Dec. at Page 89, Lines 5-10.).  All TVPA claims should be dismissed against each defendant.

## **CONCLUSION**

For the foregoing reasons, and those set forth in the accompanying Declarations, Rule 56.1 Statements and defendants' moving papers, the Court should grant defendants' motion in its entirety, deny plaintiff's cross-motion in its entirety, and award defendants such other and further relief that is just and proper.

---

[22] Plaintiff's claims concerning discovery should not be considered as a matter of law and are factually incorrect and untrue. (Pl. Memo fn. 4)  First, Mr. Howley never designated himself as a witness with knowledge concerning this case in the Rule 26 disclosure or in response to defendants' interrogatories.  Defendants would have deposed Mr. Howley concerning his claims concerning the prior litigation.  Mr. Howley cannot now make himself a witness with regard to summary judgment.  Second, any delays in the prior actions were caused by Mr. Howley's motion practice.  For example, when Paguirigan moved to change venue to Richmond County, the State Court Justice refused to hold a preliminary conference and set a discovery schedule until the State Court Justice determined the venue motion.  Likewise, none of Mr. Howley's clients ever appeared for depositions in the other cases nor did Mr. Howley produce the complete Contract.  In fact, in the state court action filed against plaintiff (Sup. Ct., Nassau Co. Index No. 602050/16), Mr. Howley submitted to the Court his client's sworn affidavit with the first page of the Contract removed. (*See* NYSCEF doc. No. 5).  As discussed above, in this action, plaintiff did not initially produce the copy of the Contract in its true form with the eyelet showing the complete document, but removed the first page and produced it as a separate document.

Dated: Brooklyn, New York
      December 20, 2018

**HAHN EISENBERGER PLLC**

By:    /s/ Seth Eisenberger
        Seth Eisenberger (SE-6769)
        Elliot Hahn (EH-6087)
Hahn Eisenberger PLLC
969 East 27th Street
Brooklyn, New York 11210
347-410-5800
mail@hahneisenberger.com

        &amp;

**ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK, P.C.**

By:    Sheldon Eisenberger (SE-2021)
        Alan M. Pollack (AMP-3759)
        Tarique Collins (TC-4744)
875 Third Avenue, 9th Floor
New York, NY 10022
212-603-6300

*Attorneys for Defendants*