**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
**ROSE ANN PAGUIRIGAN, individually and on behalf of all others similarly situated,**

         **Plaintiff,**

     **- against -**

**PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ SENTOSA SERVICES, SENTOSACARE LLC, SENTOSA NURSING RECRUITMENT AGENCY, BENJAMIN LANDA, BENT PHILIPSON, BERISH RUBENSTEIN a/k/a BARRY RUBENSTEIN, FRANCIS LUYUN, GOLDEN GATE REHABILITATION & HEALTH CARE CENTER LLC, and SPRING CREEK REHABILITATION AND NURSING CENTER,**

         **Defendants.**
-------------------------------------------------------------x

**OPINION & ORDER**

**17-cv-1302 (NG) (JO)**

**GERSHON, United States District Judge:**

Plaintiff Rose Ann Paguirigan brings claims, on behalf of herself and a class of similarly situated Filipino nurses, for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 *et seq.*, against defendants Prompt Nursing Employment Agency LLC ("Prompt Nursing"), Sentosacare LLC ("Sentosacare"), Sentosa Nursing Recruitment Agency ("Sentosa Agency"), Benjamin Landa, Bent Philipson, Berish Rubenstein, Francis Luyun, Golden Gate Rehabilitation and Health Care Center LLC ("Golden Gate"), and Spring Creek Rehabilitation and Nursing Center ("Spring Creek"). Plaintiffs also seek damages for breach of contract against Prompt Nursing, Rubenstein, Landa, and Philipson, and a declaratory judgment regarding certain aspects of their employment contracts.

All defendants previously moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the TVPA claims and the declaratory judgment claim, and defendants Landa, Philipson, and

Rubenstein moved to dismiss the breach of contract claim as alleged against them individually. I denied that motion in full. *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017). I subsequently granted the named plaintiff's motion to certify a class comprised of "all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008," and I appointed her counsel as class counsel under Rule 23(g). *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018). The records defendants produced at the class certification stage establish that there are more than 200 known class members.

Defendants now move for summary judgment dismissing all of plaintiffs' claims, and granting Prompt Nursing's counterclaim for breach of the named plaintiff's employment contract. Plaintiffs also move for summary judgment on all of their claims, including a declaration that the liquidated damages provision and confessions of judgment are unenforceable, and a permanent injunction preventing defendants from threatening or attempting to enforce either.

## I.     Factual Background

Except as otherwise noted, the following facts are undisputed.

### A.     Defendants' Employment of the Named Plaintiff and their Legal Actions Against Her

In either 2006 or 2007, plaintiff, a Filipino citizen, attended a meeting in the Philippines regarding a nursing home job in New York. The meeting was organized by defendant Sentosa Agency, a recruiting agency registered in the Philippines. Defendants Luyun—who is the sole proprietor of Sentosa Agency—and Philipson were in attendance.

In 2007, defendant Golden Gate, a nursing home located in Staten Island, New York, submitted a visa application on plaintiff's behalf. After plaintiff and Golden Gate agreed that a visa application would be submitted, the U.S. government issued a Prevailing Wage Determination

for plaintiff of $26.87 per hour. Eight years later, plaintiff was notified of a visa interview with the United States Consulate in the Philippines. At the time of the interview, the United States Consulate required confirmation that a job was still available. On April 15, 2015, defendant Landa, who is the CEO, managing partner, and one of the owners of Golden Gate,[1] signed a letter addressed to the U.S. Consulate affirming that an employment position was still available and stating that Golden Gate had offered plaintiff a position at $29.00 per hour. On that day, Landa also signed the last page of plaintiff's employment contract with Golden Gate.

On April 22, 2015, one week later, plaintiff herself signed the employment contract with defendant Golden Gate, which was for a three-year term. When plaintiff signed the contract, Landa's letter to the U.S. Consulate was attached to the front of the contract. Plaintiff's signature appears on each page of the contract, but does not appear on the letter.[2]

The contract states the following regarding wages:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). (The parties dispute the exact mechanism by which the National Prevailing Wage and Helpdesk Center ("NPWC") determines a prevailing wage, but it is agreed that in essence the NPWC determines prevailing wages at the request of an employer for a particular employee as

---

[1] Landa owns approximately 55 percent of Golden Gate. Philipson's wife also has an ownership interest in Golden Gate of approximately 25 percent.

[2] This appears to have been a standard practice for defendants. Each of the contracts produced at the class certification stage has a letter attached to it. Like plaintiff's contract, each page of the contract is signed by the employee, but none of the attached letters is signed by the employee.

part of the visa process and also lists the prevailing wage by geographic area online and elsewhere. NPWC determines prevailing wages on an hourly and annual salary basis.)

"Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as described in Article IV." Contract III.

The contract further provides that:

> Both the Employer and Employee agree that the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area. In as much as the parties agree that damages would be difficult to calculate if the Employee willfully, voluntarily, and without cause terminates the Agreement before the completion of the three (3) year term, and/or if the Employer terminated the Agreement pursuant to Article VI(2)(i) or (ii),[3] the parties agree that such an act shall result in an obligation by the Employee to pay the Employer and/or its designee/assignee Twenty Five Thousand Dollars ($25,000) as liquidated damages (the "Liquidated Damage").

Contract VII (4). Section VII (4)(a) states that the liquidated damages are reduced to $16,666.67 should plaintiff pre-terminate or breach the employment contract in her second year, and are reduced to $8,333.34 should she do so in her third year. Contract VII (4)(a).

Finally, "in order to secure Employee's performance of the Employment Term," Section VII (4) of the contract requires plaintiff to execute a confession of judgment for the amount of

---

[3] Under Article VI (2)(i) and (ii), the employer may terminate the agreement under the following conditions:

i. Employee willfully or intentionally undertakes or commits any conduct that is harmful to Employer's practice or reputation;

ii. Breach of any term or condition of this Agreement as determined by Employer and/or its designee/assignee, which shall include, but not be limited to, Employee's failure or refusal to comply with the reasonable directions, policies, standards and regulations that Employer and/or its designee/assignee may establish from time to time.

liquidated damages, which may be filed in court in the event that she fails "to complete the employment term." Plaintiff is also required to "pay upon demand all reasonable costs and expenses (including attorney's fees), and disbursements[ ] incurred by the Employer and/or its designee/assignee to enforce any of [the] rights of the Employer and/or its designee/assignee hereunder and/or collect the aforementioned liquidated damages." Contract VII (4).

In a separate document dated April 22, 2015, plaintiff signed an acknowledgment of costs related to her recruitment. This document is titled "Declaration and Undertaking" and states that Sentosacare expended $3,685 for attorneys' fees, filing fees, visa fees, airfare, and miscellaneous fees in connection with plaintiff's hiring and travel to the United States. Sentosacare is a company co-owned by defendants Landa and Philipson that provides consultants to nursing homes.

Once plaintiff arrived in the United States, Golden Gate verbally assigned her contract to defendant Prompt Nursing, a staffing agency owned by defendant Rubenstein that provides nurses to nursing homes. On June 22, 2015, plaintiff began working at defendant Spring Creek, a nursing home located in Brooklyn, New York. Landa is a managing partner and owner of Spring Creek.[4] On or about June 22, 2015, plaintiff signed an "Employer and Wage Acknowledgment" form, which states that her employer is Prompt Nursing and that her pay is $29.00 per hour.

Plaintiff quit her job on March 7, 2016. Defendant Prompt Nursing then sued plaintiff and two other Filipino nurses to enforce the $25,000 liquidated damages provision in their contracts and for $250,000 from each for tortious interference with contract and prospective business relations, and an additional $250,000 from each in punitive damages. Those lawsuits were voluntarily dismissed after plaintiff filed this action.

---

[4] Landa owns approximately 48 percent of Spring Creek, and Philipson, or his wife, owns approximately 38 percent.

**B.    Legal Actions Directed at Other Nurses**

Plaintiff has presented evidence concerning past legal actions taken by defendants against Filipino nurses. Defendants acknowledge that these actions occurred, but they dispute their responsibility. The events are recounted in detail in other judicial opinions, including one case— *Anilao v. Spota*, 774 F. Supp. 2d 457 (E.D.N.Y. 2011)—which is ongoing in this district. *See Matter of Vinluan v. Doyle,* 60 A.D.3d 237, 240 (2d Dep't 2009); *SentosaCare LLC v. Anilao*, Index No. 6079/2006 (Sup. Ct. Nassau Cty. May 20, 2010) (hereafter *"Anilao*, Order").

Briefly, in April 2006, ten nurses recruited by Sentosa Agency in the Philippines resigned from their jobs at nursing homes in New York. Following these resignations, an administrator at one of the nursing homes alerted the New York State Education Department ("Education Department") that the nurses had abandoned their patients by simultaneously resigning without adequate notice. After an investigation, the Education Department took no action against the nurses.

Subsequently, defendants Philipson and Landa met with the Suffolk County District Attorney on May 31, 2006. In March 2007, a Suffolk County grand jury indicted the ten nurses and their attorney for conspiracy to endanger the welfare of a child and endangering the welfare of a physically disabled person. The nurses and the attorney sought a writ of prohibition to stop the criminal proceeding. The Appellate Division, Second Department, granted the writ, declining to find that "this is such an 'extreme case' that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer." *Vinluan*, 60 A.D.3d at 249. The court further held that "the prosecution impermissibly violates

[the attorney's] constitutionally protected rights of expression and association in violation of the First and Fourteenth Amendments." *Id.* at 250.

During the period from 2006 through 2008, defendants Sentosacare, Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate, and other nursing homes owned by defendants brought a series of civil suits against more than 30 Filipino nurses in attempts to enforce the liquidated damages provision. In one decision related to those lawsuits, the New York State Supreme Court, Nassau County, found that "the liquidated damages provision at issue is unenforceable as damages flowing from any proven breach by defendant Nurses will easily be ascertained at trial." *Anilao*, Order at 6.

Additional relevant undisputed facts not discussed here will be addressed in the discussion section below.

## II.    Discussion

### A.    Legal Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the nonmoving party must "come forward with

specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. Where, as here, both parties move for summary judgment, the court need not "grant judgment as a matter of law for one side or the other." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

### B. Plaintiffs' Breach of Contract Claim

Both sides move for summary judgment on plaintiffs' breach of contract claim against defendants Prompt Nursing, Rubenstein, Landa, and Philipson. The named plaintiff claims she was owed more than $29.00 per hour under the contract and that she was to be paid a base salary as opposed to an hourly wage. In order to recover for breach of contract, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *Javier v. Beck*, 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).

"Under New York law . . . the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 459 (1957)).

If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions . . . ." *Id.* (citations omitted).

As stated above, the contract's relevant wage provision provides:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). "Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as provided in Article IV." Contract III.

Neither party argues that the contract is ambiguous. Defendants urge me to find that the phrase "as determined by National Prevailing Wage and Helpdesk Center" refers to the prevailing wage determination provided to plaintiff in 2007. They also note that, under the contract, plaintiff was entitled to only $12.00 per hour for her first four weeks of employment and argue that the contract's inclusion of the phrase "[a]s of the Commencement Date" is meant only to indicate

when this initial four-week period ends. Plaintiff argues that defendants' interpretation is contrary to the contract's plain language and that the contract requires that plaintiff be paid the prevailing wage as of the Commencement Date. In 2007, the hourly prevailing wage was $26.87. The parties agree that, when plaintiff began working for Prompt Nursing in 2015, the prevailing wage exceeded this amount.

The contract is unambiguous. I also find that defendants' interpretation is at odds with the contract's plain language and must be rejected. The phrase "prevailing wage" refers to the prevailing wage as of the Commencement Date. There is nothing in the text of the contract to suggest that the phrase "as determined by National Prevailing Wage and Helpdesk Center" is meant to refer to the prevailing wage determination that was made almost a decade prior to the Commencement Date. Even if one purpose for the inclusion of the phrase "[a]s of the Commencement Date" was to indicate when the initial four-week period ends, the meaning of the text is unchanged.

Defendants argue that the holding in *Rosales v. Hispanic Emp. Leasing Program, LLC*, 2008 U.S. Dist. LEXIS 96417, at *4–6 (W.D. Mich. Nov. 26, 2008), must be treated "as part of the contract 'as though it were expressed or referred to therein.'" Defs.' Reply at 11. That decision, of course, is not binding on this court, and there is no sound basis for treating it as part of the contract. Moreover, the *Rosales* court was not addressing the issue presented here. In *Rosales*, the court held that the employer was obligated to pay the prevailing wage previously calculated by the government and not the prevailing wage in effect when the employees began working. There is no indication that the *Rosales* court was asked to interpret a contract that provides for payment of the prevailing wage as of the employee's Commencement Date.

Alternatively, defendants argue that I should reject plaintiff's interpretation because it undermines the protections given United States workers under 8 U.S.C. § 1182(a)(5)(A) and 20 C.F.R. § 656.21. But defendants have failed to convince me that an interpretation that requires defendants to pay their employees the prevailing wage "[a]s of the Commencement Date" undermines the policies underlying these provisions.

Defendants also make much of the letter affixed to plaintiff's contract, which states that she was to be paid $29.00 per hour; they argue that it should be treated as the "first page" of the contract. Whether multiple writings should be construed as one agreement depends on the intent of the parties. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'" *Id.*

Here, the letter is plainly not part of the contract. According to Philipson, the letter was created for the purpose of confirming that a job was still available. Philipson Declaration, ¶ 9. Therefore, it did not share the "same purpose" as the contract. *TVT Records*, 412 F.3d at 89. The letter is from Landa to the U.S. Embassy in Manila, was signed by Landa a week prior to the contract's execution and, unlike each of the 10 pages of the contract, was not signed by plaintiff. Although "the fact that the two documents at issue here were not executed at the same time or by the same parties is not dispositive, this fact does weigh against a conclusion that the documents were intended to be read together as a single contract." *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 279 (S.D.N.Y. 2012), *aff'd*, 513 F. App'x 75 (2d Cir. 2013) (citations omitted). While it is typically a fact issue whether multiple writings should be construed as one agreement, the

question is a matter of law if, as here, "the documents in question reflect no ambiguity as to whether they should be read as a single contract." *TVT Records*, 412 F.3d at 89.

Defendants contend that *Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc.*, 26 A.D.2d 481, 484 (1st Dep't 1966), *aff'd*, 20 N.Y.2d 871 (1967), requires me to treat the letter as part of the contract because "letters and other instruments may be construed as part of a contract where they are referred to therein or annexed thereto." *Id.* However, that case held that "[t]he purpose of a written agreement must be ascertained from the instrument itself, if it is possible to do so . . . ." *Id.* (internal quotation marks omitted). Here, I can do just that: the contract is straightforward, and defendants may not introduce parol evidence, such as the letter, to "*create* an ambiguity in the agreement" that is otherwise unambiguous. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (emphasis in original).

Notably, the contract's integration clause provides that the contract "supersedes all previous employment contracts and *constitutes the entire agreement* between the parties," Contract VIII (7) (emphasis added), and Section VIII (3) states that any amendments are to be "in writing and executed in multiple copies." In sum, I decline to treat the letter as part of the contract.

I further reject defendants' argument that plaintiff ratified the contents of the April 15 letter through her subsequent conduct. In support of this argument, defendants rely on a wage acknowledgment form that plaintiff signed, which states that her hourly pay is $29.00 per hour, as well as plaintiff's deposition testimony, where she stated that she understood that the letter was an offer to be paid $29.00 per hour pursuant to the contract, and that the contract was for $29.00 when she signed it.

The cases that defendants rely on discuss whether a party has ratified the contract such that it may no longer assert claims for fraud and fraudulent inducement, *Sotheby's Fin. Servs., Inc. v.*

*Baran*, 2003 WL 21756126, at *5–6 (S.D.N.Y. July 29, 2003), *aff'd*, 107 F. App'x 235 (2d Cir. 2004), or that a deed was forged, *Cashel v. Cashel*, 94 A.D.3d 684, 686–687 (2d Dep't 2012), or that the principal did not authorize its agent to enter into the contract, *Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*, 286 A.D.2d 118, 126–129 (1st Dep't 2001). In other words, these cases focus on parties' attempts to be relieved from contractual obligations.

Here, plaintiff is not attempting to disavow or dispute the contract. Rather, relying on the contract's clear language, she asserts that the defendants breached by failing to pay her the prevailing wage and a base salary. Plaintiff should not be faulted for initially accepting defendants' representation that the $29.00 hourly rate was in fact the prevailing wage. Indeed, she testified that she learned the prevailing wage was higher than $29.00 per hour only after she came to New York and spoke to her colleagues, which was after she had signed the wage acknowledgment form.

Finally, defendants assert that plaintiff has provided no basis for her claim that she was to be paid a base salary as opposed to an hourly wage. To the contrary, plaintiff has provided a basis: the contract's clear language. As noted above, the contract states that, "[a]s of the Commencement Date, Employee will be paid a *base salary* in accordance with the prevailing wage for the geographic area in which the employee is assigned to work . . . ." Contract IV (1) (emphasis added). In light of the contract's unambiguous text, no further support is needed. Defendants also assert that plaintiff has failed to satisfy the damages element of her breach of contract claim and argue that she was actually overpaid. Plaintiff has submitted a summary pursuant to Federal Rule of Evidence 1006 depicting the difference between what each class member was paid and what each is owed if paid the prevailing wage as of their Commencement Date and a base salary. This document is sufficient to show that damages accrued, and, because plaintiff was owed a base

salary, it is apparent that her damages exceed the amount by which defendants claim she was overpaid.

Based on these undisputed facts, I find that plaintiff has met the elements for her breach of contract claim. She has proven that a contract existed between her and defendant Prompt Nursing; that she performed under the contract; that Prompt Nursing breached the contract by failing to pay her the prevailing wage as of her Commencement Date and by failing to pay her a base salary; and that she was damaged. *See Javier*, 2014 WL 3058456, at *9.

As for the rest of the class, the provisions specifying the wage and defining "Commencement Date" are identical in each contract defendants produced at the class certification stage. Each contract references a base salary, and each was assigned to Prompt Nursing. It is undisputed that none of the class members was paid a base salary commensurate with the prevailing wage in effect as of his or her "Commencement Date." There is therefore no meaningful difference between the named plaintiff and the class as to each element of the breach of contract claim. Accordingly, class-wide liability has been established against Prompt Nursing for breach of contract.

### C.    Plaintiffs' Application to Find the Liquidated Damages Provision Unenforceable

Plaintiffs request a declaratory judgment finding the liquidated damages provision unenforceable. They also request that defendants be enjoined from attempting or threatening to enforce the liquidated damages provision or the confessions of judgment.

The question of whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties

at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement"; it will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977). Accordingly, "[a] provision that does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)).

"'New York courts will construe a purported liquidated damages provision strictly,' and 'where the damages flowing from a breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the stipulated sum will be treated as a penalty and disallowed.'" *Agerbrink*, 196 F. Supp. 3d at 417 (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004)). While the New York Court of Appeals has cautioned courts against interfering with liquidated damages provisions, if either of these factors is not satisfied, the provision will be deemed unenforceable. *Union Capital LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017). In doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages," and the party challenging the liquidated damages provision bears the burden of proving its unenforceability. *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169–170 (S.D.N.Y. 1990) (internal quotation marks omitted). Courts also often consider the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arms length "in determining whether one side is not exacting an unconscionable penalty." *Id.* at 172 (internal quotation marks omitted).

Here, the liquidated damages provision is a penalty. The contract required plaintiff to submit a confession of judgment, for an amount of $25,000 if she quit in her first year, that would be held by defendants during her employment term, and could be filed in the event that plaintiff terminated her contract early. Contract VII (4). Considering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing. This supports the conclusion that this provision is "intended to operate as a means to compel performance," ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms. *Rattigan*, 739 F. Supp. at 169; *see Perthou v. Stewart*, 243 F. Supp. 655, 658 (D. Or. 1965). Indeed, even though it is immaterial that the parties may describe the provision as a penalty, *Truck Rent–A–Ctr.*, 41 N.Y.2d at 425, the confession of judgment provision goes much further and outright states that its purpose is to "secure Employee's performance of the Employment Term," Contract VII (4). Furthermore, although New York courts are hesitant to invalidate such provisions when they are negotiated at arms length, here I agree with the Nassau County Supreme Court's assessment that the parties were of "unequal bargaining power" and that the contract was "not achieved through arms length negotiation." *Anilao*, Order at 6. Plaintiff was not represented by counsel when she executed the contract, and there is no evidence she had any familiarity with American contract law.[5]

Turning to the question of ascertainability, I agree with the Nassau County Supreme Court's conclusion that the liquidated damages provision is unenforceable because defendants'

---

[5] Other class members who were deposed indicated they were not represented by counsel when they signed their contracts or did not show the contract to a lawyer before signing.

damages were ascertainable. *See Anilao*, Order at 6.[6] The contract states that the liquidated

damages provision was implemented to reimburse defendants for several types of costs:

> the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area.

Contract VII (4).

Plaintiff signed a Declaration and Undertaking indicating that $3,685.50 in costs were

incurred on her behalf for lawyer's fees, filing fees, visa fees, ICHP visa screening fees,

miscellaneous expenses, and airfare. As demonstrated by this form, many of the costs listed in

Section VII (4) of the contract were tracked, easy to determine, and could be ascertained at the

time the contract was entered into. Upon arrival in New York, defendants gave plaintiff temporary

housing for two months. The apartment's monthly rent was $1,500 per month, totaling $375 per

nurse living there. Thus, the total cost of plaintiff's housing was $750—one could not reasonably

argue that this was unascertainable. Finally, the contract permitted defendants to recoup "further

orientation and 'hands on' training costs"[7] by initially only paying plaintiff $12 per hour for her

first four weeks on the job, which invites the question why liquidated damages would be needed

to account for training and orientation costs in the first place. Contract IV (2). In light of

---

[6] Defendants argue that the *Anilao* decision does not have res judicata effect because the case settled before trial, and in the same decision, the court denied the nurses' motion for summary judgment. Plaintiff has not argued that the decision constitutes res judicata, and I do not rely on it as such.

[7] Although the contract refers to "further" orientation and training, there is no evidence, and defendants do not argue, that any training or orientation occurred prior to the nurse beginning work in the United States. As with each provision discussed above, the provision concerning "further" orientation and training is in each contract, but several contracts specify that the applicable minimum wage would be paid as opposed to $12.00 per hour.

defendants' extensive experience in this business, it is simply not possible that any of these costs would be difficult or impossible to determine from one nursing contract to the next. *See, e.g.,* Philipson Deposition ("Dep.") at 9–10 (stating that he first went to the Philippines to recruit nurses around 2000 and has been there "many" times).

In order to demonstrate that the liquidated damages provision is proportional to their probable loss, defendants offer the expert testimony of Michael Kupka. Kupka is the Managing Director of the Forensic Accounting and Dispute Resolution Department of Mazars USA LLP's New York location. He has more than 17 years of experience in public and forensic accounting. He is a certified public accountant, accredited in business evaluation and financial forensics, a certified fraud examiner, and a certified valuation analyst. Kupka concludes that, as to the named plaintiff, Golden Gate's potential damages are up to $26,182 in recruiting costs and up to $114,114 in increased operating costs, and that Prompt Nursing's damages can be measured as either $26,182 in recruiting costs or $35,951 in lost profits. Kupka Report ("Rep.") at 13.

Rule 56(e) requires that affidavits submitted on summary judgment "set forth such facts as would be admissible in evidence." "Therefore 'it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment,' and the trial court need only consider admissible evidence in ruling on a summary judgment motion." *Cibbarelli v. Bombardier, Inc.*, 2004 WL 3090594, at *3 (E.D.N.Y. Sept. 3, 2004) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). An expert's assumptions "based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001). Here, Kupka's opinion lacks a proper evidentiary basis and is therefore unreliable.

First, Kupka assumed that Golden Gate incurred direct recruiting costs, and used that as a basis for calculating Golden Gate's potential damages of $26,182. Kupka Rep. at 3; Kupka Dep. at 15. This assumption, however, is belied by Philipson's testimony that the nursing home does not pay anything towards the cost of recruiting. Defendants argue that Golden Gate, and Prompt Nursing, once it was assigned the contract, were responsible for paying recruitments costs that were expended by other entities. But when asked about the costs listed in the Declaration and Undertaking, Kupka admitted that he did not see any documents stating that "Golden Gate was responsible for any of" those expenses and that his basis for believing that Golden Gate paid for or was responsible for these costs "was communicated to [him] as part of the underlying facts of this case" by counsel. Kupka Dep. at 18–20. Similarly, Kupka stated that his assumption that Golden Gate was responsible for costs associated with sponsoring nurses' visa status was based on "discussions with the counsel" and "[a]n employment agreement that was signed by Golden Gate," but admitted that he has not "seen any evidence that Golden Gate actually paid any" of these costs. *Id.* at 21–23. Nor does the "Documents and Information Considered" page in Kupka's

report reference any documents purporting to show that Golden Gate reimbursed other entities for recruitment costs. Kupka Rep., Attachment 3; *see Supply & Bldg. Co.*, 2001 WL 1602976, at *5 (excluding expert testimony when expert's opinion was based on client's assurances that were contradicted by other evidence).

Furthermore, Kupka reached the $26,182 recruiting costs figure by assuming that Prompt Nursing incurred a variety of costs related to recruitment in 2015, including but not limited to, $388,510 for office expenses, $105,225 for auto and travel expenses, and $97,352 for licenses and permits, for a total of $864,373. Kupka Dep. at 50–57. Kupka determined the average cost of recruiting a nurse in 2015 was $26,182 by rounding down the recruiting costs to $864,000, and then dividing by 33, the number of nurses that were recruited in that year. Kupka Rep. at 11. The figures Kupka relied on, however, were solely derived from a one-page summary that was provided by defendants' counsel that Kupka refers to as a "Profit and Loss Statement" for Prompt Nursing.[8]

Kupka, at his deposition, revealed that he knew little about the numbers listed in this one-page summary. Kupka did not know where the numbers came from, who created the document, when it was created, or why it was created. For the "general and administrative" expenses, Kupka did not know the specifics of what is included in each number listed (such as what is included in office expenses). Kupka Dep. at 50–89. Kupka did not know whether the summary was created in the ordinary course of business or whether it was created specifically for this lawsuit. *Id.* at 48. When asked whether a specific cost, such as "Maintenance" costs, constituted all of Prompt Nursing's "Maintenance" costs (as it seems), or just its "Maintenance" costs allocated to

---

[8] Kupka, however, admitted that this document does not show income or losses and that it could be argued that Profit and Loss Statement is "not the best description of this document." Kupka Dep. at 47–49.

recruitment, Kupka either stated that he did not know, or that he assumed the cost was only related to recruitment because the document's header says recruitment costs and because that is what defendants' attorneys told him. *Id.* at 50–89. Other than defendant Rubenstein, Kupka never spoke with anyone at Prompt Nursing about its recruitment costs. *Id.* at 10.

Similarly, regarding Golden Gate's increased operating costs of up to $114,114, Kupka determined that number by assuming that Golden Gate would have to pay $52.20 per hour for a permanent replacement nurse from a third-party staffing agency for the remainder of plaintiff's contract term, or approximately 27 months. Kupka Report at 3; Kupka Dep. at 32, 36–37. The $52.20 figure is based solely on a redacted invoice provided to Kupka by defendants' counsel for a staffing agency nurse in 2015 addressed to Sentosacare. Kupka's assumption that "defendants could not simply replace one sponsored nurse from the Philippines with another" was based on his understanding of the facts of the case presented to him by counsel for defendants and "[his] understanding of the overall industry." Kupka Dep. at 28–32. When asked about the sources that informed his understanding of the industry, Kupka referenced only "articles I have read, just to familiarize myself with the overall state of the industry," and stated that he did not list these in his report because "[i]t's general information that I obtained with no specific documents that I could list as part of the research." *Id.*

Like the recruiting cost summary, Kupka knew little about this invoice and the nurse referenced in it. For example, he did not know how many years of experience she had, whether she was assigned to work at Golden Gate, whether she worked on a temporary or permanent basis, whether she was a staff or supervising nurse, what shift she worked, and whether she was paid a shift differential. *Id.* at 37–40. He did not know why the invoice says Sentosacare on it or whether Sentosacare or Golden Gate paid the amount owed. *Id.* at 40. Kupka also did not know, and did

21

not ask, who actually replaced plaintiff at Spring Creek when she resigned from Prompt Nursing, what Spring Creek did to find a replacement for her, how long it took Spring Creek and Prompt Nursing to find a replacement, whether Prompt Nursing ever found a replacement for her, whether she was replaced with a sponsored nurse, a nurse from an agency, or a nurse from Prompt Nursing. *Id.* at 33–36. Kupka never reviewed any Golden Gate documents. *Id.* at 16. Kupka never asked anyone from Golden Gate whether they would in fact need to find a permanent replacement for plaintiff from a staffing agency; his assumption that Golden Gate would face increased operating costs was based on his "discussions with the counsel." *Id.* at 11, 32.

Courts have excluded expert testimony when it is based "on the conclusory statements of [the expert's client], and not on his independent evaluation of the facts." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (quoting *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986)). "[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003). Moreover, "[a]n expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge." *Arista Records LLC v. Usenet.com*, Inc., 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009). Here, Kupka's failure to base his recruiting costs and increased operating costs analysis on his own "independent evaluation," but rather on a one-page summary, an invoice, untested and contradicted facts provided by defense counsel, and a discussion with one of the defendants in this action, makes his testimony unreliable and does not assist the trier of fact.

*CIT Grp*, 815 F. Supp. 2d at 677 (quoting *Argus*, 612 F. Supp. at 926). Kupka's expert opinion is therefore inadmissible.[9]

For this reason, I decline to consider the damages provided in defendants' expert report in my assessment of the liquidated damages provision, which is present in each class member's contract. I also decline to consider defendants' declarations concerning these damages, all of one of which was submitted on reply, that essentially restate and comment upon the analysis provided in the Kupka report, and fail to provide a sufficient evidentiary basis for concluding what their costs were. Given that the record contains admissible evidence of only $4,435.50[10] in damages, which plaintiff has demonstrated were ascertainable at the time of the contract, it is evident that the liquidated damages provision does not bear "a reasonable proportion to the probable loss" and is an unenforceable penalty. *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425. Because each class member's contract contains the same liquidated damages provision, this conclusion applies across all contracts.

---

[9] In addition, the section of Kupka's report concerning lost profits is irrelevant. "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Here, Kupka's analysis is based on Prompt Nursing's losses in relation to its nursing home clients, and is therefore properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989). There is no evidence that any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed. *Id*; *see also Valentine Dolls, Inc. v. McMillan*, 25 Misc. 2d 551 (Sup. Ct. Kings Cty. 1960) (holding that lost profits are not recoverable in a breach of contract action against an employee). Therefore, even if Kupka's testimony were admissible, I would still not consider his lost profits analysis.

[10] This figure is comprised of the amounts listed in the Declaration and Undertaking together with plaintiff's rent.

Prompt Nursing's counterclaim for breach of contract against the named plaintiff is therefore limited to "actual damages proven." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (internal quotation marks omitted).

### D. Plaintiffs' Requested Declaratory and Injunctive Relief

In order to be entitled to a declaratory judgment, a plaintiff must demonstrate that there is "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) (internal quotation marks omitted). Further, in deciding whether to entertain a declaratory judgment action, district courts should ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Here, there is a substantial controversy concerning whether plaintiff and the other class members may be sued under their contracts' liquidated damages provisions for resigning prior to the end of their contract terms. And a decision regarding plaintiffs' requested declaratory relief will serve the useful purpose of finalizing this aspect of the parties' dispute.

Having found the provision to be a penalty, I therefore grant plaintiffs' requested declaratory relief. The liquidated damages provision and confessions of judgment will be declared unenforceable, and defendants will be enjoined from attempting or threatening to enforce either.

### E.    Piercing the Corporate Veil

Because defendants Rubenstein, Philipson, and Landa[11] were not signatories to the contract, plaintiffs seek to hold these individual defendants liable for breach of contract by piercing the corporate veil of Prompt Nursing.[12] Under New York law, a non-signatory to the contract may be held liable for breach of contract where the plaintiff demonstrates "that the non-signatory was the 'alter ego' of one or more of the signatories to the contract." *Kaliner v. Mt. Vernon Monetary Mgmt. Corp.*, 2008 WL 4127767, at *2 (S.D.N.Y. Sept. 3, 2008). In order to pierce the corporate veil, plaintiff must demonstrate "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (internal quotation marks omitted). In determining whether complete control exists, courts have considered the following factors, none of which is decisive:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

---

[11] Landa signed the contract as a representative of Golden Gate, and not in his personal capacity.

[12] LLC veil-piercing is permitted under New York law. *Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209, 210 (N.Y. 2005).

Plaintiffs argue that Prompt Nursing is a corporate shell used by defendants to harm Filipino nurses, including by paying them less than what is owed under their contracts, using an unenforceable liquidated damages provision to secure their employment, and suing them for the liquidated damages amount. Prompt Nursing does business as Sentosa Services and the other non-individual defendants (other than the nursing homes Golden Gate and Spring Creek) all bear the same Sentosa name. Plaintiffs argue that this arrangement was created so that nurses would view the Sentosa companies as a single, integrated corporate enterprise. When the nurses want to pursue legal action against defendants, however, defendants insist that Prompt Nursing is an entirely separate entity. Plaintiffs contend that this arrangement benefited defendants Rubenstein, Philipson, and Landa and nursing homes, such as Spring Creek and Golden Gate, owned by Philipson, Landa, or Philipson's wife.

The deposition testimony supports the conclusion that Prompt Nursing, which is owned by Rubenstein, did not adhere to corporate formalities and that dealings between Prompt Nursing and its nursing home clients were not conducted at arms length. Philipson travels to the Philippines to recruit nurses. When asked who pays for his trips to the Philippines to recruit nurses, Philipson stated that "[s]ometimes the nursing homes would pay for it, at times Prompt Nursing recruitment -- I don't recall, Prompt something, would have paid for it." Philipson Dep. at 14. He later clarified that initially the nursing homes paid for his trips, but once Prompt Nursing came into existence, only Prompt Nursing would. *Id.* When asked how Prompt Nursing would pay for his travel expenses, Philipson said that there was "no set specific way," and that he may be reimbursed by Prompt Nursing, or Prompt Nursing would pay his expenses in advance. *Id.* at 15.

Rubenstein testified that Prompt Nursing pays Sentosa Agency for all "expenses for the recruitment [of the nurse]" as part of the responsibilities it takes on when it assumes the nurse's

contract. Rubenstein Dep. at 86. He also stated that Prompt Nursing reimburses Sentosa Agency for its personnel and office expenses. *Id.* at 89–90. Prompt Nursing pays Sentosa Agency by wire after it receives an invoice, but only sometimes keeps a record of the payment. *Id.* Similarly, Prompt Nursing's nursing home clients pay Prompt Nursing for its services, but there is no written agreement "on what those payments are." *Id.* at 91. Rather, the amount Prompt Nursing will charge is negotiated between Philipson and Rubenstein, and nothing is put in writing. *Id.* Rubenstein stated that Prompt Nursing does not engage in any nurse recruiting, but did not know why his email address appears on letters to the U.S. Embassy. *Id.* at 12, 92.

Rubenstein testified that all of the nursing contracts produced by defendants in this action were assigned to Prompt Nursing. *Id.* at 27–83. He also testified that, for all but one of the contracts,[13] assignment negotiations occurred between him, negotiating on behalf of Prompt Nursing, and Philipson, negotiating on behalf of the nursing home. *Id.* at 27–83. Landa is also authorized to enter into a general agreement to assign nurse contracts to Prompt Nursing. Philipson Dep. at 16–17. When asked if there were any contracts with Filipino nurses that Golden Gate did not assign to Prompt Nursing, Philipson stated that "I would have to check my records," and "I wouldn't know. Sitting here, I would not be able to tell you." *Id.* at 18. No evidence has been presented that Prompt Nursing provides nurses to nursing homes other than those affiliated with defendants, or that the nursing homes affiliated with defendants assign contracts to staffing agencies other than Prompt Nursing.

---

[13] As to this one contract, which was between nurse Robin Ancheta and Immediate Home Care, Rubenstein could not recall who negotiated on behalf of the nursing home. At the time this contract was assigned, Rubenstein was a managing partner of Immediate Home Care. Rubenstein Dep. at 56–57.

When it receives a nurse's contract by assignment, Prompt Nursing never pays anything for the assignment. *Id.* at 18–19. There is never a written record of the assignment, and Philipson testified that he did not think there is ever a record of the date of the assignment. *Id.* at 19.

Rubenstein's deposition also indicates that he directed Prompt Nursing's wrongful conduct. Regarding the unenforceable penalty provision that Prompt Nursing used to secure nurses' employment, Rubenstein stated that he selected[14] the liquidated damages amounts himself based on "costs of business," stating that "I went over the numbers and it made sense," and "[i]t costs Prompt Nursing a lot of money to run the business, and based on my calculations, this is an estimated number that's what I feel is the damages." Rubenstein Dep. at 37–39. Rubenstein does not recall whether any nurses ever directly paid him the liquidated damages amount after resigning, and he does not know whether Prompt Nursing has records of any of those payments. *Id.* at 92–94. When asked how Prompt Nursing determined what to pay a particular nurse under her employment contract, Rubenstein stated that "we based" the wage on the prevailing wage determination that was issued in 2007, and that Prompt Nursing did not calculate what the appropriate prevailing wage was for the contract. *Id.* at 41–42. As for the lawsuits Prompt Nursing brought against the nurses who resigned in 2016, Rubenstein testified to the facts that he believes support Prompt Nursing's tortious interference claims: he discussed how the nurses were threatening to leave, and, "being in the business for a while," he could tell that "this was a coordinated effort" that was being instigated by the three nurses who resigned. *Id.* at 95–101.

Defendants have offered no evidence to rebut plaintiff's claim that Prompt Nursing's corporate veil should be pierced. They merely make a conclusory statement that each corporate

---

[14] Philipson testified that he was also involved in calculating the liquidated damages amounts. Philipson Dep. at 43–44.

defendant operates separately and maintains corporate formalities. Most importantly, defendants have offered no explanation as to why the nurses' contracts were assigned, seemingly gratuitously,[15] to Prompt Nursing without any documentation or payment. *Freeman*, 119 F.3d at 1053 (listing corporations' failure to deal at arms length as a corporate control factor).

The critical question in any veil piercing analysis is "whether the corporation is a 'shell' being used by the individual shareowners to advance their own 'purely personal rather than corporate ends.'" *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Here, I am satisfied that Prompt Nursing is just that, a shell used to carry out defendants' scheme of paying nurses less than they are owed, using an unenforceable liquidated damages provision to secure the nurses employment, and suing those nurses who quit for the liquidated damages amount. By assigning the nurses' contracts to Prompt Nursing, defendants were able to carry out this scheme while simultaneously protecting themselves, and the other nursing homes affiliated with defendants, from liability arising from these activities.

While it is apparent that this scheme benefitted all defendants, I find that only Rubenstein, as the owner of Prompt Nursing, exercised sufficient control over the company to be held liable. As for Philipson and Landa—who assign and have the authority to assign nurse contracts to Prompt Nursing—it is apparent that they participated in this scheme. But they are unaffiliated with Prompt Nursing[16] and their dealings with Prompt Nursing were on behalf of other corporate entities. Plaintiffs have failed to prove that Philipson and Landa sufficiently dominated Prompt Nursing

---

[15] Defendants argue that there was consideration for these assignments because Prompt Nursing assumed all liabilities and responsibilities under the contract. Defs.' Mot. at 7. This does not explain the purpose of this arrangement and why its existence was never documented.

[16] No evidence has been presented indicating that either Philipson or Landa have an ownership interest in Prompt Nursing.

such that they may be held liable as "equitable owners" of the company. *Freeman*, 119 F.3d at 1051. Therefore, Prompt Nursing's veil may be pierced only to reach Rubenstein, the actual owner of the company.

Based on the undisputed facts, plaintiffs' summary judgment motion to pierce the corporate veil is granted as to Rubenstein but denied as to the other individual defendants. Defendants' summary judgment motion on the veil piercing issue is denied as to Rubenstein but granted as to Philipson and Landa. In light of my finding class-wide liability on the breach of contract claim, both Prompt Nursing and Rubenstein are liable for breach of contract damages owed to the class.

**F. TVPA Claims**

Both sides move for summary judgment on plaintiffs' claims brought under 18 U.S.C. §§ 1589 *et seq.*

**1.    18 U.S.C. § 1589(a)**

TVPA § 1589 prohibits obtaining the labor or services of a person by using:

> (1) "force, threats of force, physical restraint, or threats of physical restraint," (2) "serious harm or threats of serious harm," (3) "the abuse or threatened abuse of law or legal process," or (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person would suffer serious harm or physical restraint."

18 U.S.C. § 1589(a). Congress enacted § 1589 in response to the Supreme Court's holding in *United States v. Kozminski*, 487 U.S. 931 (1988), which limited the definition of involuntary servitude to "physical" or "legal" coercion. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting *Kozminski*, 487 U.S. at 952). Through § 1589, Congress "intended to provide federal prosecutors with the tools to combat severe forms of worker exploitation" and to address situations in which "traffickers threaten harm to third persons" or "restrain their victims without physical violence," all while taking into account "the individual circumstances of [the] victim[ ]...

including [ ] age and background." *Paguirigan*, 286 F. Supp. 3d at 438–439 (quoting H.R. Conf. Rep. No. 106–939, at 101) (internal quotation marks omitted).

Here, plaintiffs contend that defendants violated § 1589(a) in two ways. First, plaintiffs argue that defendants' conduct constituted a threat of "serious harm" under § 1589(a)(2). TVPA § 1589(c)(2), which defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA, states:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

Thus, the relevant question under § 1589(a)(2) is whether defendants' conduct constituted a threat of harm serious enough to "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." As articulated by the Second Circuit in *United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015), this standard is a hybrid one. The factfinder is permitted to consider the "particular vulnerabilities of a person in the victim's position," but is required to find that "her acquiescence be objectively reasonable under the circumstances." *Id.* at 186–187; *see Hongxia Wang v. Enlander*, 2018 WL 1276854, at *5 (S.D.N.Y. Mar. 6, 2018). In the class action context, "the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011).

Second, plaintiff argues that defendants' actions constituted "abuse or threatened abuse of law or legal process" under § 1589(a)(3). That phrase is further defined as "the use or threatened

use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." § 1589(c)(1).

Plaintiff relies on the following actions by defendants to support her claims under TVPA §§ 1589(a)(2) and (a)(3): The inclusion of a $25,000 liquidated damages provision in each contract; defendants' filing of lawsuits to enforce the $25,000 liquidated damages provision against nurses who resigned, including lawsuits in 2016 that included claims for $250,000 in tortious interference with contract and business relations damages, despite the liquidated damages provision having been found unenforceable by the Nassau County Supreme Court in 2010; the filing of a professional disciplinary complaint against 10 nurses who resigned in 2006 that resulted in no action against the nurses; Philipson and Landa's meeting with the Suffolk County District Attorney, followed by the prosecution of those same 10 nurses and their attorney. Defendants make multiple arguments as to why the TVPA's prohibitions are inapposite here. Each will be discussed in turn.

Defendants first correctly note that plaintiff, as well as several other nurses, testified that they were never verbally threatened by defendants. Paguirigan Dep. at 26–31, 404; Valdez Dep. at 83, 104–105; Bane Dep. at 61–62, 99; Padernal Dep. at 74. That fact alone, however, is insufficient to avoid TVPA liability, as the statute applies to subtle, nonviolent threats that may still effectively compel an individual to keep working. *See Dann*, 652 F.3d at 1169.

Second, defendants argue that, because the liquidated damages provision is not a penalty, their efforts to enforce the provision constituted a valid exercise of their contractual rights, and therefore cannot give rise to liability under the TVPA. In support, defendants rely on *Panwar v. Access Therapies*, Inc., 2015 U.S. Dist. LEXIS 38117, at *8–15 (S.D. Ind. Mar. 25, 2015), which

found that defendants' efforts to enforce a liquidated damages provision that was valid under Indiana law did not give rise to TVPA liability. Since I have already found the provision to be unenforceable as a penalty under New York law, this argument fails.

In a similar vein, defendants argue that plaintiff is essentially claiming that her labor was obtained through economic duress, and they make several arguments as to why economic duress is not applicable in this context. But plaintiff is not arguing that she was subjected to economic duress. Economic duress is typically used to void a contract on the ground that "the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will." *Stewart M. Muller Constr. Co. v. New York Tel. Co.*, 40 N.Y.2d 955, 956 (1976). Here, plaintiff is not seeking to void or disavow the contract. Economic duress is simply not in issue.

Defendants' reference to 20 C.F.R. § 655.731(c)(10)(i)(B), which states that "the employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to an agreed date," is similarly misplaced. First, the visas at issue in this lawsuit are not H-1B visas, but EB-3 visas. Second, of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts. The provision at issue here, however, is a penalty under New York law, and 20 C.F.R. § 655.731(c)(10)(i)(A) explicitly provides that the "employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date."

Defendants also make much of the named plaintiff's and other class members' deposition testimony, and argue that it supports their argument that the liquidated damages provision did not amount to a "threat of serious harm." For example, class member Padernal testified that she entered into the contract with the intent to work only for the first two years of her contract because

33

the remaining payment of $8,000 was "affordable to [her]," Paderand Dep. 58, and Paguirigan

testified that she entered into the contract knowing she would have to pay a penalty if she

terminated her contract early, Paguirigan Dep. at 166–167. Paderand also stated that she viewed

working for Sentosa as a stepping-stone; class member Bane stated that his ultimate goal was to

come to America. Paderand Dep. at 94–95; Bane Dep. at 32.

Defendants misapprehend the serious harm requirement. As noted above, the serious harm

requirement asks whether a reasonable person "of the same background and in the same

circumstances" would "perform or . . . continue performing labor or services in order to avoid

incurring that harm." One nurse's testimony that she could afford $8,000 by no means establishes

how a reasonable person would respond to the $25,000 penalty during the first year of work.

Section 1589 was designed to combat "severe forms of worker exploitation" that do not amount to

actual involuntary servitude. *Paguirigan*, 286 F. Supp. 3d at 437. An employee's prior awareness

of the harm does not make a defendant's actions, if indeed in violation of the TVPA, any less

exploitative. Nor does a nurse's desire to come to the United States, or that he or she viewed the

job as a stepping stone, give an employer license to subject him or her to unlawful work conditions

in violation of the TVPA.[17]

Moreover, defendants' references to the record omit several notable statements by plaintiff.

Plaintiff stated during her deposition that the liquidated damages provision "is the reason why we

were not able to leave or we are scared. We have that fear because we don't have that ability to

---

[17] Defendants also point out that several nurses were aware of the "2007 incident," presumably referring to the administrative complaint, the attempted prosecution, or the civil suits for breach of contract defendants filed against the nurses, through news reports in the Philippines, yet entered into their contracts anyway. Defs.' Mot. at 12. This argument fails for the same reasons as the others addressed above.

pay the $25,000." Paguirigan Dep. at 354. She also stated that she quit because she was working "in the unsafe environment" due to understaffing, such that she felt she was putting "my professional license at stake . . . if I continue working," and because of fear she felt from being "trapped because I'm thinking about the contract which says that there's the provision of the $25,000 to be paid or I will be penalized with the $25,000 if I just leave." Paguirigan Dep. at 26–30.

Finally, defendants contend that plaintiff has not provided evidence of damages resulting specifically from the TVPA violations, so her TVPA claims must be dismissed. TVPA § 1595(a) provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . and may recover damages and reasonable attorneys fees." The statute has been interpreted to provide both compensatory damages, including compensation for emotional distress, and punitive damages. *See Ditullio v. Boehm*, 662 F.3d 1091, 1096–1098 (9th Cir. 2011); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457–458 (E.D. Va. 2015). Defendants offer no persuasive authority that a finding of TVPA liability requires a finding of damages. In any event, the record here sufficiently supports the existence of damages under the TVPA, and this argument therefore fails.

Having reviewed the record and considered the parties' arguments, I find on the undisputed facts that defendant Prompt Nursing violated TVPA § 1589(a)(2).[18] The nurses in this lawsuit were all recent arrivals from the Philippines. They were not paid the prevailing wage and a base salary, despite the terms of their contracts. Three of the nurses who were deposed complained of being overworked or that the nursing home was understaffed, and the fourth stated that he was

---

[18] Having found liability under § 1589(a)(2), I do not reach whether any defendant violated § 1589(a)(3).

unjustifiably suspended. Padernal Dep. at 51; Bane Dep. at 60–61; Paguirigan Dep. at 29; Valdez Dep. at 83. Paguirigan testified that "[w]e were just . . . fed the good side, but they never told us that you're going to work 16-hour shift, with less staff . . . ." Paguirigan Dep. at 146. Critically, if she or any nurse wanted to stop working for defendants during the first year of the contract, he or she would have had to pay the employer $25,000 pursuant to the liquidated damages provision. This provision constitutes a threat of sufficiently serious financial harm "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2). Indeed, the confession of judgment requirement, which is part of the liquidated damages provision, explicitly states that it is meant to "[s]ecure Employee's performance of the Employment Term." Contract VII (4). I also note that the $25,000 figure is larger than any sum threatened in the TVPA cases referenced by the parties. *See Dann*, 652 F.3d 1160 at 1171 (threat of $8,000 payment); *Javier*, 2014 WL 3058456, at *6 (threatened enforcement of $15,000 confession of judgment); *Nunag–Tanedo*, 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011) (threatened payment of $10,000); *Macolor v. Libiran*, 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016) ($20,000 liquidated damages provision that applied if plaintiff stopped working). In reaching my conclusion, I have considered the "particular vulnerabilities" of plaintiff and other class members—all of them recent immigrants to the United States—and have also focused on whether it would be objectively reasonable for them to continue working under the circumstances. *Rivera*, 799 F.3d at 186–187.

Regarding TVPA § 1589(a)'s scienter requirement, the statute contains an express scienter requirement, ("[w]hoever knowingly provides or obtains the labor or services of a person . . . ."), and one of its subsections, TVPA § 1589(a)(4), contains a second scienter requirement ("by means

of any scheme, plan, or pattern *intended* to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint . . . ."). 18 U.S.C. § 1589(a)(4) (emphasis added); *United States v. Calimlim*, 538 F.3d 706, 710–711 (7th Cir. 2008). As stated in *Muchira v. Al–Rawaf*,

> There must be evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work. The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment.

850 F.3d 605, 618 (4th Cir. 2017) (internal quotation marks and citations omitted). Here, the contract, of which Prompt Nursing was the assignee, explicitly states that the confession of judgment provision was meant "to secure Employee's performance of the Employment Term." Prompt Nursing also attempted to enforce the liquidated damages provision against plaintiff and two other nurses in 2016—in addition to suing for $250,000 in tortious interference damages— even though the liquidated damages provision had been found unenforceable in 2010 by the Nassau County Supreme Court. On these undisputed facts, it is apparent that Prompt Nursing acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing to work.

### 2. 18 U.S.C. § 1589(b)

Having found that Prompt Nursing violated TVPA § 1589(a), I also find on the undisputed facts that the remaining defendants are liable under TVPA § 1589(b). Section 1589(b) provides that "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such

means, shall be punished as provided in subsection (d)." As discussed above, Rubenstein is the owner of Prompt Nursing; Luyun is the sole proprietor of Sentosa Agency; Landa and Philipson co-own Sentosacare; Landa is an owner of Spring Creek and Golden Gate; and Philipson or his wife is an owner of Spring Creek.[19] Therefore, each defendant played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the United States to work at nursing homes affiliated with defendants. Thus, each defendant "knowingly benefit[ed]" financially from labor obtained in violation of TVPA § 1589(a).

Moreover, each defendant acted with "know[ledge] or in reckless disregard of the fact that the venture . . . engaged in the providing or obtaining of labor or services" through means prohibited by TVPA § 1589(a)—in this case, through the contracts' liquidated damages provisions. Indeed, defendants Philipson, Luyun, and Rubenstein all testified regarding their direct knowledge of the provision, and Landa signed the contract itself. Philipson Dep. at 43–44; Luyun Dep. at 55–60; Rubenstein Dep. at 36–40; Hahn Dec. Exh. H. The standard Golden Gate contract and the standard Spring Creek contract both contain the liquidated damages provision—as do all the contracts defendants produced. Thus, Golden Gate and Spring Creek knew of the provision.

As for Sentosa Agency, Luyun is the sole proprietor of Sentosa Agency, and the latter therefore has "no separate existence, but rather exists as the so-called 'alter ego' of the owner." *United Parcel Serv. of Am., Inc. v. Net, Inc.*, 225 F.R.D. 416, 421 (E.D.N.Y. 2005). As for Sentosacare, Landa and Philipson are the owners of the company, with each retaining a 50 percent ownership share. Philipson Dep. at 6–7. "As a general matter, knowledge that an agent acquires in the scope of his agency is imputed to the principal, meaning that the latter is bound by that

---

[19] For several of the nursing homes that Philipson was asked about in his deposition, he could not recall whether he or his wife has an ownership interest. Philipson Dep. at 9, 37.

information even if he never actually received it." *J.J.J. Properties Inc. v. Travelers Indem. Co.*, 2008 WL 2735865, at \*3 (S.D.N.Y. July 7, 2008).[20] Because there is no evidence that Landa or Philipson acted outside the scope of his agency, their knowledge as Sentosacare's sole owners may therefore be imputed to the company itself. *See also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (internal quotation marks omitted). In any event, both Sentosa Agency and Sentosacare operated with at least "reckless disregard" of the liquidated damages provision in light of their involvement in bringing nurses to the United States. 18 U.S.C. § 1589(b).

### 3. 18 U.S.C. § 1590(a)

TVPA §1590(a) extends liability to "any person who knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter . . . ." Defendants Luyun, Philipson, and Sentosa Agency "knowingly recruit[ed]" nurses to work in nursing homes; defendants Prompt Nursing, Sentosacare, Rubenstein, and Landa knowingly "provid[ed]" nurses to work in nursing homes[21]; and defendants Spring Creek and Golden Gate knowingly "obtain[ed]" nurses. Thus, each defendant knowingly recruited, provided,

---

[20] This general rule does not apply when the agent has "totally abandoned" the interests of the principal, an exception that is inapplicable here. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997).

[21] Prompt Nursing is a staffing agency that "provides" nursing homes with nurses. Landa is involved in the visa application process—he provided the letter addressed to the embassy for plaintiff's visa—and thus he also "provides" nursing homes with nurses. Sentosacare paid the costs listed on the Declaration and Undertaking that plaintiff signed, and thus it is also involved in "provid[ing]" nursing homes with nurses. Rubenstein, in addition to being the owner of Prompt Nursing, testified to his personal involvement in Prompt Nursing's business, as described earlier. He is therefore also involved in "provid[ing]" nursing homes with nurses.

or obtained persons "for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). The same undisputed facts regarding each defendant's role in this enterprise therefore support their liability under TVPA § 1590(a).

### 4. 18 U.S.C. § 1594(b)

Defendants have also violated TVPA § 1594(b), the conspiracy provision, which extends liability to whoever conspires with another to violate, *inter alia*, TVPA §§ 1589 and 1590.[22] For there to be a conspiracy, there must be an agreement to violate the prohibition on forced labor. *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014). There need not be proof of an explicit agreement, but the "evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (internal quotation marks omitted). As detailed above, on the undisputed facts, defendants "entered into a joint enterprise" for purposes of bringing nurses to the United States to work at nursing homes, including at defendants Spring Creek and Golden Gate, and violated TVPA §§ 1589 and 1590 in doing so. *Id.* Defendants acted with "consciousness of [the conspiracy's] general nature and extent," as each defendant was aware of the liquidated damages provision. *Id.* Thus, each defendant is liable under TVPA § 1594(b).

### G. Damages and Attorneys' Fees Under TVPA § 1595(a)

TVPA § 1595(a) provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action . . . in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." Because the liquidated damages provision is in each

---

[22] Having found that defendants violated §§ 1589 and 1590, there is no need to consider whether they are liable for attempt under § 1594(a).

contract, plaintiff has established class-wide liability under the TVPA against all defendants. And having found that the plaintiff and the rest of the class are entitled to damages under the TVPA, I also find that they are entitled to reasonable attorneys' fees. Class counsel may file a motion for fees at the conclusion of the case. Damages under the TVPA will be determined at a later time.

### H. Prompt Nursing's Breach of Contract Counterclaim Against the Named Plaintiff

The only remaining claim is Prompt Nursing's counterclaim against the named plaintiff for breach of her employment contract and attorneys' fees under the contract, which as discussed above, is limited to "actual damages proven." *JMD Holding Corp.*, 4 N.Y.3d at 380. Resolution of this claim also will be determined at a later time.

## III. Conclusion

For the reasons set forth above, the Clerk of Court is directed to enter partial summary judgment as follows:

1. Defendants' summary judgment motion regarding plaintiff's breach of contract claim is granted as to Landa and Philipson. Except for Prompt Nursing's counterclaim for breach of contract against the named plaintiff, which remains undecided, the rest of defendants' summary judgment motion is denied.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is granted against Prompt Nursing and Rubenstein. Damages to the plaintiff and the class caused by defendants' breach of contract are to be determined at a later time.

3. Plaintiffs' requested declaratory and injunctive relief is granted. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision in all plaintiffs' contracts, and the confessions of judgment, to be unenforceable and to enter an injunction permanently enjoining defendants from attempting or threatening to enforce either.

4. Plaintiffs' summary judgment motion as to liability on the TVPA claims is granted against all defendants. Damages to the plaintiff and the class under the TVPA are to be determined. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

5. The parties are directed to appear for a status conference on November 4, 2019, at 2:00 PM to address how damages are to be determined and to address Prompt Nursing's counterclaim for breach of contract as to the named plaintiff. The parties are further directed to promptly meet and confer on these issues and attempt to present a joint plan to the court. By October 17, 2019 the parties should submit written proposals to the court.

**SO ORDERED.**

/s/ *Nina Gershon*
**NINA GERSHON**
**United States District Judge**

Dated: September 23, 2019
      Brooklyn, New York